**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | Case No. 1:11-cv-11732 |
| Plaintiff, | Judge Denise J. Casper |
| v. | **ORAL ARGUMENT REQUESTED** |
| TEXAS ROADHOUSE, INC., TEXAS ROADHOUSE HOLDINGS LLC, and TEXAS ROADHOUSE MANAGEMENT CORP., d/b/a TEXAS ROADHOUSE, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO STRIKE THE REPORTS AND TESTIMONY OF DR. DAVID L. CRAWFORD**

28106985v.12

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

LEGAL STANDARD ............................................................................................3

ARGUMENT ..........................................................................................................5

I.    DR. CRAWFORD'S ANALYSES USING CENSUS DATA ARE NEITHER PROBATIVE NOR RELIABLE BECAUSE THE DATA DO NOT ACCURATELY REFLECT THE APPLICANT POOL AT TEXAS ROADHOUSE...................................5

    A.    The Census Data Are Not A Reliable Basis From Which To Estimate The Actual 40+ Applicants To Texas Roadhouse. ...................................................6

    B.    The Census Data Include Workers In An Overly Broad Range Of Food Service Establishments That Are Not Comparable To Texas Roadhouse. .........................8

    C.    The Census Data Do Not Include People Who Are New To The Job Market, Which Distorts Dr. Crawford's Analysis. ..........................................................10

    D.    The Census Data Are Incomplete. ...................................................................11

II.    DR. CRAWFORD'S CONCLUSIONS CANNOT ASSIST THE TRIER OF FACT IN DETERMINING WHETHER HUNDREDS OF HIRING MANAGERS FOLLOWED A PRACTICE OF INTENTIONALLY DISCRIMINATING AGAINST PERSONS AGE FORTY OR OLDER. ......................................................................................13

    A.    Even Accepting Dr. Crawford's Flawed Analysis At Face Value, The Wide Variation In His Results Is Inconsistent With A Standard Pattern Or Practice Of Age Discrimination. ............................................................................................13

    B.    Dr. Crawford's Aggregate Statistics Do Not Identify Any Cause Of The Alleged Hiring Discrepancies. ....................................................................................16

III.    THE COURT MUST DISREGARD DR. CRAWFORD'S SPECULATIVE STATEMENTS REGARDING THE EFFECT OF THE 2010 LETTER OF DETERMINATION AND SUBSEQUENT LAWSUIT, AND THE PURPORTED POST-OPENING "CHILLING" EFFECT. ....................................................................17

    A.    Dr. Crawford's Assertions Are Speculation And Should Be Stricken. ................17

    B.    The Court Should Strike Dr. Crawford's Speculation About "Chilling" Because It Was Made For The First Time On Reply. ...........................................................19

CONCLUSION.....................................................................................................20

28106985v.12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abram v. UPS of Am., Inc.*,
   200 F.R.D. 424 (E.D. Wis. 2001) .........................................................................15

*Anderson v. Douglas & Lomason Co.*,
   26 F.3d 1277 (5th Cir. 1994) ...............................................................................5

*Calisi v. Abbott Labs.*,
   No. CIV.A. 11-10671-DJC, 2013 WL 5441355 (D. Mass. Sept. 27, 2013) .....................3, 17

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ...........................................................................................1, 3

*EEOC v. Freeman*,
   778 F.3d 463 (4th Cir. 2015) ...............................................................................4

*Eng'g Contractors Ass'n of S. Fla v. Metro. Dade Cnty.*,
   122 F.3d 895 (11th Cir. 1997) .............................................................................15

*Griffin v. Gulfstream Aerospace Corp.*,
   No. CV401-97, 2004 WL 5518161 (S.D. Ga. Feb. 19, 2004) ............................................4, 10

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-cv-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ..................................19

*Int'l Brotherhood of Teamsters v. U.S.*,
   431 U.S. 324 (1977) ...........................................................................................13

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ...........................................................................................1, 3, 13

*Maga v. Hennessy Indus., Inc.*,
   No. 12–11423–FDS, 2014 WL 10051399 (D. Mass. Dec. 1, 2014) .................................4, 18

*Moore v. Boeing Co.*,
   No. 4:02CV80 CDP, 2004 WL 3202777 (E.D. Mo. Mar. 31, 2004) ....................................15

*Real View, LLC. v. 20-20 Techs., Inc.*,
   878 F. Supp. 2d 282 (D. Mass. 2012) ...................................................................4, 10

*Smith v. Jenkins*,
   732 F.3d 51 (1st Cir. 2013) .................................................................................3, 13

*United States v. Fairfax Cty., Va.*,
    629 F.2d 932 (4th Cir. 1980) ................................................................6

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................... 13, 15

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ................................................................4

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988) ................................................................17

*Wu v. Miss. State Univ.*,
    No. 1:13–CV–00002–DMB–DAS, 2014 WL 5799972
    (N.D. Miss. Nov. 7, 2014) ................................................................19

*Zibolis-Sekella v. Ruehrwein*,
    No. 12-CV-228-JD, 2013 WL 4042423 (D.N.H. Aug. 8, 2013) .......................................5, 18

**Other Authorities**

Federal Rule of Evidence 403 ...............................................................1-5, 12

Federal Rule of Evidence 702 ...............................................................*passim*

Federal Rule of Civil Procedure 26 ............................................................... 1, 3, 5, 19, 20

David H. Kaye & David A. Freedman, "Reference Guide on Statistics,"
    REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 83
    (Fed. Judicial Ctr. Ed., 2d ed. 2000) ...............................................................15

U.S. Census Bureau, Census 2010 Occupation Index, available at
    *http://www.census.gov/people/io/methodology/indexes.html* ................................................8

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Rules 403 and 702 of the

Federal Rules of Evidence, and the standards announced in *Daubert v. Merrell Dow Pharm.*,

*Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and subsequent

cases, Defendants Texas Roadhouse, Inc., Texas Roadhouse Holdings LLC, and Texas

Roadhouse Management Corp., d/b/a Texas Roadhouse (collectively, "Texas Roadhouse") move

to strike the expert reports and testimony of Dr. David L. Crawford, an expert designated by the

Equal Employment Opportunity Commission ("EEOC"), in whole or, in the alternative, in part,

as set forth below.

## INTRODUCTION

The EEOC relies heavily on Dr. Crawford's statistical analyses to support its claim of a

pattern or practice of intentional age discrimination in four front-of-the-house ("FOH") positions

(servers, server assistants, hosts and bartenders) across hundreds of Texas Roadhouse restaurants

over eight years.  Dr. Crawford concludes that the nationwide average hiring rate of applicants

age 40 and over ("40+") for these four positions is lower than expected given the applicant pool

for those positions, that this result is statistically significant, and therefore that it is unlikely to

have occurred by chance or purely random factors.

Dr. Crawford's analyses have been a moving target:  after submitting his affirmative

expert report, he recognized several errors and served an amended report with significant

changes to his calculations and opinions.  Dr. Crawford has since substantively amended his

reply report twice – even after his deposition and the close of expert discovery – with each

iteration setting forth new conclusions, analyses, and amended data sets.  After multiple revisions

and corrections, however, Dr. Crawford's conclusions still fall short of the minimal standards for

admissible evidence and should be excluded from this case for the following reasons.

*First*, Dr. Crawford relies on Census data relating to current employees in a wide range of non-comparable food service establishments as a "proxy" to estimate the percentage of 40+ applicants in the Texas Roadhouse applicant pool.  This application of Census data is unreliable because: (a) comparing the Census data to actual applicant flow data demonstrates that the Census data overestimate the number of 40+ individuals who applied for jobs at Texas Roadhouse by a multiple of five; (b) the Census data include a large group of jobs and establishments that are not comparable to the four FOH positions at Texas Roadhouse that are at issue in this case; (c) the Census data do not account for first-time job seekers, and (d) the Census data are no more complete than actual applicant flow data.  As a result, the use of Census data in any statistical analysis for this case renders the analysis neither probative nor admissible under Federal Rule of Evidence 702, and would also confuse and mislead the finder of fact in contravention of Rule 403.

*Second*, Dr. Crawford's opinions – even taken at face value – are based on averages from nationwide aggregate statistics that are not probative of the EEOC's theory of intentional age discrimination by hundreds of individual decision-makers acting in a common way.  Because these analyses do not support the EEOC's theory, cannot help a jury in determining any fact at issue in this litigation, and are more likely to mislead the trier of fact, they should be excluded in their entirety.

*Third*, Dr. Crawford offers nothing but speculation on key elements of his analysis, namely his assertions that (i) Texas Roadhouse's hiring rates may have improved during the relevant period because the EEOC sent a letter of determination in 2010 and filed this litigation in 2011, and (ii) that there could have been a "chilling effect" on 40+ FOH applicants after the opening of new restaurants.  In both instances, Dr. Crawford admittedly did not investigate any

2

facts or alternative causes and has not formed a professional opinion as to whether or not his conjectures are true.  As mere speculation, these assertions cannot assist a jury in understanding the evidence or in determining a fact at issue, and should therefore be excluded pursuant to Federal Rules of Evidence 702 and 403.  In addition, Dr. Crawford's theory regarding a "chilling effect" was articulated for the first time in his reply expert report in contravention of Fed. R. Civ. P. 26, and it should be disregarded for that reason as well.

For each of these reasons, Dr. Crawford's opinions fail the standards for admissibility and reliability in expert evidence and should be stricken.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"Federal Rule of Evidence 702 assigns to the district court 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Smith v. Jenkins*, 732 F.3d 51, 64 (1st Cir. 2013) (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993)).  Consistent with Rule 702, district courts serve an important gatekeeping function by conducting a rigorous analysis of both the relevance and reliability of proposed expert testimony before admitting or considering expert testimony for any purpose.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-52 (1999); *Calisi v. Abbott Labs.*, No. CIV.A. 11-10671-DJC, 2013 WL 5441355, at *5, *12 (D. Mass. Sept. 27, 2013) (Casper J.) (granting

3

motion to exclude expert evidence under Rule 702).  The EEOC has the burden of establishing

that Dr. Crawford's testimony satisfies these requirements.  *Id.*

      In particular, courts exclude expert opinions where those opinions rely on inaccurate data

or are premised on assumptions not based on fact.  *See, e.g., EEOC v. Freeman*, 778 F.3d 463,

466-69 (4th Cir. 2015).  Courts also strike expert testimony that is "too speculative to survive

scrutiny under Rule 702" and amounts to "mere conjecture."  *See Maga v. Hennessy Indus., Inc.,*

No. 12–11423–FDS, 2014 WL 10051399, at *9-10 (D. Mass. Dec. 1, 2014); *see also Real View,*

*LLC. v. 20-20 Techs., Inc.*, 878 F. Supp. 2d 282, 285-87 (D. Mass. 2012) (striking speculative

expert testimony and explaining that "trial judges may evaluate the data offered to support an

expert's bottom-line opinions to determine if that data provides adequate support to mark the

expert's testimony as reliable" (citation omitted) (internal quotation marks omitted)).  Courts

have also excluded expert testimony in employment discrimination cases where the expert relies

on general population data to represent the pool of potential employees.  *See EEOC v. Freeman,*

961 F. Supp. 2d 783, 789 (D. Md. 2013) ("The general population pool cannot be used as a

surrogate for the class of qualified job applicants, because it contains many persons who have not

(and would not) be applying for a job with Defendant") (quoting *Wards Cove Packing Co. v.*

*Atonio*, 490 U.S. 642, 653-54 (1989)); *see also Griffin v. Gulfstream Aerospace Corp.,* No.

CV401-97, 2004 WL 5518161, at *2-3 (S.D. Ga. Feb. 19, 2004) (striking expert analysis where

"it is difficult to discern how the … population identified by [plaintiff's expert] can be

legitimately compared to the [] workforce of defendant and yield applicable and probative

results").

      Not only must Dr. Crawford's testimony meet the relevance and reliability standards of

Rule 702, but also Rule 403's requirement that the probative value of the evidence outweigh the

danger of unfair prejudice and confusion of the issues.  *See* Fed. R. Evid. 403; *Zibolis-Sekella v. Ruehrwein,* No. 12-CV-228-JD, 2013 WL 4042423, at *3 (D.N.H. Aug. 8, 2013).  In addition, any expert opinion must meet the disclosure requirements of Federal Rule of Civil Procedure 26, including the requirement that an expert witness's opening report contain "a complete statement of all opinions the witness will express and the basis and reasons for them. "  Fed. R. Civ. P. 26(a)(2)(B).

## ARGUMENT

## I.    DR. CRAWFORD'S ANALYSES USING CENSUS DATA ARE NEITHER PROBATIVE NOR RELIABLE BECAUSE THE DATA DO NOT ACCURATELY REFLECT THE APPLICANT POOL AT TEXAS ROADHOUSE.

Courts agree that "[w]here plaintiffs use statistical evidence to challenge an employer's hiring practices, that evidence … must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market."  *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1286-87 (5th Cir. 1994) (citation omitted) (collecting cases).  Using data reflecting "[a]ctual applicant flow figures are the preferred method by which to measure an employer's hiring practices and performance."  *Id.* at 1287.

To support the EEOC's claims, Dr. Crawford analyzed three sets of data – or "benchmarks" – which he uses to establish the population of individuals who applied to the FOH jobs at issue in this case:  servers, server assistants, hosts and bartenders.  (App. 2, Crawford Am. Report ¶¶ 14-16, 28-37, 43-56.)  Two of Dr. Crawford's benchmarks use actual applicant flow data for Texas Roadhouse restaurants:  paper applications and electronic applications submitted through an online portal called Snag-A-Job ("Snag-A-Job data").  (*Id.* ¶¶ 32-37, 43-55.)  However, the third benchmark analyzed by Dr. Crawford is comprised of general labor force data obtained from the U.S. Bureau of the Census ("Census data").  (*Id.* ¶¶ 28-29.)  The Census

data contain information regarding existing workers in a broad collection of occupations in food and beverage service establishments of every type.  The Census data are not limited to particular kinds of businesses or employers, but rather include <u>all</u> workers identified as performing one of four occupational "codes": waiter/waitress, host/hostess, bartender, or "food preparation and serving related worker."  (*Id.* ¶ 29.)  Although this data is in no way tailored to the applicant pool for FOH positions at Texas Roadhouse restaurants, Dr. Crawford uses data from these overbroad occupational classifications as a "proxy" for the Texas Roadhouse applicant pool.  (*Id.* ¶¶ 28-31.) The Census data, however, are a wholly inappropriate substitute for the actual Texas Roadhouse applicant pool, and accordingly, each of Dr. Crawford's analyses based on Census data should be stricken.  *See United States v. Fairfax Cty., Va.*, 629 F.2d 932, 939-41 (4th Cir. 1980) (holding that actual applicant flow data are the proper measure of the relevant labor market for a particular employer, and finding that the district court erred in accepting generalized census data as a composite of the labor market).

> **A.     The Census Data Are Not A Reliable Basis From Which To Estimate The Actual 40+ Applicants To Texas Roadhouse.**

Because the data include only incumbent employees, the Census data vastly overestimate the number of applicants in the 40+ group and produce a highly unreliable estimate of the actual age distribution of the applicant pool in any year.  The inaccuracy of the Census data for Dr. Crawford's analyses is best demonstrated by comparing Dr. Crawford's actual applicant pool data for the year 2014 with Census data for that same period.  Starting in 2013, Texas Roadhouse began to phase out the use of paper applications, and to instead rely almost exclusively on the online Snag-A-Job portal ("Snag-A-Job").  (App. 1, Crawford Dep. 134.)  Consequently – and as Dr. Crawford admitted during his deposition – there is no reason to believe that Snag-A-Job data

for 2014 are in any way incomplete and there is no basis to substitute the Census benchmark as a proxy for the actual data for 2014.  (*Id.* 134-35.)

Using the complete, actual applicant flow data captured by Snag-A-Job for 2014, Dr. Crawford finds that 3.7% of the persons who applied to Texas Roadhouse for a FOH position were 40+.  (App. 6, Saad Report, Ex. 29.)  Using Census data for that same period, however, Dr. Crawford concludes that 18.5% of the applicants for FOH positions should be 40+.  (*Id.*, Ex. 30.) In other words, the Census data proxy applicant flow exceeds the proportion of 40+ applicants that actually applied for jobs in that year by a multiple of five (500%).  Further, because Dr. Crawford uses the 18.5% Census benchmark for each year of his analysis – not just 2014 – and the percentage of 40+ applicants in the paper applications and Snag-A-Job benchmarks only vary within a narrow range of a few percentage points from year to year, using Census data vastly overstates the proportion of 40+ applicants in all years, not just 2014.  (*Id.*, Exs. 28-30.)

Dr. Crawford recognizes the vast discrepancies in the age distribution of the data, but made no attempt to reconcile or investigate the differences:

> Q.    [T]he U.S. Census data for 2014 shows a percentage of over-forty in the applicant pool that is almost five times greater than the percentage of those folks actually represented in the 2014 SNAGAJOB applications which are complete; are you aware of that?
>
> A.    Yes, yes, I'm aware of that. ...
>
> Q.    You didn't investigate explanations for those differences, is that true?
>
> A.    No.

(App. 1, Crawford Dep. 136-37.)

But this over-estimation resulting from Census data is unsurprising.  To begin with, Census data are comprised of existing employees in a category of jobs as opposed to those who

7

are actually looking for a job.  (*Id.* 125-27.)  Workers generally apply for entry-level jobs at the beginning of their career and then become progressively older during their time in the work force.  Applicants for entry-level positions and incumbent employees therefore constitute entirely different populations when it comes to age distribution: the applicants for entry-level positions tend to be younger than incumbent employees.  Consequently, the age of persons currently working in the food service industry generally tells little about their age when they applied for their first job in an entry level position, which is the information that matters to an analysis of applicant flow.

> **B.** **The Census Data Include Workers In An Overly Broad Range Of Food Service Establishments That Are Not Comparable To Texas Roadhouse.**

The Census benchmark is also a flawed proxy for actual Texas Roadhouse applicants because it includes numerous non-comparable jobs in a wide range of food and beverage service establishments that are entirely different from the four FOH positions at issue.  Critically, the Census data include anyone currently employed at any business fitting within one of four broad occupational codes:  waiter/waitress, host/hostess, bartender, or "food preparation and serving related worker."  (App. 2, Crawford Am. Report ¶ 29.)  Each occupational code, in turn, covers numerous "occupation titles":  for example, waiter/waitress includes not only "car hop" and "deck steward," but also "sommelier."  (App. 9.[1])  Taking the four occupational codes together, they cover a sweeping range of jobs across the service spectrum, from "cafeteria worker" and

---

[1] Census 2010 Occupation Index, *available at* *http://www.census.gov/people/io/methodology/indexes.html*.  For the Court's convenience, an extract from the U.S. Census Bureau index with the relevant occupational codes are included in the appendix to this Motion.

"lunchroom aide," to "Maitre D'" and "dining room captain." (*Id.*) The Census data therefore include, on one end of the service spectrum, venues such as school cafeterias, diners and delis; and on the opposite end of the spectrum, expensive white tablecloth restaurants. (*Id.*; App. 1, Crawford Dep. 127-132.) The Census data also include, in contrast to Texas Roadhouse, restaurants that serve only breakfast and/or lunch, and establishments that serve alcohol and offer late night entertainment. (*Id.*) The variation in food service establishments yields not only variation in the expected guest experience, which dictates certain required skill sets and potential earnings, but also wide differences in the employee's own job expectations regarding hours, work schedules, and working conditions. Notably, Texas Roadhouse does not serve breakfast, and the majority of Texas Roadhouse restaurants do <u>not</u> serve lunch during the week, and Dr. Crawford acknowledges that "restaurants that serve lunch during the week hire more over-forty applicants than those that do not." (App. 1, Crawford Dep at 121.)[2]

The Census data are not tailored to include only casual dining restaurants that primarily serve dinner and are therefore comparable to Texas Roadhouse. Nevertheless, Dr. Crawford assumes, without any stated scientific or factual basis, that an experienced waiter or waitress at a five-star restaurant is as likely to apply to Texas Roadhouse as someone who works as a deck hand or in a school cafeteria. Dr. Crawford's analysis ignores the profound differences between establishments and the skill set, compensation expectations, and hours preferences of their employees, which are likely to differ by age and years of experience in the work force.

---

[2] Despite that acknowledgement – and notwithstanding that most Texas Roadhouse restaurants do not serve lunch – Dr. Crawford did not separately analyze restaurants that serve lunch from those that do not. (App. 1, Crawford Dep. 120.)

In sum, Dr. Crawford's unsupported assumption that unfiltered Census data may stand as a proxy for Texas Roadhouse applicant flow ignores reality, particularly where, as here, the Census estimates have been proven to grossly overstate the percentage of 40+ applicants when compared to actual applicant flow data. Accordingly, the Court should strike Dr. Crawford's opinions based on Census data, as opposed to actual applicant flow data. *See Real View*, 878 F. Supp. 2d at 286-87 (holding that benchmarks are improper under *Daubert* where they are not comparable to the facts at issue); *Griffin*, 2004 WL 5518161, at *2-3 (striking expert testimony in an employment discrimination case which used overbroad population data as a proxy for the applicant pool).

### C. The Census Data Do Not Include People Who Are New To The Job Market, Which Distorts Dr. Crawford's Analysis.

The Census data include only persons who <u>currently hold a job</u>, not those who are <u>looking for a job</u> but do not currently hold one (such as first-time job seekers or the unemployed). Dr. Crawford does not contest that a large number of applicants are thus omitted from the data. In fact, he concedes that the data "do not reflect anybody who's not employed." (App. 1, Crawford Dep. 125.)

By omitting the large group of job-seekers, Dr. Crawford ignores the undisputed fact that a large percentage of applicants to Texas Roadhouse restaurants are people who are newly entering the employment market. First-time employees, including students, are a large source of labor for entry level jobs such as the FOH positions at issue here, and the National Restaurant Association reports that one in three adults in the United States obtained their first work experience in a restaurant, a reality which Dr. Crawford concedes. (*Id.* 118, 122.) Dr. Crawford cannot dispute that the population of first-time job seekers naturally skews younger, the result being that the Census data disproportionately excludes a large population of job seekers who are

under the age of 40.  (App. 6, Saad Report ¶¶ 66, 73-74.)  Dr. Crawford has therefore omitted a

substantial portion of the applicant flow that his Census data is designed to proxy, and that

omission asymmetrically excludes a larger number of younger job seekers compared to older

persons, not in the work force, who may no longer be seeking employment or who may not be

seeking to re-enter the work force in the types of entry-level jobs offered by restaurants such as

Texas Roadhouse.  (App. 1, Crawford Dep. 126-27.)

> **D.** **The Census Data Are Incomplete.**

Dr. Crawford's rationale for using the Census data is that since some paper applications

are missing and electronic applications were not used for the entire time period, the applicant

flow data is incomplete and the Census data should be used instead.  (App. 4, Crawford Am.

Reply ¶¶ 10(e)-(h).)  However, this rationale is undermined by the fact that Dr. Crawford only

analyzed approximately 70,000 of over 350,000 paper applications produced in discovery,

suggesting that there were many more paper applications than were necessary for his analysis.

(App. 2, Crawford Am. Report ¶¶ 46, 49.)  Also, Dr. Crawford concedes that there is no basis for

favoring the Census benchmark for 2014 because the actual applicant flow data is complete for

that year.  (App. 1, Crawford Dep. 134-35.)[3]

---

[3] The parties' experts dispute whether, if a restaurant had an incomplete production of the total number of
its paper applications, the missing applications have any relationship to age.  Texas Roadhouse's expert,
Dr. Saad, opined that there was no reason to expect that the age composition of missing applications
would be different from the 350,000 applications produced in discovery.  (App. 6, Saad Report ¶¶ 52-55).
On the other hand, Dr. Crawford – who did not initially address this question – replied to Dr. Saad and
concluded the opposite.  (App. 3, Crawford Reply ¶¶ 54-60; App. 4, Crawford Am. Reply ¶¶ 54-60; App.
5, Crawford Revised Am. Reply ¶¶ 54-60.)  Dr. Saad subsequently demonstrated that Dr. Crawford's
conclusions were based on false assumptions, which when corrected lead to the opposite result.  (App. 7,
Saad Sur-Reply ¶¶ 2-18.)  Additionally, Dr. Saad showed that the missing applications could not
conceivably change the application pool to equal the Census benchmark.  (*Id.* ¶¶ 19-20.)  In any event, for
the purposes of this motion, the Court need not enter this fray.  The disagreement on this issue does not

In any event, Dr. Crawford's suggestion that the Census is a superior benchmark is also undercut by the fact that the Census data itself is incomplete.  As explained in Dr. Crawford's report, the Census data provide the age distribution for workers in particular geographic regions called "Core Based Statistical Areas" ("CBSAs").  Dr. Crawford's analysis attempted to match each Texas Roadhouse restaurant with a CBSA, but was unable to do so for 28 restaurants, which is 7% of the total population.  (App. 2, Crawford Am. Report ¶¶ 28-30.)  Dr. Crawford speculates – again without investigation or analytical bases – that this missing data would make no difference in his results, but he has no empirical basis for that assumption.  (App. 1, Crawford Dep. 142-43.)  The Census data are no more "complete" than the actual applicant data; and, moreover, the Census data are proven to be highly unreliable when compared to applicant flow data in 2014 that are concededly complete.

In sum, Dr. Crawford cannot reliably base any conclusions on Census data because (i) that data as a proxy for actual applicant flow is demonstrably inflated; (ii) it is contaminated by data for jobs that are not remotely comparable to the FOH jobs offered by Texas Roadhouse; (iii) it excludes a large population of job-seekers who would reduce the average age of a proper benchmark; and (iv) it is no more "complete" than either of the other two actual benchmarks.  Dr. Crawford's opinions relying on a Census "proxy" for actual job seekers for the positions in question thus do not meet the standards of Rule 702 or Rule 403 and should be stricken.

---

provide Dr. Crawford license to use a defective Census benchmark that has been shown to wildly overstate the percentage of 40+ applicants and which, itself, is incomplete.

II.   **DR. CRAWFORD'S CONCLUSIONS CANNOT ASSIST THE TRIER OF FACT IN DETERMINING WHETHER HUNDREDS OF HIRING MANAGERS FOLLOWED A PRACTICE OF INTENTIONALLY DISCRIMINATING AGAINST PERSONS AGE FORTY OR OLDER.**

Courts must exercise their gatekeeping function to exclude expert findings that do not assist the trier of fact in understanding the evidence or in determining a fact at issue.  *Kumho Tire*, 526 U.S. at 149; *Smith*, 732 F.3d at 64.  Here, the EEOC alleges that "Texas Roadhouse has engaged in a pattern or practice of age discrimination, engineered at the Company's highest levels and carried out at its restaurants nation-wide."  (Dkt. 183 at 2.)  To succeed on its claim, the EEOC must, at a minimum, (i) prove that routine and purposeful age discrimination was Texas Roadhouse's nationwide "standard operating procedure, the regular rather than the unusual practice," *Int'l Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 336 (1977), and (ii) prove that Texas Roadhouse's 40+ applicants were subject to a single, shared discriminatory environment, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352-53 (2011).  The legal foundation for a pattern or practice claim is addressed in more detail in Defendants' contemporaneous Motion for Summary Judgment.

A.   **Even Accepting Dr. Crawford's Flawed Analysis At Face Value, The Wide Variation In His Results Is Inconsistent With A Standard Pattern Or Practice Of Age Discrimination.**

Managing Partners are independent operators with primary responsibility for a single restaurant location.  (App. 10, Beckel Dep. 24.)  Texas Roadhouse delegates the authority to hire restaurant-level employees to the Managing Partners, who are free to apply their own judgment – subject to the Non-Discrimination Policies promulgated by Texas Roadhouse.  (*See generally*

Collective Managing Partner Decs.[4])  Dr. Crawford concedes that the different Managing

Partners at each restaurant use different criteria for hiring (App. 1, Crawford Dep. 108), and he

further admits that his analyses tell us nothing about the hiring decisions of any specific

Managing Partner or at any particular restaurant in any given year:

> Q.    So as not to lose the forest for the trees here, wouldn't it be fair to
> say, Dr. Crawford, that looking at your statistical analysis of all
> restaurants combined using the M-H procedure, we cannot tell
> whether or not the hiring decisions of any specific managing
> partner at any location are age neutral or not; that's true, isn't it?
>
> A.    Yeah, that's not what I was testing.
>
> *        *        *
>
> Q.    So the combined results in your report do not provide us with any
> evidence as to whether or not there were age-neutral hiring
> decisions made by specific individual [Managing Partners] at their
> store in any given year?
>
> [objection]
>
> A.    That's correct.

(*Id.* 91-92; 101.)  Further, Dr. Crawford acknowledges that his results may change from year to

year for any individual restaurant, and also between positions at a single restaurant.  (*Id.* 101-

102.)

It is therefore not surprising that Dr. Crawford's underlying statistics reflect wide

variation among restaurants that is utterly inconsistent with a pattern or practice of intentional

age discrimination.  (App. 6, Saad Report ¶¶ 18-42; App. 8, Saad Dec. ¶¶ 3-11, Exs. A-G.)  His

opinions are irrelevant to the EEOC's claim because they are the result of averaging results

across restaurants nationwide, and hide meaningful underlying variation between different

restaurants, different Managing Partners, different positions, and different years.  As Dr.

---

[4] Filed with the Appendix to Defendants' Rule 56.1 Statement of Material Facts.

Crawford agreed during his deposition: "averages may conceal substantial variation in the magnitudes of the relative risks among subgroups."  (*Id.* 91.)[5]

Moreover, Dr. Crawford provides no justification for aggregating hiring data across hundreds of Texas Roadhouse restaurants nationwide.  (*Id.* 70-71, 108.)  Without a uniform policy or uniform decision-maker(s) across restaurants, Dr. Crawford's analysis of aggregated data has no foundation.  *See Wal-Mart Stores*, 564 U.S. at 356-57 (explaining that where there is no specific employment practice implemented across locations, statistical disparities based on aggregate nationwide data fail to demonstrate the existence of discrimination); *Moore v. Boeing Co.*, No. 4:02CV80 CDP, 2004 WL 3202777, at *13 (E.D. Mo. Mar. 31, 2004) ("When the decision-making processes and the criteria used vary from one job group to the next, it is difficult to see how the aggregation of these decisions is useful.")[6]

In short, Dr. Crawford's opinions based on nationwide averages conceal the very different outcomes at the decision-maker levels that vary from restaurant to restaurant, year to year, and even by position.  His opinions therefore cannot assist the trier of fact in determining if individual decision-makers intentionally discriminated so pervasively as to constitute a pattern or practice of discrimination.  More likely, they will mislead or confuse a lay trier of fact, by

---

[5] *See, e.g., Abram v. UPS of Am., Inc.,* 200 F.R.D. 424, 431 (E.D. Wis. 2001) (noting the pitfalls in drawing conclusions based on averages by citing the parable of Bill Gates meeting in a room with nine monks: on average the people in the room are extremely wealthy, but in reality, 90% of them have taken a vow of poverty).

[6] Aggregating data from heterogeneous sources can distort patterns in the data, a phenomenon known as "Simpson's Paradox."  David H. Kaye & David A. Freedman, "*Reference Guide on Statistics,*" REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 83, 108-10, n. 92 (Fed. Judicial Ctr. Ed., 2d ed. 2000) (demonstrating how improper aggregation can distort patterns in the data); *Eng'g Contractors Ass'n of S. Fla v. Metro. Dade Cnty.*, 122 F.3d 895, 919 n.4 (11th Cir. 1997) ("the aggregation of [] statistics for nonheterogenous data populations can give rise to a statistical phenomenon known as 'Simpson's Paradox,' which leads to illusory disparities in improperly aggregated data that disappear when the data are disaggregated").

purporting to bear a probative weight they cannot logically claim.  Since his expert reports and testimony cannot assist the trier of fact in this litigation, the Court should strike and exclude them.

### B.  Dr. Crawford's Aggregate Statistics Do Not Identify Any Cause Of The Alleged Hiring Discrepancies.

Even accepting Dr. Crawford's findings for the purposes of argument, his reports and testimony make no attempt to investigate the cause of the alleged hiring discrepancies or to analyze any theory advanced by the EEOC as to what factors allegedly brought about this difference in hiring.  Indeed, Dr. Crawford admitted during his deposition that he was not provided information regarding the reasons for the hiring of applicants for any given restaurant (App. 1, Crawford Dep. 54), making it impossible for him to develop an understanding as to why certain applicants were hired and others were not.  Dr. Crawford further testified that his statistical methodology did not prove any theory of causation, that he had no basis to form an opinion regarding causation, and that he could not identify any specific employment practice or policy that might have caused the hiring rates that he observed.  (*Id.* 69-71.)

In other words, Dr. Crawford opines only on the <u>average</u> hiring difference based on nationwide aggregate statistics without any theory of causation identified by him or by the EEOC that is put to the test by his analysis.[7]  But average statistical disparities alone cannot support a finding of discrimination, much less <u>intentional</u> age discrimination as alleged in this suit.  The

---

[7] Dr. Crawford claimed in his amended reply report that "I did not present any aggregated or averaged results."  (App. 4, Crawford Am. Reply ¶ 10(b).)  But during his deposition testimony, Dr. Crawford admitted that the procedure he used to analyze paper applications and Snag-A-Job data – called the "Mantel Haenszel technique" – utilizes a "weighted average" of restaurant-level results thereby entirely undermining his claim.  (App. 1, Crawford Dep. 80-81.)  Additionally, his conclusions based on Census data combined all restaurant-level observations.  (*Id.* 92.)

Supreme Court instructs:  "It is completely unrealistic to assume that unlawful discrimination is the sole cause of people failing to gravitate to jobs and employers in accord with the laws of chance…[or] to suppose that employers can eliminate, or discover and explain, the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992 (1988) (citation omitted).

**III.   THE COURT MUST DISREGARD DR. CRAWFORD'S SPECULATIVE STATEMENTS REGARDING THE EFFECT OF THE 2010 LETTER OF DETERMINATION AND SUBSEQUENT LAWSUIT, AND THE PURPORTED POST-OPENING "CHILLING" EFFECT.**

Dr. Crawford states that he does not provide any opinion regarding the cause of purported hiring discrepancies on the basis of age, and yet he speculates – without actually concluding – that his results are "consistent" with certain hypothetical possibilities relating to the effect of the EEOC's 2010 letter of determination and filing of this litigation in 2011, and the possible "chilling effect" on hiring at new restaurants.  His assertions of what "might have" or "could have" happened are pure speculation, not expert opinion, and they are likely to mislead, not inform, the trier of fact.

**A.   Dr. Crawford's Assertions Are Speculation And Should Be Stricken.**

Dr. Crawford's report includes assertions that are unreliable conjecture, not based on "sufficient facts or data" and unlikely to assist a trier of fact.  These assertions should be excluded by this Court. *Calisi*, 2013 WL 5441355, at *12.

*First*, Dr. Crawford stated that his certain of his results "are consistent" with the notion that Texas Roadhouse's hiring rates improved during the relevant period because the EEOC sent a letter of determination in 2010 and filed this litigation in 2011.  (App. 2, Crawford Am. Report ¶¶ 25-26, 62, 66, 69, 72, 78, 83, 86, 92, 96, 101.)  In other words, increases in 40+ hiring after

17

these two events somehow demonstrates that Texas Roadhouse maintained a prior practice of intentional age discrimination. But when pressed during his deposition, Dr. Crawford plainly testified that he did not investigate the reasons for hiring decisions, his statistical analysis implied no theory of causation, and that he was not offering any opinion as to what was, in fact, the cause of an increase in 40+ hires:

> Q:   You referred to the hiring rates over time as consistent with the hypothesis, your phrase, that Texas Roadhouse increased its effort to hire older workers after the EEOC[']s letter of determination in 2010?
>
> A.   Right.
>
> Q:   Directing your attention to that hypothesis, you have not come to a professional opinion as to whether the hypothesis is true, only that your statistical findings are consistent with it, isn't that right?
>
> A.   Yeah, I have not proven and don't claim to have proven that the changes before and after the letter were caused by the letter.

(App. 1, Crawford Dep. 73, 54, 69-71.) Dr. Crawford admitted that he did not know whether the individuals responsible for FOH hiring at the various restaurants were even aware of the 2010 letter. (*Id.* 72.) Similarly, Dr. Crawford's assertion that the filing of this case in 2011 might have led to an increase in 40+ hiring is pure speculation without investigation or statistical analysis.

Courts in the First Circuit strike speculative opinions unsupported by sufficient facts, and the Court should do so here. As explained by one district court, "[a] court may choose to exclude an expert's opinion when it is based on conjecture or speculation from an insufficient evidentiary foundation." *Maga*, 2014 WL 10051399, at *10 (excluding speculative expert testimony); *Zibolis-Sekella*, 2013 WL 4042423, at *3 (excluding "opinions about causation [] based on mere possibilities and speculation"). Moreover, Dr. Crawford's speculation that changes in the applicant pool <u>might</u> have occurred due to certain events is more likely to mislead

the trier of fact than assist.  S*ee* 6 Jones on Evidence § 42:32 (7th ed.) ("[F]or an expert to testify

that … certain events or substances 'might' or 'could' have caused a specified result, are of little

help to a fact-finder and therefore should be excluded."); *Wu v. Miss. State Univ.*, No. 1:13–CV–

00002–DMB–DAS, 2014 WL 5799972, at *12 (N.D. Miss. Nov. 7, 2014), *aff'd sub nom.* 626 F.

App'x 535 (5th Cir. 2015) (rejecting expert opinion that it was "not improbable" that "some"

students were impacted by their professor's speech).

  *Second*, Dr. Crawford asserts that his results are "consistent with post-opening chilling of

applications from people who were 40 and older."  (App. 3, Crawford Reply ¶ 61; App. 4,

Crawford Am. Reply ¶ 61; App. 5, Crawford Revised Am. Reply ¶ 61.)  But similar to his

testimony regarding the effect of the letter of determination, Dr. Crawford admits that he was

only speaking hypothetically and has not formed any professional opinion that the circumstances

surrounding a restaurant opening caused a decrease in applications from 40+ individuals.  (App.

1, Crawford Dep. 74-75.)  Dr. Crawford further admitted that a decline in 40+ applications could

have occurred for a variety of reasons, including external economic factors.  (*Id.* 79.)  Dr.

Crawford's assertion is unsupported by any empirical investigation and will not assist the trier of

fact, and must be stricken on that basis.

  **B.**  **The Court Should Strike Dr. Crawford's Speculation About**
     **"Chilling" Because It Was Made For The First Time On**
     **Reply.**

  Dr. Crawford's assertion that certain of his results are "consistent with post-opening

chilling of applications" was also articulated for the first time in his reply report, rendering the

opinion untimely under Rule 26.  Fed. R. Civ. P. 26(a)(2)(D).  Courts exclude expert opinions

where, as here, they are articulated for the first time in a reply report and do not directly respond

to a criticism leveled by the opposing expert.  *See, e.g., In re High-Tech Emp. Antitrust Litig.*,

No. 11-cv-02509-LHK, 2014 WL 1351040, at *12 (N.D. Cal. Apr. 4, 2014) ("In sum, because

Plaintiffs waited until after Defendants had filed their last expert report for [Plaintiffs' expert] to offer a new theory, Plaintiffs have violated Rule 26(a)(2)(B)'s requirement that an expert witness's opening report contain 'a complete statement of all opinions the witness will express and the basis and reasons for them' together with 'the facts or data considered by the witness in forming them.' Fed. R. Civ. P. 26(a)(2)(B)(i)–(iii).  Plaintiffs will not be allowed to 'sandbag' Defendants with new analysis that should have been included at the very least in [Plaintiffs' expert's] opening merits report.").

Dr. Crawford admitted that his "chilling" observation was not included in his affirmative expert report (App. 1, Crawford Dep. 74), and since Dr. Saad's rebuttal report says nothing about the percentage of applications from 40+ individuals before and after the opening of a restaurant, Dr. Crawford's new observation cannot be a rebuttal to any critique leveled by Dr. Saad.  (*See generally* App. 6, Saad Report.)  For this reason alone, the Court should strike Dr. Crawford's belated "chilling" opinion.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion to strike Dr. Crawford's reports and testimony in whole or in part.


Dated: August 1, 2016                               Respectfully submitted,

                                                    SEYFARTH SHAW LLP


                                                    By:   /s/Christopher J. DeGroff
                                                          By One of Its Attorneys

Christopher J. DeGroff*
Rebecca P. DeGroff*
Jason Priebe*
Gerald L. Maatman, Jr.*
131 South Dearborn Street, Suite 2400
Chicago, IL 60603
Phone: (312) 460-5000
Fax: (312) 460-7000
cdegroff@seyfarth.com
rdegroff@seyfarth.com
jpriebe@seyfarth.com
gmaatman@seyfarth.com


Daniel B. Klein
Michael D. Fleischer
2 Seaport Lane, Suite 300
Boston, MA 02210
Phone: (617) 946-4840
Fax: (617) 690-6728
dklein@seyfarth.com
mfleischer@seyfarth.com

David B. Ross*
620 Eighth Avenue, 32nd Floor
New York, NY 10019
Phone: (212) 218-5500
Fax: (212) 218-5526
dross@seyfarth.com

*Admitted *pro hac vice*

*Attorneys for Defendants Texas Roadhouse, Inc.,
Texas Roadhouse Holdings LLC, and Texas
Roadhouse Management Corp. d/b/a Texas
Roadhouse*

21

## CERTIFICATE OF SERVICE

I, Christopher J. DeGroff, an attorney, do hereby certify that, on this 1st day of August, 2016, I have caused a true and correct copy of the foregoing DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO STRIKE THE REPORTS AND TESTIMONY OF DR. DAVID L. CRAWFORD to be filed with the Clerk of the Court using the CM/ECF system, which will send notification to the following:

**Markus L. Penzel**
Equal Employment Opportunity Commission
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203-0506
Ph: 617-565-3193
Fax: 617-565-3196
Email: markus.penzel@eeoc.gov

**Robert D. Rose**
Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, NY 10027
Ph: 212-336-3708
Email: robert.rose@eeoc.gov

**Sara E. Smolik**
Equal Employment Opportunity Commission
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203-0506
Ph: 617-565-3207
Fax: 617-565-3196
Email: sara.smolik@eeoc.gov

**Raechel L. Adams**
Equal Employment Opportunity Commission
33 Whitehall Street
5th Floor
New York, NY 11217
Ph: 212-336-3707
Fax: 212-336-3623
Email: raechel.adams@eeoc.gov

**Ami Sanghvi**
Equal Employment Opportunity Commission
Philip Burton Federal Building, 5th Floor West
450 Golden Gate Avenue, POB 36025
San Francisco, CA 94102
Ph: 415-522-3071
Fax: 415-522-3425
Email: ami.sanghvi@eeoc.gov

      /s/ Christopher J. DeGroff

28106985v.12