UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TEXAS ROADHOUSE, INC., TEXAS ROADHOUSE HOLDINGS LLC, and TEXAS ROADHOUSE MANAGEMENT CORP., d/b/a TEXAS ROADHOUSE,<br><br>Defendants. | ) | Civil Action No. 1:11-cv-11732 |

**EXPERT REPORT OF ALI SAAD, Ph.D.**

**ASSIGNMENT**

1. I was retained by counsel for defendant Texas Roadhouse, Inc. ("TXRH") to respond to the expert report offered by Dr. David Crawford on behalf of the EEOC in the case of *EEOC v. Texas Roadhouse, Inc*. The EEOC has alleged that the company engaged in intentional age discrimination in the hiring of "front of the house" (FOH) employees. I was provided with TXRH's electronic human resources data, electronic and paper applicant flow information, and other information to assess Dr. Crawford's analysis supporting plaintiffs' allegations. Dr. Crawford submitted his report on February 19, 2016. I received Dr. Crawford's back-up materials gradually over the period between February 22 and March 29, 2016. My report responds to the analyses and opinions summarized in his report and associated backup materials. I may supplement this report at a later date if additional relevant information is made available to me, and if Dr. Crawford expresses any new opinions at his deposition, which will be taken after this report is filed. I have also reviewed depositions, declarations and various other company documents provided to me by Counsel, which are detailed below.

**QUALIFICATIONS**

2. I am the Managing Partner of Resolution Economics LLC, a firm whose activities include performing economic and statistical analyses in connection with litigation and other consulting matters. Before beginning my consulting career I was in academia as a member of the faculty of the economics and finance department at Baruch College of The City University of New York. While there I taught labor economics, micro and macroeconomics, econometrics, and economic history. In connection with my consulting, I have extensive experience providing statistical and economic analyses in connection with class action employment cases, including employment discrimination and wage and hour matters, and I have also published and lectured on these topics. A particular focus of my work has been in statistical analysis related to claims of systemic age discrimination, and I have written and spoken on this topic. I also have significant experience in analyzing complex data for the purpose of assisting counsel in evaluating class

certification and liability. I hold a Ph.D. in Economics from The University of Chicago, and a B.A. degree in History and Economics from The University of Pennsylvania. I have been qualified as an expert witness in both Federal and State Courts. My resume, including all publications and testimony over the past four years, is attached to this report as Attachment A. My firm bills for my services rendered at a rate of $650 per hour.

**DATA AND DOCUMENTS RELIED UPON**

3. I was provided by Counsel with databases, depositions, declarations, and other documents. In addition, I collected Census and other publicly available data, and relied on selected additional secondary materials. The materials I reviewed and relied upon for my analysis and opinions are listed in Attachment B.

**INTRODUCTION**

4. It is my understanding that the EEOC alleges that there is a "pattern or practice" of hiring discrimination against persons 40 years of age and above ("40+") into front of house jobs ("FOH") at TXRH. In support of their claim, the EEOC offers Dr. Crawford's report. Dr. Crawford performs a number of statistical analyses, all essentially using a similar approach. He uses several benchmarks for the expected rate of hiring, and compares, store by store and by job the actual to the expected numbers of hires based on those benchmarks, and then presents aggregated findings which are based essentially on an average of the results for all stores combined. He performs many very similar analyses, depending on the hiring benchmark used, the position applied to, and the subset of years considered, and in virtually all instances, he concludes with a statement such as the following: "If hiring of all FOH personnel were age neutral, the probability of obtaining [the] results shown by the data would be an extremely small number which would be the equivalent of more than 7 standard deviations…."[1] All of his

[1] See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, page 47, paragraph 81.

conclusions relate to the averaged result across stores, based on aggregations across all of the store years considered in each of his analyses. However, while he analyzes the data at each store in order to arrive at his aggregated bottom line opinions, where store is the decision making level, and displays this information in his various charts and tables, he does not report on the specific store by store results in his written opinion. Instead, he just presents the bottom line findings of the aggregated store by store analyses in several different ways, and opines on these alone.

5. There are many conceptual and analytical problems with Dr. Crawford's approach However, even if we take Dr. Crawford's results at face value, there is wide variation shown in the hiring outcomes on a store by store and year by year level, which is masked by only looking at his bottom line results. This wide variation, from a statistical perspective, does not support the allegation of a consistent or common pattern adverse to applicants aged 40+ across TXRH. In addition, I demonstrate below that once the flaws in Dr. Crawford's data handling and analytical approach are corrected, there continue to be wide variations in hiring outcomes. Therefore, to implicitly represent, as Dr. Crawford has done, that his bottom line findings are consistent with a hypothesis that TXRH maintains some sort of commonly applied intentional company practice that is adverse to 40+ applicants in hiring, is inappropriate. His bottom line findings do not tell us if this is an appropriate inference – they simply reflect an aggregated average.

6. Nevertheless, to respond to Dr. Crawford's aggregated analyses, I have also conducted an aggregated analysis of hiring at TXRH. In the analysis I perform, I correct a number of errors made by Dr. Crawford, and I also apply a missing statistical control that refines the percentage availability of applicants in the age categories under 40 and 40+. My hiring analysis demonstrates that there is no statistical evidence of a shortfall in the hiring of 40+ applicants, even when the store by store results are aggregated to a bottom line result. I have also conducted additional analyses concerning the outcome of other employment practices for 40+ employees, none of which support a conclusion that TXRH's employment practices point to systemic age discrimination.

## SUMMARY OF FINDINGS

7. The claims in this case cover the period from 2007 through the present, but the discovery period in this case runs from 2007 to 2014. TXRH had 224 stores at the beginning of the period, and had 396 stores by the end of the discovery period. Applicant flow information is found in two basic sources: hard-copy paper applications covering the period 2007 through a portion of 2013, with much smaller numbers thereafter, and electronic applications covering the period from mid-2013 through 2014, and in much smaller numbers over the period from 2007 through mid-2013. This information was combined with the TXRH information on hires and other information gathered for the analysis I conducted to reach the following series of conclusions.

- Based on Dr. Crawford's own results, there are wide variations in hiring outcomes for 40+ applicants across stores at TXRH. This variation is inconsistent from a statistical perspective with the hypothesis that the standard operating procedure across TXRH store locations is to treat applicants aged 40 and above (40+) adversely relative to younger applicants.

- Reporting only the aggregated and averaged set of results for all store years hides meaningful underlying variation.

- The range of standard deviations store by store relative to the median store is extremely wide – up to 40 standard deviations in the case of Dr. Crawford's Census based analysis.

- Dr. Crawford fails to perform any analysis designed to systematically compare or reconcile the different hiring benchmarks he uses in his hiring analyses.

- Dr. Crawford implies that the TXRH applicant flow data is highly incomplete. He provides no analysis to support this assertion. The SAJ data are essentially complete starting in 2013 through 2014, which is the period when the company actually used the SAJ. There are almost 350,000 unsuccessful paper applications, and approximately 140,000 implicit successful paper applications mostly over the period 2007-2012, which is a more than sufficient number for conducting hiring analysis.

- Dr. Crawford fails to consider that SAJ was not used until 2013, and paper applications were essentially phased out once SAJ came into full use by TXRH.

- Dr. Crawford's alleged or implied "incompleteness" of SAJ and paper applications over the entire period is primarily because neither was in use during the entire discovery period, yet they are either very complete in the case of SAJ for the period of time during which SAJ was

used, or sufficiently complete in the case of the paper applications for the period of time during which paper applications were in primary use.

- Dr. Crawford considered a representative sample of approximately 70,000 paper applications adequate for his study, which is inconsistent with his implication that the 350,000 plus paper applications are "incomplete" simply because certain stores have been unable to locate applications for certain periods.

- Dr. Crawford performs no analyses to assess whether the "missing" paper applications create biases in his measures of 40+ availability for hire, but his statements imply that the missing paper applications must or might be biased, which is one of the reasons he claims that the Census benchmarks he computes should be used.

- There is no downward bias in the applicant flow benchmarks based on the paper applications. In fact, analysis demonstrates that there is no relationship between the volume of paper applications provided during discovery at a per-store level and the age distribution of applicants at the store level. Thus, it appears that the 350,000 paper applications that were retained are representative of whatever the complete population would be were all paper applications available for all stores for all periods of time during which TXRH relied upon paper applications for its hiring.

- Dr. Crawford states that "The result [of tests on the SAJ data] does not, however, mean that there is no need to consider data from the U.S. Census because the Census data will support more powerful statistical tests." A footnote to this sentence goes on to state "Generally, larger samples yield more powerful tests, which is why one should use the Census data even if the paper application data is expected to support unbiased tests."[2] This is mistaken. One should never select a benchmark simply because there is more data. More data that is not the appropriate data simply produces a stronger mistaken conclusion. Furthermore, since the Census benchmark percentages of 40+ applicants are four to five times larger than the paper applicant percentages, it would be impossible for both benchmarks in Dr. Crawford's analysis to be "unbiased." If one is unbiased, the other must be biased.

- Dr. Crawford uses outdated external labor market data that are only available in highly aggregated summary tabular form, which limits the types of comparisons he can make and prevents construction of a correct relevant external labor market benchmark for hiring at TXRH. Furthermore, his analysis of these data contains mistakes.

- Dr. Crawford's Census benchmarks dramatically overstate the true availability of workers 40+ for jobs at TXRH.

- For analyses of the type required in this case, aggregated summary level Census data are inappropriate, since they do not permit an accurate focus on the most applicable relevant external labor market.

---

[2] See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, page 14, paragraph 41.

- Individual level "microdata" are preferred by labor economists for external labor market analyses, since they can be tailored to fit the specifics of a particular employer.

- A major omission from Dr. Crawford's Census availability pool is students, who are widely reported to be a substantial source of labor force availability for entry level restaurant work.

- When the appropriate micro level Census data are used and Dr. Crawford's analyses are corrected for his various mistakes, the Census benchmark numbers are in line with the benchmarks derived from the TXRH applicant flow data.

- Dr. Crawford's approach does not point to any factors that could cause the aggregated bottom line findings he reports – there are no explanatory or causal variables in any of his statistical models, and there are no statistical tests of any particular practice designed to demonstrate that such a practice impacts or treats applicants 40+ differently from applicants under the age of 40.

- Dr. Crawford's bottom line aggregated conclusions do not take into account important job-related factors that influence the probability of hire.

- Specifically, Dr. Crawford fails to control statistically for the well-known effect sometimes referred to as "duration dependence."

- If the store by store hiring analyses are aggregated, and a statistical analysis is performed by taking duration dependence into account, there is no shortfall in the hiring of 40+ applicants when compared to appropriately adjusted hiring benchmarks constructed from the actual applicant flow data provided by TXRH.

- Since Dr. Crawford does not adjust his applicant flow benchmarks for duration dependence, his applicant flow benchmarks are artificially higher than they should be. This has the effect of increasing the shortfalls and statistical significance of Dr. Crawford's results.

- Analyses of other employment practices at TXRH are inconsistent with Dr. Crawford's inference of systemic unfavorable treatment of those employees 40+. 40+ employees received statistically significantly more promotions than those under age 40. 40+ employees were also more likely to be still working at TXRH at the end of the period studied, and received higher starting pay than their younger counterparts.

- Dr. Crawford's backup materials are incomplete, and contain multiple internal consistency errors and in some instances do not allow a complete replication of his work. What materials were produced were provided sporadically over time in response to numerous requests for their production. Certain productions were inconsistent with earlier productions, and the process was chaotic at best.

**OVERVIEW**

8. Dr. Crawford's work is fundamentally flawed in a number of ways. The flaws are both conceptual as well as technical. I will begin with the conceptual issues. From the most general perspective, Dr. Crawford has not provided in his report anything that addresses from a statistical perspective whether or not there exists a "pattern or practice" of intentional age discrimination with regard to the claims in the case. To determine if there is a pattern or practice, it is necessary to examine statistical outcomes at a decision maker level, to see if there is a broad statistical pattern of consistency. Instead, Dr. Crawford delivers aggregated findings, based alternatively on three sets of benchmarks: external labor market, TXRH paper applications, and electronic applications. He never considers these applicant benchmarks together, or reconciles them. As an example of Dr. Crawford's bottom line approach, he analyzes hiring relative to external labor market benchmarks, and obtains a benchmark for each store for each year.[3] He then conducts his statistical analysis on a store by store level, but aggregates all of the store level findings, and reports the aggregate statistical result based on the average store findings. He does not discuss the store level findings, even though they are present in his backup materials, except to use the store level findings to conduct another type of aggregated bottom line analysis. If one examines Dr. Crawford's backup materials, one finds wide variation in the nature of the hiring patterns across the hundreds of TXRH stores. Similarly, for his analyses comparing hires to benchmarks based on either the paper applications submitted by applicants, or the applicants coming through the electronic online portal, referred to as "Snag-a-Job" ("SAJ"), Dr. Crawford uses an analytical method focused at the store level, yet never specifically discusses the store by store level results, choosing instead to focus on several types of bottom line aggregated findings. If he had examined his own store level statistical findings, he would have seen wide variations in hiring

[3] In fact, Dr. Crawford has only one Census benchmark per job which he uses for all years from 2007 through 2014. This is due to his reliance on pre-processed tabular Census data for the years 2006-2010. As will be discussed in detail below, there is no reason to impose this restriction, as individual-level Census data are available for all years through 2014.

outcomes between stores. These types of findings are inconsistent with the statistical notion of a common "pattern or practice."

9. There are flaws in each of Dr. Crawford's three hiring analyses, the most egregious of which are related to his use of external labor market benchmarks. An external labor market benchmark would typically only be used in a hiring context if the company in question either had limited or no applicant flow data, or the applicant flow data they had was determined to be somehow deficient. Dr. Crawford alludes to the latter as his reason for considering an external labor market benchmark, but does not demonstrate why the TXRH applicant flow data are purportedly deficient. One important reason labor economists prefer specific employer application flow is that Census data do not adequately proxy for job interest *to that employer*.[4, 5] Only interest in the occupation is captured. But clearly within any industry, there are wide differences in the non-monetary characteristics of different employers. Indeed, scattered throughout the 245 declarations submitted by TXRH are references to this issue, as many declarations highlight their interest in TXRH over other companies. Jason Abbott stated in his declaration that the previous restaurant he worked at "was not very busy" and that he applied at TXRH because he "had also been a guest at TXRH and knew the restaurant was busy." Heidi Estes liked that TXRH "was not open for lunch" and therefore "it works much better with my nursing schedule." Claudia Calcaterra "knew that TXRH's food is terrific and the restaurant is very busy," and Catherine Morrill "liked the food and atmosphere, and thought it would be a fun place to work." Many other declarants stated specific reasons why they chose to apply to TXRH,

---

[4] See *Litigation Services Handbook: The Role of the Financial Expert*, Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, eds. Section 32.7: Recruitment and Hiring, by Christopher Haan, Elaine Reardon, and Ali Saad. See "Statistical Evidence in Pattern and Practice Litigation," by Oswald B. Cousins,2009, Orrick, Herrinton & Sutcliffe LLP, page 7, citing *Ward Cove, supra*, 490 U.S. at 653-654, 109 S. Ct. at 2123 and *Hazelwood*, 433 U.S. a 308 n.13, among other cases.

[5] An example of interest at TXRH can be seen through the relative application and hiring rates to locations with weekday lunch hours. Workers 40+ apply to lunch locations at higher rates than workers under 40, are hired at higher rates, and a larger percentage of those that apply are hired relative to non-lunch stores. This analysis is detailed later in the report.

and why they preferred TXRH over other restaurants. See, for example, declarations of Annette Flynn, Manuela Kelsey, Angela Lyall, Howard Streby, and Sheila Weil, among many others.[6]

10. Dr. Crawford simply asserts or implies that there are deficiencies in the TXRH benchmarks. For example, while he had 350,000 paper applications for unsuccessful applicants spread over the entire time period of the case, he suggests, by insisting on its use, that because there are stores or periods of time where these applications are not complete, that a Census benchmark should also be used.

11. If a decision to use an external labor market benchmark is made, because there are insurmountable problems with company applicant flow, the purpose of the external labor market benchmark is to proxy for what the applicant flow "must have been," or "could have reasonably been" for particular jobs at a particular company located in a particular place. Thus, the external labor market benchmark must accurately proxy for the potential applicant flow available in the labor market for the company in question. Characteristics of that applicant flow that must be captured and measured are the types of qualifications typical applicants would have to apply to the jobs in questions, the interest of potential applicants from the labor market to apply, and the proximity to the company to which application is being made. Simply put, the external labor market benchmark is supposed to proxy for the qualified, interested, and available pool of applicants. Dr. Crawford fails to appropriately address these various criteria.

12. The primary reason Dr. Crawford's external labor market benchmark fails to get it right is that he relies upon the wrong data in the first place. He uses aggregated summary level data from the U.S. Census Bureau, which is referred to as EEO tabulations. These tabulations are constructed from the underlying person level data collected by the Census department, and aggregated up by the Census department for particular uses by the public.[7] These data as

---

[6] See the declarations of Jason Abbott, Chad Boroff, Heidi Estes, Claudia Calcaterra, Catherine Morrill, Annette Flynn, Manuela Kelsey, Angela Lyall, Howard Streby, and Sheila Weil.

[7] http://www.census.gov/newsroom/releases/archives/employment_occupations/cb12-225.html

presented in their pre-processed and tabulated form are not appropriate for use in this type of setting because the data are for current job holders only and there is no way to identify who among those in the data are potential job seekers. The data are also not delineated by earnings level, and thus current holders of the identified jobs can work in places with a wide range of earnings levels, from entry level such as in the case of TXRH, to high end steak houses like Del Frisco's in Boston or other similar establishments, where earnings are considerably higher.[8] They can work in establishments with a wide range of working conditions, hours of work, and work schedules. Finally, the data do not include anyone who is not currently a holder of one of the occupations used by the Census. In the context of this case, this one omission is especially critical. Students, not currently active in the labor market, and who are newly entering the labor market via application for a job, are not captured. Indeed, the TXRH data reflect large numbers of applicants who clearly are students. In addition secondary sources note the fact that students and/or teenagers are a large source of restaurant labor, particularly in entry level jobs such as those at issue in this case.[9]

13. All of the issues work in the same direction with respect to the accuracy of Dr. Crawford's external labor market benchmarks: they push his measured availability of 40+ applicants higher. The Census benchmarks he creates are 300% to 500% higher than either of his TXRH applicant flow benchmarks, which should have raised a concern for Dr. Crawford. Yet Dr. Crawford never mentions this fact, and does nothing to reconcile these substantial differences.

---

[8] The per person average check size at TXRH is $16.31, according to the 2015 10k report. According to on-line the Zagat guide, the average total dinner cost at Del Frisco's in Boston is $79. A Bone in Ribeye at Del Frisco is $61, compared to $25.99 at TXRH, and sides are between $10.50 and $18.00 at Del Frisco's compared to $2.49 at TXRH. Since tips are based on check size, average earnings at Del Frisco's for a server are likely to be significantly higher than at TXRH. See https://www.zagat.com/r/del-friscos-double-eagle-steakhouse-boston/menu, https://www.texasroadhouse.com/menu

[9] See, for example, https://www.restaurant.org/Downloads/PDFs/News-Research/Factbook2013_LetterSize.pdf and http://www.restaurant.org/News-Research/News/Employee-turnover-rate-tops-70-in-2015. Also see, http://www.bls.gov/ooh/food-preparation-and-serving/food-and-beverage-serving-and-related-workers.htm#tab-3.

14. Once all of the problems with Dr. Crawford's external labor market benchmark are fixed, by using the microdata upon which the EEO tabulations are based, the correct external labor market benchmark figures are actually very similar to the benchmarks based on the two TXRH applicant flow measures. Thus a comparison of the external labor market benchmark to internal applicant flow measures does not support the notion that Census data should be considered, and favors the use of actual TXRH applicant flow measures rather than an externally based proxy measure.

15. Turning to Dr. Crawford's analyses based on TXRH applicant flow, he conducts one hiring analysis using the paper applications as his reference pool, and a separate analysis using the SAJ applicants as the reference pool. However, while he separates the applicant pools by whether they originate from paper or SAJ, he includes all hires, whether from paper or SAJ sources, into both analyses. Consequently, these analyses are inaccurate.

16. Importantly, TXRH stores did not use both paper and SAJ applicant approaches in the same way throughout the period 2007 through 2014. Instead, TXRH primarily relied upon paper until part way into 2013, when it essentially shifted to the electronic SAJ approach. Thus for the early years there are relatively few SAJ applications, and virtually no hiring from these applications, and for the later years, almost all applications were from the SAJ source, and virtually all hires came from these applications. So, for example, in 2014, Dr. Crawford studies store 243, which had 48 unsuccessful paper applications and 202 unsuccessful SAJ applications.[10] There were 82 hires.[11] In his analysis relative to the paper applications benchmark, Dr. Crawford uses the 48 unsuccessful paper applications, and essentially assumes all selections came from these applications. By definition, the unsuccessful SAJ applications are not in the analysis at all – only the successful SAJ applications are implicitly included, because

[10] See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, Tables 5 and 8.

[11] See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, Table 2.

many if not most hires (57 out of 82 hires for store 243) came from these applications.[12] Thus, Dr. Crawford's analysis is incorrect. None of the unsuccessful SAJ applicants are present in this analysis, and they are required to determine the benchmark for this set of hires. What Dr. Crawford should have done is to either combine paper and SAJ into one analysis, or remove the SAJ hires from the hires used in the paper-based analysis, by noting which of those hires had an associated SAJ application. The data are available to do this. This problem is common to every one of his store year analyses based on either the paper or the SAJ application data. In many instances this presents a significant problem.

17. When Dr. Crawford's external labor market benchmark is corrected, the figures are quite similar to the benchmarks derived from the TXRH applicant flow. And when the applicant flow is used in the appropriate manner for statistical analysis, the results are that there is no aggregated shortfall in hiring to FOH jobs for applicants 40+. We turn next to a more detailed critique of Dr. Crawford's analyses and opinions.

## DR. CRAWFORD'S AVERAGED AND AGGREGATED ANALYSIS CONCEALS NUMEROUS AND WIDE VARIATIONS IN OUTCOMES THAT ARE FOUND WITHIN HIS RESULTS

Analyses Based on Paper Applicant Flow Data

18. Although Dr. Crawford analyzes and displays in his tables the store by store statistical results of his hiring analyses, he fails to discuss the wide variation in the outcomes by store. Bottom line "averages" based on aggregating individual store findings, regardless of the outcome, are not persuasive from a statistical perspective to establish a statistical pattern or practice of hiring too few 40+ applicants. The substantial variation that exists in Dr. Crawford's own results across years, jobs and stores ultimately undercut an inference of pattern or practice discrimination against 40+ applicants. In the several sections that follow, I will demonstrate in various ways the wide variations that underlie Dr. Crawford's bottom line findings, all based on

[12] See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, Table 6.

his own tables as contained in his report. We begin by considering Dr. Crawford's analyses of hiring based on the paper applicant flow data and we examine first the statistical significance at the store level.[13]

19. Many stores underlying Dr. Crawford's aggregated averaged bottom line results do not exhibit statistical significance when viewed on their own, which is important to point out at the outset. Exhibit 1 summarizes Dr. Crawford's statistical results when the paper applicant data is compared to the TXRH hiring data for all jobs combined using his analysis summarized in his Table 22. For example Exhibit 1 shows that in 2009, 95% of the stores analyzed by Dr. Crawford did not show a statistically significant shortfall of 40+ applicants, and none showed statistical significance at three standard deviations.[14] Over all stores, jobs and years analyzed by Dr. Crawford a statistically significant shortfall at two standard deviations is found only 26% of the time. A statistically insignificant shortfall is found 74% of the time.[15]

20. Similar results are obtained when each of the FOH positions are analyzed separately. Exhibit 2 shows Dr. Crawford's results when the paper applicant data is compared to the TXRH hiring data for server jobs using his approach. Exhibit 2 shows that in 2009, 89.5% of the stores analyzed by Dr. Crawford did not show a statistically significant shortfall of 40+ applicants for the server job. Over all stores and years for the server job analyzed by Dr. Crawford (paper applicant data), a statistically significant shortfall is found only 28.3% of the time; i.e. a statistically insignificant shortfall is found 71.7% of the time.[16]

---

[13] Dr. Crawford did not analyze all of the paper applications he was provided with. He analyzed a fraction of the paper applications - 321 of the 1,693 store-years that met the criteria for selection to his sample, or about 19%, "In order to control the cost of this litigation." See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, pages 16-17, paragraphs 48 and 49.

[14] Dr. Crawford only conducts analysis when there are 30 or more Texas Roadhouse hires and 30 or more corresponding unsuccessful paper applications.

[15] At three standard deviations, a statistically significant shortfall is found only 6.9% of the time.

[16] At three standard deviations, a statistically significant shortfall is found only 7.5% of the time.

21. Exhibit 3 summarizes Dr. Crawford's paper application results for hosts. In 2013, none of the stores analyzed by Dr. Crawford show a statistically significant shortfall of 40+ hires into the host job. Over all stores and years for the host job analyzed by Dr. Crawford, a statistically significant shortfall is found only 10.5% of the time, and an insignificant shortfall is found 89.5% of the time.[17]

22. Exhibit 4 shows Dr. Crawford's paper applicant results for server assistant jobs. In 2007, none of the stores analyzed by Dr. Crawford show a statistically significant shortfall of 40+ hires into the server assistant job. For the host job, a statistically significant shortfall is found by Dr. Crawford only 20% of the time. A statistically insignificant shortfall is found 80% of the time.[18]

23. Dr. Crawford did not perform any analyses using the paper applicant data for hiring into the bartender position because no store had 30 or more hires of bartenders in a given year.[19]

24. Dr. Crawford's results can also be examined by store location across jobs or years to determine whether a particular location appeared to have a pattern of under-hiring 40+ applicants. Exhibit 5 shows that, when the paper application benchmark is used, Dr. Crawford's results show that not a single TXRH job had statistically significant shortfalls of 40+ hires for more than two years during the discovery period. Exhibit 5 also shows that only three stores had statistically significant shortfalls of 40+ hires into the server position in two of the eight years in the discovery period. Fifty-eight stores had statistically significant shortfalls of 40+ hires into the server position in only one of the eight years in the discovery period. Given the sampling plan utilized by Dr. Crawford, for the server assistant and host positions, no stores had statistically significant shortfalls of 40+ hires into these positions in more than one of the eight years in the discovery period.

---

[17] At three standard deviations, a statistically significant shortfall is found 0.0% of the time.

[18] At three standard deviations, a statistically significant shortfall is found 0.0% of the time.

[19] Dr. Crawford's sampling plan with the paper applications does not permit him to address patterns *within* stores across years, and thus he cannot establish consistency across time with these data.

25. Exhibit 6 shows that, when the paper application benchmark is used, Dr. Crawford's results show that not a single store had statistically significant shortfalls of 40+ hires into all three of the positions (i.e., server, server assistant and host) in a given year. Exhibit 6 show that only five stores had statistically significant shortfalls of 40+ hires for two of the positions in a given year. In 2007, 2009 and 2014, no stores had statistically significant shortfalls of 40+ hires for two of the positions in a given year. This result does not support a statistically based adverse pattern or practice in the hiring of applicants 40+.

Analyses Based on SAJ Applicant Flow Data

26. Similar to Dr. Crawford's analyses which compare the paper applicant data to the TXRH hiring data, his results using the SAJ applicant data also do not support a statistical argument that a pattern or practice of hiring fewer age 40+ applicants than expected exists at TXRH locations. Substantial variation exists in Dr. Crawford's results across years, jobs and stores that undercut an inference of statistical pattern or practice based discrimination against 40+ applicants.

27. Exhibit 7 shows Dr. Crawford's results when the SAJ applicant data is compared to the TXRH hiring data for all jobs combined using his approach. Exhibit 7 shows that in 2014, 95.2% of the stores analyzed by Dr. Crawford did not show a statistically significant shortfall of 40+ hires. Put another way, except for 2007, there is no year in which the number of stores with a statistical disparity at the two standard deviation level exceeded half the number of stores, and over all years, 84.2% were not statistically significant. Over all stores, jobs, and years analyzed by Dr. Crawford using the SAJ data, a statistically significant shortfall is only found 15.8% of the time.

28. Similar results are obtained when each of the FOH positions are analyzed separately. Exhibit 8 shows Dr. Crawford's SAJ based results for server jobs using his approach. Exhibit 8 shows that in 2013, 92.9% of the stores analyzed by Dr. Crawford did not show a statistically significant shortfall of 40+ applicants into the server job. Over all stores and years for the server

job analyzed by Dr. Crawford, a statistically significant shortfall is only found 13.0% of the time. The shortfall was not statistically significant 87.0% of the time.

29. Exhibit 9 shows Dr. Crawford's SAJ based results for host jobs using his approach. Exhibit 9 shows that in 2013, none of the stores analyzed by Dr. Crawford show a statistically significant shortfall of 40+ hires into the host job. Over all stores and years for the host job analyzed by Dr. Crawford, a statistically significant shortfall is only found 4.8% of the time. The shortfall was not statistically significant 95.2% of the time.

30. Exhibit 10 shows Dr. Crawford's SAJ based results for server assistant jobs using his approach. Exhibit 10 shows that in 2008, 2009, and 2013, none of the stores analyzed by Dr. Crawford show a statistically significant shortfall of 40+ applicants into the server assistant job. Over all stores and years for the server assistant job analyzed by Dr. Crawford, a statistically significant shortfall is only found 2.3% of the time. The shortfall was not statistically significant 97.7% of the time.

31. Dr. Crawford did not perform any analyses comparing the SAJ applicant data to the TXRH hiring data for the bartender position because no store had 30 or more hires of bartenders in a given year.

32. Dr. Crawford's results can also be examined by store location across jobs or years to determine whether a particular location appeared to have a pattern of under hiring 40+ applicants. Exhibit 11 shows that, when the SAJ application benchmark is used, Dr. Crawford's results show that not a single job had statistically significant shortfalls of 40+ hires for more than three years during the discovery period. Exhibit 11 shows that only three stores had statistically significant shortfalls of 40+ hires into the server position in three of the eight years in the discovery period. Forty-one stores had statistically significant shortfalls of 40+ hires into the server position in only one of the eight years in the discovery period. Eleven stores had statistically significant shortfalls of 40+ hires into the server position in only two of the eight years in the discovery period. For the server assistant and host positions, no stores had

statistically significant shortfalls of 40+ hires into these positions in more than one of the eight years in the discovery period.

33. Similarly, Exhibit 12 shows that, when the SAJ application benchmark is used, Dr. Crawford's results show that not a single store had statistically significant shortfalls of 40+ hires into all three of the positions (i.e., server, server assistant and host) in a given year. Exhibit 12 shows that only four stores had statistically significant shortfalls of 40+ hires for two of the positions in a given year. In 2007, 2009, 2010, 2011 and 2013, no stores had statistically significant shortfalls of 40+ hires for two of the positions in a given year.

34. Exhibits 11 and 12 show that if a statistically significant shortfall of 40+ hires occurred in a particular store, it was unlikely to occur in multiple years for the same job or for multiple jobs in the same year. This result does not support a statistical pattern or practice against 40+ applicants. A visual representation of Exhibits 1-4 and 7-10 for all years combined is shown in Exhibits 13 and 14.

35. I have noted above that SAJ applications pertain primarily to the period starting in mid 2013 through 2014, and were available in smaller numbers in the period prior to that. Because Dr. Crawford chose not to combine the two application sources, his approach essentially does not permit him to address pattern or practice issues using SAJ alone.

<u>There is Substantial Variation in Dr. Crawford's Statistical Results at the Store Level</u>

36. The previous section highlighted how few stores, which is the decision-maker level of analysis, showed statistical significance on their own when using the unadjusted paper and SAJ applicant flow data. We turn next to showing the highly differing statistical hiring outcomes themselves that are found within Dr. Crawford's aggregated analyses. We will look at all of Dr. Crawford's hiring analyses: paper based benchmarks, SAJ benchmarks, and Census benchmarks, each for all FOH jobs, and the separate jobs that he analyzes and presents results for in his report.

37. We start with Dr. Crawford's analysis using the paper applicant data for hires into all FOH job codes combined, which is shown in his Table 22. Each of the standard deviation

figures represents the difference Dr. Crawford computes between the actual and expected proportions. The median of all the standard deviations across all stores is -1.57.[20] Because we are using a median, half of the stores have standard deviations above this figure, and half are below this figure. The question is how wide is the spread in the individual store level standard deviation figures that are aggregated to a single bottom line result by Dr. Crawford. Since we are not interested for this comparison in the relationship between the store level numbers of standard deviations and zero standard deviations, but instead by how much stores are below or above the figure of -1.57, we shift the median value to zero, and shift each of the store level standard deviations by -1.57. The charts sort the store level standard deviations from most negative to most positive, which better reveals the extent of the spread in these values. As is clear in Exhibit 15, there is very large store by store variation across the statistical outcomes.[21] The overall difference spans almost seven standard deviations. Given that the sample sizes at the store year level are not typically that large, this is a very strong finding, and supports the inference that there is no statistically common set of forces acting to the disadvantage of applicants 40+. If the median store has a shortfall of -1.57 standard deviations, using Dr. Crawford's approach to the paper based benchmark, there are many stores far in excess of this figure, and many stores far lower than this figure.

38. Dr. Crawford's analyses using the paper application data for individual jobs show the same store by store variation in the statistical outcomes. When Dr. Crawford's individual store outcomes for servers, server assistants and hosts are charted as described above, we again see large store by store variation. Exhibits 16, 17 and 18 show that while the median number of

[20] All jobs codes combined using Dr. Crawford's nomenclature is job 1111.

[21] The number of standard deviations for each store relative to the median number of standard deviations across all stores is sorted from most negative to most positive. Note that the median store does not achieve statistical significance.

standard deviations across all stores is -1.53, -1.32 and -1.27 for servers, server assistants and hosts respectively, large store by store variation exists.[22]

39. Similarly, when using Dr. Crawford's approach with the SAJ applicant data for all FOH jobs combined, the median number of standard deviations across all stores is -1.11 – again, not statistically significant. As is the case with the paper based benchmarks, Exhibit 19 shows large store by store variation across the statistical outcomes for all jobs combined using the SAJ data. Dr. Crawford's analyses using the SAJ application data for individual jobs also show the same store by store variation in the statistical outcomes. When Dr. Crawford's individual store outcomes for servers, server assistants and hosts are charted as described above, we again see large variation. Exhibits 20, 21 and 22 show that while the median number of standard deviations across all stores is -0.97, -0.74 and -1.03 for servers, server assistants and hosts respectively (none of which are statistically significant), large across store variation exists.

40. When using Dr. Crawford's approach with the Census data for all FOH jobs combined, the median number of standard deviations across all stores is -1.73 – again, not statistically significant. As is the case with the paper and SAJ based benchmarks, Exhibit 23 shows large store by store variation across the statistical outcomes for all jobs combined using the Census data.

41. Finally, Dr. Crawford's analyses using the Census data for individual jobs also show wide store by store variation in the statistical outcomes. In fact, the variation here is far higher, spanning almost 30 standard deviations, due primarily to the excessive benchmarks used, but also their wild swings from location to location. When Dr. Crawford's individual store outcomes for servers, server assistants and hosts are charted as described above, we again see large variation. Exhibits 24, 25 and 26 show that while the median number of standard deviations

[22] Note that Dr. Crawford's aggregated Z-score results across all stores for Charts 24, 25, and 26 are much greater in absolute value since the aggregated result is created by combining many highly varying store level results for each individual job, and because the Census benchmarks themselves, as discussed in detail below, are highly overstated.

across all stores is -5.46, -5.35 and -1.78 for servers, server assistants and hosts respectively (two of which are statistically significant), large across store variation exists.

42. Exhibits 15 - 26 all demonstrate the lack of underlying store level consistency in statistical hiring outcomes, which is masked by focusing only on the aggregated level as Dr. Crawford does. By examining Dr. Crawford's statistical results at the store level, substantial variation is shown, which refutes the notion that hiring managers at all TXRH are behaving in statistically similar ways with respect to the hiring of applicants aged 40+.

Dr. Crawford Does Not Reconcile or Examine the Differences Between the Different Hiring Benchmarks he Relies Upon

43. Dr. Crawford states that because SAJ data was available for relatively few stores in early years, this argues "…against using *only* SAJ data to analyze the hiring behavior of TXRH over the 2007-2014 and argues in favor of using the data from the Census and the paper applications as well as the data from SAJ."[23] However, if the SAJ data is complete for some period of time, it would still be appropriate to use this data for that period of time as a benchmark for hiring during that time period.

44. As noted above, there is a good reason why SAJ data is incomplete in the early years of the relevant time period. It is my understanding that TXRH did not rely much upon SAJ for its applicants until sometime during 2013. However, during 2013, TXRH apparently made a decision to phase out paper applications, and move exclusively to the use of SAJ, and thus, by the end of 2013, the volume of SAJ applications had risen dramatically, and virtually all hires came from SAJ applications.[24] There was also a corresponding drop in paper applications over the course of 2013, such that by mid-2014, there were very few paper applications compared to earlier years. According to the deposition of Amanda Kramer, prior to 2013, SAJ captured relatively few applicants for TXRH. At that time, the system required Managing Partners to call

[23] See Amended Expert Report of David L. Crawford, Ph.D., dated February 25, 2016, paragraph 33.

[24] Deposition of Amanda Kramer, p. 29:3-4, 29: 14-15.

or email TXRH's People Department (Human Resources) and request a job posting, which the People Department then faxed to SAJ.[25] Empirically, it does not appear that TXRH considered these applications as much as they considered the much higher volume of paper applications received during this period. The reason for this inference is that the success rate for applicants applying through SAJ for the years 2007 through 2012 was extremely low – less than one tenth of the overall success rate. The percentage of applications that led to a hire was only 1.34% during the time period of 2007-2012, in contrast to the period 2013-2014, where the hiring success rate was 12.98%.

45. For Dr. Crawford to imply that both the SAJ and the paper applicant sources are incomplete is misleading – each is quite complete during the period of time when TXRH relied upon that source, and predictably incomplete during the opposite periods of time. Exhibit 27 depicts the time trend in the numbers of applications from both the paper and the SAJ applications, with hires from paper being inferred by their being not from SAJ, only the latter for which one can verify hire status.

46. As shown above, Dr. Crawford's analyses, using the actual TXRH applicant flow data (i.e., paper applications and SAJ electronic applications), show that the majority of stores analyzed do not show a statistically significant shortfall of 40+ hires in a given year. In addition, there are widely varying statistical outcomes store to store. These outcomes, from a statistical perspective, do not support an alleged pattern or practice adverse to 40+ applicants. Dr. Crawford focuses on his aggregated bottom line findings, and for these, his opinion is that there are substantial age related disparities in the hiring of applicants 40+. I demonstrate in detail below that these conclusions are without merit as well, since Dr. Crawford failed to consider an important omitted variable that has a substantial influence on hiring. We turn next to a discussion of Dr. Crawford's Census based hiring analyses.

47. Dr. Crawford also conducts analyses using Census data for his benchmarks for expected

[25] *Ibid*, p. 19:12-15.

hiring at TXRH. He states at various points in his report that these benchmarks should also be used, since in his view the actual applicant flow data is incomplete or otherwise not sufficiently useful. No specific analysis is conducted by Dr. Crawford to support this opinion. In addition, Dr. Crawford does not explain or even refer to the enormous disconnect between the actual applicant flow and the Census benchmarks he uses. The closest he gets is the following: "Generally, larger samples yield more powerful tests, which is why one should use the Census data even if the paper application data is expected to support unbiased tests." This is mistaken. One should never select a benchmark simply because there is more data. More data that is not the appropriate data simply produces a "more powerful" mistaken conclusion. Furthermore, since the Census benchmark percentages of 40+ applicants are so much larger than the paper applicant percentages, it would be impossible for both benchmarks in Dr. Crawford's analysis to be "unbiased." If one is unbiased, the other must be biased. In some cases Dr. Crawford's Census benchmarks are more than ten times the TXRH applicant flow percentages. Aggregated across all stores and jobs, his total FOH jobs benchmark averages out to be 18%, as compared to approximately 4% for his other applicant flow sources. As it turns out, there is a simple reconciliation of the various benchmarks. Corrected for his mistakes, the Census benchmark actually tracks the TXRH applicant flow percentages.

48. When actual applicant flow is available and considered sufficiently complete for analysis, it should be preferred to external Census benchmarks.[26] I will discuss the flaws in Dr. Crawford's Census benchmark below, but first, it is worth noting that when Dr. Crawford uses his 18% Census benchmark of what the numbers of 40+ hires to TXRH should be, an over 30,000 shortfall in hiring relative to the approximately 3,000 actual hires. This result is so

[26] See, for example, *Litigation Services Handbook: The Role of the Financial Expert*, Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, eds. Section 32.7: Recruitment and Hiring, by Christopher Haan, Elaine Reardon, and Ali Saad; "Statistical Evidence in Pattern and Practice Litigation," by Oswald B. Cousins, 2009, Orrick, Herrinton & Sutcliffe LLP, page 7, citing Ward Cove, supra, 490 U.S. at 653-654, 109 S. Ct. at 2123 and Hazelwood, 433 U.S. a 308 n.13, among other cases; and Gastwirth, Joseph L. "Estimating the demographic mix of the available labor force." *Monthly Lab. Rev.* 104 (1981): 50.

extreme on its face that it is simply not credible from an economics or statistical perspective.

49. Typically, a labor economist will only resort to using an external labor market benchmark such as the Census when the internal applicant flow benchmark is clearly and demonstrably inferior or unavailable. Dr. Crawford, by not reconciling his three benchmarks and by not carefully considering the question of the quality of the existing TXRH applicant flow, has not shown that the internal TXRH applicant flow benchmarks are inferior to an external benchmark based on the Census.

50. Exhibits 28, 29 and 30 show the average benchmark percent age 40 and above used by Dr. Crawford in his analyses by job and year for the three benchmarks. It should be noted that Dr. Crawford's paper and SAJ benchmarks do not include successful applicants, as he notes in his amended report, and are thus greater than the true applicant flow percentages. But even so, the figures in these tables clearly show that Dr. Crawford's Census benchmarks do not remotely resemble the benchmarks he uses based on TXRH's own applicant flow data. Dr. Crawford should have reconciled the external Census benchmark to the internal applicant flow benchmarks to justify his repeated claim that the external benchmark should also be used, to create "more powerful tests." A simple comparison shows that Dr. Crawford's Census benchmarks must be overstated. The fact that the Census benchmark for some jobs and in some years is more than *ten times* higher than the benchmark based on actual TXRH applicant flow data is certainly a "red flag" that something has gone awry. For example, Dr. Crawford's Census benchmark in 2007 for server assistants is 30.9%, but the same benchmark using the paper applications is only 2.8%.

51. In sum, Dr. Crawford's Census benchmarks do not reconcile with the internal TXRH applicant flow data, even for years like 2013 and 2014 when the TXRH SAJ data is almost complete. The Census benchmarks calculated by Dr. Crawford are so far out of sync with the applicant flow benchmarks as to defy economic or statistical credibility. Dr. Crawford does not attempt to reconcile the large disparity between his Census benchmarks and the actual applicant flow benchmarks. The issue is not that the data the Census Bureau collects is fundamentally

flawed or wrong, it is that Dr. Crawford relied upon the wrong Census data. As shown in Exhibit 31, correcting Dr. Crawford's errors brings a benchmark based on the Census in line with the internal applicant flow benchmarks and thus lends support that the internal applicant flow benchmarks are not inferior to external measures.

**THE PAPER APPLICATION INFORMATION IS NOT BIASED WITH RESPECT TO AGE, MAKING IT A SUITABLE BENCHMARK DURING THE TIME WHEN TXRH PRIMARILY USED PAPER APPLICATIONS**

52. Dr. Crawford apparently uses a Census benchmark because of his opinion that the TXRH applicant flow data is somehow incomplete or insufficient. Any analysis of completeness must acknowledge that paper was primarily used for the period 2007 – 2012, and SAJ was primarily used for the period 2013 – 2014, and thus to consider "completeness" for either applicant source over the entire period is incorrect. Since we know the SAJ is essentially complete for 2013-2014, we must only address the paper applications on this issue. However, the "completeness" of the 350,000 applications is not an issue for benchmarking analysis if it can be shown that there is no bias with respect to age among the possible missing applications. Dr. Crawford does not opine on this issue – he presents no analysis of whether the purported paper application incompleteness causes a bias in the applicant flow 40+ percentage benchmarks. That is, since the applicant flow data serves in the statistical analysis as a percentage benchmark for 40+ applicants, against which the percentage of 40+ hires is compared, all one must do is consider whether those missing paper applications are likely to have been disproportionately from younger applicants, disproportionately from applicants 40+, or instead essentially random with respect to age. We can analyze this question using data provided by Dr. Crawford.

53. Dr. Crawford states that he randomly selected 321 store years from an eligible population of roughly 1,700, and collected *all* paper applications associated with those store years. Thus Dr. Crawford did not sample *within* store years. The 321 store years yielded roughly 70,000 applications. Dr. Crawford then obtained age information for the selected applications from

Accurint.[27] Dr. Crawford states that this resulted in a sample of 51,730 paper applications with known age. Dr. Crawford indicates that he conducted additional tests to assess whether the missing ages were likely to be systematically different from the ages Accurint found, and concluded they likely were not. Thus, we can treat the sample of 51,000 applications as representative of the entire population of 350,000 with respect to age, as well as the various other applicant characteristics.

54. Based on Dr. Crawford's store-year sampling approach, the paper application data constitutes all applications those stores found for each of these months. Within the data, there are store months with very small numbers of applications provided, and other months with hundreds of paper applications. The question is if a store had an incomplete production of the total number of its paper applications, is there any relationship to age that is evident? Put another way, for stores with lower production than perhaps expected, implying they did not find all of their applications in some years, is there a correlation to age, such that higher producing stores, all else constant, have higher percentages of applicants 40+, implying that the lower producing stores cause there to be an understatement in the proportion of applicants 40+? No such correlation exists. Exhibit 32 contains the results of the analysis. The analysis was conducted using multiple regression, where the dependent variable is the number of paper applications produced for a given store month. The unit of analysis was store month.[28] The rows of the table reflect adding independent, or explanatory variables sequentially, and observing their impact. Starting with the top row in the table, when we look at the relationship between number of applications provided and the number of hires in a store month, it shows that a larger number of hires is associated with a larger number of applications provided for those store months. That is, stores that hired more employees tended to provide larger numbers of applications. If we add variables for the year of application, we see that more recent years are

[27] Accurint® is part of LexisNexis.®

[28] The data were available and therefore were analyzed at a monthly level.

positively correlated with greater numbers of paper applications provided. The next row adds a variable for the sampled month being a store opening month, which is also positively related to the number of applications produced. Store openings tend to produce substantially larger numbers of applicants.[29] Finally, when we add store location we observe relationships in both directions between location and paper applicant production, with some locations providing more, and some less. And finally, if we add the proportion of 40+ applications found among the actual applications retained/produced, there is no statistical relationship at all – meaning that for stores with higher paper application production, holding constant the other things which would be expected to correlate with the volume of production, there is no relationship between the age composition of the applicants produced and the volume of production relative to stores with lower production of paper applications. Thus, if stores with incomplete production found and produced those missing applications, there is no reason to expect these applications will have a different age composition than the applications they actually produced.

55. This means that there is no evidence the 50,000 plus applications upon which Dr. Crawford relied for his analysis is a biased benchmark of the actual paper applications. Notably, Dr. Crawford does not contend otherwise. Dr. Crawford's insistence on using the Census benchmark due to an alleged "incompleteness" or the implication of biases in TXRH applicant flow sources is not supported by any empirical analysis. We turn next to examining the flaws in Dr. Crawford's Census benchmarks.

**PROBLEMS WITH DR. CRAWFORD'S CENSUS BENCHMARK APPROACH**

56. Dr. Crawford's data sources and methodology in his Census benchmark study are so flawed as to render his results both incorrect and unreliable. In this section I will explain how Dr. Crawford came to these extreme results, and I will present Census based estimates that

---

[29] There were 214 different stores represented among the 321 store years selected by Dr. Crawford, and 25 of those stores were opened during the period.

correct for the flaws in his analysis.

57. The fundamental flaw in Dr. Crawford's Census benchmark analysis is the data he relied upon. The Census "tabulation" data that he chose to use for his analysis is dated, does not provide annual estimates, and is not suited to the task at hand. When the correct Census data are used, the results demonstrate that the proportion of 40+ applicants seen in both the TXRH paper and SAJ applicant flow information correspond closely with the benchmarks derived from Census data.

The Flaws with Dr. Crawford's Census Data Source

58. The Census data that Dr. Crawford used are referred to as the "EEO Tabulation" data. The "EEO Tabulation" file is a series of pre-constructed tables created by the Census Bureau which provide select demographic information on the labor force. These tabulations are based on data taken from the American Community Survey (ACS), and then aggregated for provision to the public. The ACS is a nationwide government survey that collects and produces information on demographic, social, economic, and housing characteristics about the nation's population every year.[30] Effective with Census year 2010, the ACS has replaced the previous decennial census "long form" questionnaire, which is no longer used.[31] The ACS is collected on a person level basis from respondents, and it is these individual data that are periodically aggregated in various ways by the U.S. Census Bureau. However, any analyst has full access to the person specific data, which is available for all of the ACS surveys, not just the years chosen by the U.S. Census Bureau for its separate aggregations.[32]

[30] https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS_Information_Guide.pdf.

[31] https://www.census.gov/history/www/programs/demographic/american_community_survey.html.

[32] See http://www.census.gov/people/eeotabulation/. The Census Bureau produced the "EEO Tabulation" data at the request of four sponsoring Federal agencies: the EEOC, the Department of Justice (DOJ), the Office of Federal Contract Compliance Programs (OFCCP) at the Department of Labor (DOL) and the Office of Personnel Management (OPM). The EEO Tabulations serve, when appropriate, as external benchmarks for various types of workforce comparisons for comparing the race, ethnicity, sex and age composition of an organization's internal workforce, and the analogous external labor market, within a specified geography and job category. The tabulations

59. The "EEO Tabulation" data are a series of 107 tables with various labor force metrics summarized by sex, race, ethnicity and age.[33] In addition to being dated, the tabulations have other constraints making them inappropriate for the type of analysis Dr. Crawford attempted to perform. Because they are aggregated summary measures, they can only be used to answer particular questions for which aggregated measures are appropriate, such as simple race, age and sex distributions within a particular occupation or industry as a whole. They are not suitable for, nor were they designed for the estimation of the relevant external labor market for a particular employer in a case with specific allegations such as this. Dr. Crawford uses a table called "EEO 12w. Detailed Census Occupation by Older Age Groups, Sex, and Race/Ethnicity for Worksite Geography, Total Population." This table provides estimated counts and percentages of the target occupational groups by age, sex, and race for particular geographic areas.

60. The tabulations are at the CBSA level (the smallest geographic unit in the tabulation data is the Core-Based Statistical Area, or CBSA). From this, Dr. Crawford obtained the estimated proportions of workers who were working in CBSAs where TXRH had restaurants, and in occupations comparable to TXRH FOH positions, which are: waiters and waitresses, other food preparation and serving related workers, hosts, and bartenders.

61. The Census benchmark figures appear in Table 4 of Dr. Crawford's report. Inspection of the store by store estimates reveals that Dr. Crawford's results do not reflect reality. The ranges of availabilities by restaurant location are extremely variable. For example, in Dr. Crawford's Table 4, there are six restaurant sites with an estimated "percent over 40 among population" for bartenders of 0%.[34] In other words, based on the EEO tables it is estimated that not one bartender in the area surrounding those restaurants was over the age of 40. Dr. Crawford's table also indicates that there is one restaurant that has an estimated "percent over 40 among

---

were based on ACS data aggregated from the years 2006 through 2010, and have not been updated at this time.

[33] http://www.census.gov/newsroom/releases/archives/employment_occupations/cb12-225.html

[34] The six sites are 264, 312, 327, 329, 332 and 477. Two other sites, 224 and 362, had an estimated "percent over 40 among population" for bartenders of 0% but did not have any 40+ applicants.

population" of 100%, meaning that all of the bartenders in the area surrounding that restaurant between 2006 and 2010 were expected, under Dr. Crawford's approach, to be over the age of 40.[35] It is hard to imagine that this was actually the case, and in fact, the application and hire data demonstrate that it was not. At the six sites for which Dr. Crawford estimates 0% availability of applicants, the SAJ and UltiPro data include or indicate that there were 76 bartender applications from individuals age 40+.[36]

62. It is likely that the extreme estimates that Dr. Crawford presents result from very small sample sizes underlying the aggregations provided in the EEO tabulations in some of the smaller CBSAs he analyzes. The pre-processed Census aggregations do not show the number of observations upon which the estimate is based. And while the EEO tables include both population estimates and the associated margins of error, the instances of 0 percent estimates for the proportion of workers 40+ in the Assistant, Host, and Bartender positions suggests that the EEO tabulation data are simply not well suited to the analysis of age distributions at the level Dr. Crawford's analysis requires.

63. Importantly, the margins of error provided with the EEO tables, and used by Dr. Crawford in his analysis, are calculated at the 90% confidence level, which is equivalent to a 10% level of statistical significance.[37] However, Dr. Crawford incorrectly assumes that they were calculated at the 95% level. This is evidenced by the fact the he uses a threshold of "1.9" in his "TableC.do" program, which is roughly the number one would use in performing statistical tests at the 95% confidence level.[38] However, the EEO table's margins of error are calculated at the 90% level of confidence, so the correct number to use in his program in this case would be 1.645. In all cases, this mistake leads to an over-statement of the incidence of statistically

[35] The one site is 380.

[36] UltiPro is the Human Resources management software used by TXRH.

[37] http://www.census.gov/people/eeotabulation/about/

[38] In fact, Dr. Crawford uses 1.9 in his calculations, not 1.96 which is the actual number that should be used for 95% confidence level estimates. I assume this was probably a typo in his program.

significant results in his Census comparisons. [39]

64. While Dr. Crawford's Census analysis is restricted to workers in occupations comparable to TXRH FOH positions, it is also important in an external benchmarking exercise to compare workers drawn not only from those with the same job title, but also from those with approximately the same distribution of job skills, preferences and responsibilities within those job titles. In other words, the "availability pool" should include only those who are both available and qualified at the relevant level to perform the requisite FOH duties at TXRH. Dr. Crawford's data would include workers in these occupations at all levels, not just entry level, and at all establishments, not just those like TXRH. One way to adjust a benchmark for those available for entry level positions is to use an earnings restriction. In a functioning labor market, productivity, skill, and scope of responsibility are rewarded via compensation. Within any given occupational category, if compensation is higher, it would be on average due to higher skills, greater responsibility, or both. TXRH competes with a variety of other concepts. But the general foodservice industry includes businesses of various sizes and styles, including hospital cafeterias, fast food restaurants, themed restaurants with an entertainment component, or high end dining. Given the entry level jobs at issue in this case, these may involve work requiring very different skills, working conditions, work schedules and hours, as well as different responsibilities compared to TXRH. For example, one would not expect that a server at TXRH has the same skills, level of responsibility and scope of duties as a server at an expensive Michelin-starred fine dining establishment. To the extent that these characteristics may correlate with age in certain occupational categories, failing to control for them will produce a biased and unreliable benchmark.

---

[39] Dr. Crawford expresses the difference between the numbers of TXRH hires and his Census benchmarks in terms of the number of standard deviations from parity. Statistically, 1.645 corresponds to a 90% level of confidence, meaning that there is a 90% probability that the number of standard deviations reflected in the difference is less than 1.645. The formula for converting the "margins of error" provided for the EEO data into standard errors therefore involves dividing the margins of error by 1.645. However, Dr. Crawford mistakenly divides by 1.9 (which roughly corresponds to a 95% level of confidence). As a result, he underestimates the size of the standard errors and therefore over-estimates the number of standard deviations reflected by the difference.

65. However, the EEO tabulation data cannot be used to perform an analysis with an earnings control since it does not include any information on earnings within age-occupation profiles, i.e. the tables do not provide a disaggregation of age-occupation representation statistics by earnings level. This information is available, however, in the individual level ACS data. These individual-level data are typically referred to as the Public Use Microdata Sample – (PUMS), and they include detailed demographic information on respondents from the approximately 3.5 million households sampled by the ACS. The PUMS data are one of the most widely used data sources by economists and other social scientists. The 2006-2010 "EEO Tabulation" data that Dr. Crawford used are aggregations based on the PUMS data.

66. Dr. Crawford estimates availability based on individuals currently working in occupations similar to TXRH FOH positions. However, there is another group which should be included in the availability pool: students currently enrolled in school. Many people obtain their first job in the restaurant industry.[40] By focusing on only those workers within a current job, Dr. Crawford has excluded a substantial portion of the potential workforce or applicant flow that his Census benchmark is presumably designed to proxy. Students therefore belong in the pool of available and qualified candidates for employment. Beyond the entry level low skill nature of the work, shift work in a restaurant is also relatively flexible when compared to many other jobs, making it particularly attractive to students, and restaurant work is a common first job. One third of all working teenagers in the U.S. are employed in a restaurant.[41] 2014 Census data show that the restaurant industry employs a high proportion of students: 27% of restaurant employees are enrolled in school, versus 11% of the employed U.S. labor force.[42] The National Restaurant Association estimates that one-half of all adults have worked in the restaurant industry at some point during their lives, and one in three adults in America got their first job experience in a

---

[40] See https://www.restaurant.org/Downloads/PDFs/News-Research/Factbook2013_LetterSize.pdf

[41] http://www.restaurant.org/News-Research/News/Employee-turnover-rate-tops-70-in-2015

[42] *Ibid.*

restaurant.[43] But the EEO Tabulation data that Dr. Crawford relies on does not include any information for students. His data thus do not permit the inclusion of this group of potential employees in his availability pools.

67. In addition, the EEO tabulation tables are based on data aggregated across years. Yearly estimates cannot be obtained. Thus as seen in his table 4, Dr. Crawford's benchmarks are the same for every year. Again, there is no reason to work from this restricted perspective. The PUMS data are available by year through 2014.

68. I relied instead on the individual level ACS PUMS data for my external labor market analysis. I downloaded and processed each of the ACS annual PUMS files for the years 2007 through 2014 from the Census Bureau's website.[44] The smallest geographic unit of observation in the PUMS data is the Public Use Microdata Sample Area, or PUMA. I used zip code to determine the PUMA for each TXRH restaurant[45] and then calculated availability rates for each restaurant based on the relevant PUMA(s).[46]

69. I analyzed the representation of individuals aged 40+ in the same TXRH FOH occupations as Dr. Crawford used: waiters and waitresses, other food preparation and serving related workers, hosts, and bartenders. The earnings control for skills/responsibilities that I used was based on an examination of the earnings distributions for these occupations in the TXRH data, and then applying those distributions of earnings to the Census data. In particular, I limited

[43] http://www.restaurant.org/Industry-Impact/Employing-America/Jobs-Careers-Powerhouse

[44] https://www.census.gov/programs-surveys/acs/data/pums.html

[45] Some restaurants had zip codes which were located in more than one PUMA. In these cases, the data from all of the relevant PUMAs was combined. This is the same method Dr. Crawford used when zip codes indicated more than one CBSA for a location. All zip codes matched to one or more PUMAs so no additional mapping was necessary. Dr. Crawford discussed some corrections to restaurant zip codes that he made. I have reviewed these changes and I believe they are appropriate. Therefore I have applied the same zip code corrections in my own analysis. See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, page 10, footnote 21.

[46] Use of the tabulated data introduces other problems to Dr. Crawford's analysis. EEO table data were "not available" for 27 of the 396 restaurant locations. However, all of the restaurants can be associated with a PUMA in the PUMS data, so unlike Dr. Crawford's comparisons, my calculations are not geographically limited due to data availability.

the Census data to individuals who had earnings of less than or equal to the 75th percentile of earnings for individuals actually working in these positions at TXRH. I also included students in the availability pool.

70. Using the methodology discussed above, availability rates were estimated using the PUMS Census data. These are first stage estimates, since I apply an additional adjustment, as described below. For servers, the first stage average availability of those 40+ across restaurant locations is 4.69%. The median is very close to the mean, at 4.58%. These results are very different from the average availability for servers of 16.33% obtained by Dr. Crawford, calculated without earnings controls and excluding students (based on Crawford Table 4).

71. The first stage results are very similar for the other positions under study. For assistants, hosts, and bartenders, the estimated Census availability based rates are 4.21%, 4.14%, and 4.46%, respectively. On the other hand, Dr. Crawford's analysis suggests that the average 40-plus availability for server assistants is 30.95%, and for hosts and bartenders, 12.58% and 24.27%, respectively (based on Crawford, Table 4).

72. I also examined the range of Census availability figures I obtained, compared to the range seen in Dr. Crawford's report. For example, based on the EEO tables, Dr. Crawford estimates the proportion of those 40+ among bartenders by restaurant location to be between 0% and 100%, which clearly cannot be accurate. Based on my calculations the range is from 1.54% to 8.02%, depending on location.

73. But the Census based benchmarking analysis is still not complete. The calculations thus far include all students and *incumbent* workers within certain occupations and earnings bands. But are all of these individuals equally likely to search for new employment at any given time? They are not. The Census figures are for all incumbents in the job analyzed. What we are trying to proxy for is potential applicant flow. Potential job seekers will differ in age composition from all incumbents in those jobs currently, because of the well-researched fact that in general job

mobility is greater for younger members of the work force.[47] Job tenure is strongly related to age – older workers tend to have longer tenure than their younger counterparts. Thus, we need to adjust the incumbent-only figures, and a way to do this is to determine who among incumbents recently moved jobs and were thus recently in an applicant flow. This provides some indication of who was a job seeker, and will provide a more refined measure of potential applicant flow when using incumbent-level data.[48]

74. In the present context, since workers who are 40+ are less likely to change jobs than younger workers, this propensity should be taken into account in the calculation of age-availability benchmark estimates based on Census data. The incumbent based benchmarks discussed above do not account for the propensity to be looking for a job, which in general varies significantly between individuals less than 40 years of age and those 40+. Benchmarks that do not account for the possible age difference among workers looking for work and willing to change jobs will overestimate the proportion of *available* age 40+ workers in the labor market that could hypothetically be in a company applicant flow.

75. To adjust for this situation, I apply a factor which includes in the availability pool only those workers who have been employed in their current job for one year or less, meaning that they both looked for and found jobs in the past year. This information is not available in either the EEO tabulation data or the ACS PUMS files. However, it is included in the January supplement of the Current Population Survey (CPS), which is another government data source collected by the U.S. Census Bureau.[49]

76. That workers 40 and above have greater tenure than those less than 40 in the present

---

[47] See, for example, Jovanovic, B. *Job Matching and the Theory of Turnover*. The Journal of Political Economy, Vol. 87, No. 5, October, 1979: p. 972-990. Jovanovic primarily concludes that wage growth increases with tenure and that a worker's probability of separating from a job is a decreasing function of job tenure. See also Ehrenberg, Ronald G. and Robert B. Smith, *Modern Labor Economics*, Scott Foresman and Company, 1988.

[48] See, for example, "How Estimates Can Miss the Mark on Age Discrimination," by Stephen G. Bronars and Nathan D. Woods, *Law 360*, http://www.law360.com/articles/712535/how-estimates-can-miss-the-mark-on-age-discrimination.

[49] https://cps.ipums.org/cps/jt_sample_notes.shtml

context can be readily observed in the CPS data. Exhibit 33 shows the distribution of years worked at the current job for servers in the CPS data with the earnings control applied. The chart shows job tenure for servers less than 40 and for those 40 and above. The distribution for 40+ workers is shifted to the right of the distribution for those under 40, with under 40 servers having on average 1.44 years of tenure compared with 8.22 years for those 40+.

77. In the January CPS data, "Length of time worked at the current job in years" is requested of respondents to the January survey every other year, and this information is currently available through 2012.[50] Since this study concerns the years 2007 through 2014, I used the 2008, 2010, and 2012 data in my calculations.

78. The CPS data were processed and the same definitions were used as in the first stage of the availability analysis, i.e. with the same occupations and same earnings controls.[51] I then computed the proportion of workers with job tenure of one year or less by age group. Among those servers, 56.8% of those who are under 40 have tenure of less than or equal to one year, compared with 12.4% of those 40+. A similar pattern is shown for each of the other positions: for server assistants, 63.8% of those under 40 have tenure less than one year, compared to 23.7% for those 40+. For hosts, the numbers are 64.4% vs. 36.9%, and for bartenders, 57.8% vs. 15.1%. In other words, the proportion of workers under 40 with tenure of one year or less is smaller than the proportion of workers 40+ with tenure of one year or less in each of the four jobs under study. These results demonstrate that a higher proportion of employees under the age of 40 have both looked for and found work as servers, server assistants, hosts, and bartenders in the last year than the proportion of employees 40+.

79. The availabilities obtained from the ACS PUMS data were adjusted using these proportions. The CPS-based tenure estimates are used to adjust the number of available

[50] https://cps.ipums.org/cps-action/variables/JTYEARS#availability_section

[51] The sample size of the CPS is much smaller than the ACS. Therefore, restaurant level estimates cannot be obtained. The CPS adjustment factors are based on all respondents in the January CPS.

individuals in both age groups, and the resulting proportions therefore reflect more accurate estimates of applicant flow proxy availabilities in the population. For servers, after imposing the tenure less than one year constraint, the proportion of available and qualified potential employees who are 40+ is 3.78%. The corresponding numbers for server assistants, hosts, and bartenders are 4.06%, 4.16%, and 3.78%, respectively.

80. Dr. Crawford chose to use the EEO Tabulation data, which are not well suited to this type of analysis. As a result, his analyses do not produce estimates that reflect the potential availability pools for FOH positions at TXRH.

81. The substantial differences between Dr. Crawford's Census benchmarks and those I created, in terms of both variability and level, can be better appreciated by looking at the results visually. Exhibits 34 through 37 plot the restaurant by restaurant 40-plus availabilities calculated by Dr. Crawford against those I calculated using the PUMS data. As can be seen in each of the charts, Dr. Crawford's availability estimates are unreasonably high, and they vary wildly from restaurant to restaurant.

82. Once the proper data are used and the appropriate methodology is applied, the Census availability benchmarks are at least in line with the percentages found in the two TXRH applicant flow sources. Exhibit 38 shows Dr. Crawford's Census availability estimates compared to the corrected estimates I derived for each of the FOH positions.

83. Combining the facts that the SAJ data are complete for the period 2013 to 2014, that whatever missing paper applications exist are unlikely to reflect a different age composition than those that were not found, and that the refined Census benchmarks are similar to the two TXRH benchmarks, there is no basis for Dr. Crawford's assertion that the Census benchmark should be considered or used. Specific company data are always preferred to external benchmarks, absent a showing of flaws in the company data. This is because there is one thing the Census benchmarks cannot proxy. The Census data do not account for interest in a <u>specific</u> employer. We know that the applicants to TXRH were at least nominally interested in TXRH because they applied there. The Census benchmarks include only the "qualified" portion of the qualified *and*

interested pool. There may be those in the target occupation in the labor market who are uninterested in TXRH, but interested in jobs at other companies, with different numbers of or more convenient hours, a different work environment or working conditions, or higher pay and benefits. Thus, unless one can show company data is flawed or otherwise unreliable, there is no reason to resort to external measures. There are almost 820,000 applicants available in the TXRH data – given what we know of this information, these are more than enough to serve as benchmarks for which to compare the hiring practices of TXRH. It is to the hiring analysis that we turn next.

**STATISTICAL ANALYSIS OF AGE CLAIMS REQUIRES PARTICULAR ADJUSTMENTS TO YIELD ACCURATE FINDINGS**

84. Given the preceding sections, Dr. Crawford's benchmarks using the paper and SAJ applications show tremendous variation and his Census benchmark is very overstated. Once his errors using the Census are corrected, it is apparent that the internal applicant flow data is consistent with the external labor market benchmarks. We turn next to one additional problem with the use of any of the previously discussed benchmarks in this case.

85. Statistical analysis of claims alleging discrimination in hiring starts by creating "homogenous" (similarly situated, or similarly qualified) pools and then examines whether or not the actual number of job offers to the protected group (in this case, age 40+) differ significantly from the "expected number" of such job offers. The expected number of 40+ job offers is computed by multiplying the 40+ representation in the qualified pool by the total number of job offers from the pool. One then compares this expected number of job offers to the actual number, and conducts a statistical test to determine if the two figures differ in what is called a "statistically significant" way. There is a statistical "margin of error" in any real world process, and two numbers are called "statistically significantly" different from one another if they are not in the same "margin of error" range. For example, if 32% of a group of otherwise identical employees in a given job are 40+, then under a hypothesis of no discrimination, the standard

statistical model postulates that 32% of all employees who are hired should also be 40+, give or take a statistical margin of error.

86. Dr. Crawford's analysis assumes that all applicants in his pools (store years) are similarly situated, and only differ with respect to their age category. His statistical "null hypothesis" is that TXRH should be expected to pick randomly from these pools.[52] This assumption is incorrect. I have previously written and published on this topic, and have been researching these issues for some years now. What follows is an extension of previous work I have done.[53]

87. Dr. Crawford fails to consider an important labor market phenomenon that is unique to the analysis of selection practices involving age. The "duration dependence" process starts with the premise that older workers are higher performing in the labor market than younger employees, because they have acquired more human capital over time, and have risen up in the labor market hierarchy and thus generally are no longer available for, or interested in, entry level work. Because the high performing 40+ workers who have moved up in their work lives are unavailable to TXRH, they obviously cannot be hired. They are simply not in the pool of entry level applicants anymore. The 40+ applicants who are left in this pool are often those that, in spite of up to 20-30 years in the labor market, are still only qualified for (or perhaps interested in) entry level work. On the other hand, younger employees applying to these entry level positions have not had enough time in the work market to develop the skills, experience, etc. (the "human capital") to rise up in the labor market hierarchy. In the younger ranks, there is more of a mix of low performing individuals, and high-performing individuals who just have not had enough time to demonstrate that high performance and move to the same level as their 40+ counterparts. One is left with a candidate pool comprised more of a mix of high- and low-

[52] Or at a more nuanced level, he essentially assumes that the distribution of other job-related criteria TXRH relies upon to select its hires are unrelated to age, and thus all of those other job-related hiring criteria are identically distributed within both the group under 40 and those 40+.

[53] See Grossman, Paul, Paul W. Cane and Ali Saad, "Lies, Damned Lies, and Statistics": How *The Peter Principle* Warps Statistical Analysis of Age Discrimination Claims." *The Labor Lawyer*, Vol. 22, No. 3, Winter/Spring 2007, pp. 251-268.

performing younger candidates on one hand, and those 40+ employees who have not moved or cannot move beyond an entry-level job on the other. Put another way, if a random sample across the entire working population was to apply to TXRH, it is quite certain that 40+ applicants would be hired in much greater proportions than younger workers. But the actual applicant pool to TXRH is not simple random samples of under 40 and 40+ applicants. Yet Dr. Crawford treats them as if they were.

88. Thus, when studying age in the discrimination context, an "equal proportions" assumption, where all one must do is compare the proportions of 40+ applicants to 40+ hires, is incorrect when using typical applicant flow. Applicant flow data is incomplete in unique ways when it comes to age. If all employees were truly similarly situated in every respect within the pools, and the only difference between them were their ages, then such an analysis would be appropriate. However, in an age context, there is more that must be known regarding these employees before one can correctly assume that the employees in the pools are similarly situated with respect to all of their productivity related characteristics.

89. Why this matters centers on the fact that age differs from other protected characteristics in that it is not immutable – age changes over time. An individual applying for an entry-level job at 20 is not protected under the law, but if this same individual applies for an entry-level job at 45, then he/she is protected under the law. The fact that age continuously changes for all of us makes it different than other protected classes. Consider the following scenario. A group of individuals, all aged 20, are hired in the same year into entry-level jobs, not necessarily at the same employer. Some of the individuals hired into the entry-level jobs will be promoted within the organization or accept other job opportunities of a higher level outside the organization. That is, some of the individuals hired into entry-level positions will advance out of those jobs because they acquire greater human capital, which means as they age, they also have the opportunity to advance upwards in the job hierarchy - they can find and choose from higher paying, more advanced jobs. However, some of the individuals hired into entry-level positions will not advance to job opportunities of a higher level because they have not acquired the human

required, and will continue to work in and seek opportunities at the entry-level. As time passes, eventually we will see those same individuals who qualify only for entry-level jobs work through their 20's and 30's and eventually reach 40+. Now consider the impact of a hiring process for entry-level positions. Assume in the example that predicted job performance is completely and accurately measured by the company, and that the employer selects individuals for hire based only on expected productivity and performance. Will the hiring process be random with respect to age? It will not. Recall that most high-performing 40+ have moved out of the entry-level hiring pool, and those that remain, on average, are not, relatively speaking, as highly productive.[54] In other words, 40+ workers in this dynamic system as a whole are the *most* productive workers, and because they are more productive, they are less likely to seek entry level jobs. To be clear, the word "productivity" in this context is shorthand for a variety of attributes that would relate to overall effectiveness of employees on the job. Motivation, perseverance, underlying ability, personality, and so on, are all attributes that roll into a bundle that employers would regard as related to the effectiveness of their employees. And of course, different bundles of attributes are important for different types of jobs.

90. The reason for this outcome is straightforward: any group of applicants is likely to exhibit or possess a distribution of achieved performance, talents, underlying productivities, motivation and preferences. Not all workers are identical across this spectrum of labor market impacting attributes, there are many characteristics that contribute to success in the labor market. I have listed several. From a labor economics perspective, and for ease of exposition, one can abstract from these details, and simply refer to the bundle of such attributes as referring to

---

[54] A Ph.D. dissertation written by John R. Michael derives all of these relationships technically. Dr. Michael notes in his dissertation the connection of these concepts to age discrimination litigation cases. See: Michael, John R. (1999). *The Flow of Ability through a Job Group*, UMI Number 9943968. In addition see "Interpreting Relationships Between Age and Promotion in Age-Discrimination Cases," by Robert D. Pritchard, Scott E. Maxwell and W. Carl Jordan, *Journal of Applied Psychology*, 1984, Vol. 69, No. 2, 199-206, which derives these relationships in the context of an age discrimination setting where the practice at issue was a workforce restructuring. Also see Laurence J. Peter and Raymond Hull, The Peter Principle: Why Things Always Go Wrong, (1969), Edward P. Lazear, *The Peter Principle: Promotions and Declining Productivity*, 24 (NBER, 2001), and Lazear, Edward P. "The Peter Principle: A Theory of Decline." *Journal of Political Economy* 112 (2004): 141-163.

differences in worker "productivity." In the hiring context, a decision-maker is attempting to identify the prospective or expected productivity of candidates for hire, based on the information gleaned from applications, interviews, and so on. Regardless of the context, this distribution of productivity and all of its component contributing factors is *largely unobserved* to the statistical analyst, if one simply looks at the typical measures found in company human resource materials or application data. In the parlance of labor economics and applied econometrics, this is an example of "unobserved heterogeneity."[55] Of course, if the statistical analyst had the same measures of expected productivity that the company in the example had, the heterogeneity that exists could then be observed. However, the statistical analyst in a discrimination case typically does not have this unobserved information.[56]

91. It is my understanding that TXRH, like other employers, obviously seeks high potential employees. This is consistent with the record developed in this case. For example, according to materials provided to me describing aspects of the hiring process, TXRH looks for positive qualities in their FOH staff. In the parlance of TXRH, they seek "eagles," and not "ducks." "Eagles" are "people who are going to be successful,"[57] an "overachiever,"[58] someone "who soars above the clouds. They do an awesome job."[59] On the other hand, a "duck" is a "poor performer,"[60] an "underachiever."[61]

92. To distinguish the "eagles" from the "ducks," it is my understanding that TXRH

[55] Heterogeneity in this context refers to the fact that there is a distribution of productivity related differences that exists between a group of workers in any particular setting. See for example, Kiefer, Nicholas M., "Economic Duration Data and Hazard Functions." *Journal of Economic Literature*, 26, June 1988, pages 646-79, on the issue of heterogeneity.

[56] In some cases, such data are available. For example, in civil service hiring situations, tests are often administered, and the results rank-ordered. Selections are often based largely on this rank order. The analyst can use the ranking data, if that data is not itself challenged, to conduct analysis.

[57] Deposition of Doug Thompson, p. 88:23-24.

[58] Deposition of Rick Kaskel, p. 53:21.

[59] Deposition of Victor Hanan, p. 139:4-5.

[60] Deposition of Doug Thompson, p. 85:2.

[61] Deposition of Rick Kaskel, p. 53:21-22.

managers have discretion to develop the specific hiring criteria that will best identify the highest quality candidates in their communities. Just by way of example, these can include "attitude, integrity, and energy," [62] and "smiles and good attitude." [63] They "make good eye contact" and are "outgoing" and "able to multitask." [64] In addition, some managers are interested in hiring employees who are more likely to stay with TXRH for some time. Employees should have "longevity" with the expectation that they will "be there for a long time." [65] For example, one TXRH Managing Partner noted that he was "not looking for someone who would jump from job to job to job in short periods of time" because "nine times out of ten, you hire them and they're going to jump from you as well." [66]

93. It is also my understanding that TXRH trains its hiring managers on a concept of "behavioral interviewing," which includes reference to a number of "legendary traits" that can be considered in the FOH job hiring process. These include communication, a friendly/positive attitude, smiling, being a team player, fun, multi-tasking, energy, speed/urgency, flexibility, organization, accuracy, detail oriented, honest, service-oriented, pride, and awareness.[67] It is my understanding that Managing Partners look specifically for these traits when making their hiring decisions.

94. The "basic statistical concept" of a distribution of productivity across workers with the more productive among them advancing to higher level job opportunities over time was recently described in a district court decision involving a workforce layoff as "duration dependence."[68] The decision describes "duration dependence" as: "(i) better performing older workers tend not

---

[62] Deposition of Doug Thompson p. 92:19-20.

[63] Deposition of Rick Kaskel, p. 52:5.

[64] Deposition of Victor Hanan, p. 179:24-180:1.

[65] Ibid, p. 181, lines 6-9.

[66] Deposition of Mark Hymes, p. 56:8-12.

[67] See TXRH0720056, Interviewing and Hiring Legendary People.

[68] See Barnes, et al., v. The Hershey Company, United States District Court for the Northern District of California, No. 3:12-cv-01334-CRB.

to be in the same grade or job as better performing younger workers, because the better performing older workers *have progressed up the career ladder*, [emphasis added] and (ii) poorer performing younger workers tend not to be in the same grade (level of job) as poorer performing older workers, because the poorer performing younger workers have not yet progressed to the level of their older counterparts while, at some point, the better performing younger workers catch up with the poorer performing older workers."[69]

95. Based on this basic economic and statistical concept, any analysis that does not account for this phenomenon will be fundamentally flawed, since one would inevitably come to the erroneous conclusion that hires to the same entry level jobs will demonstrate a correlation to age, with 40+ applicants appearing to fare worse, *on average*, than younger applicants. Obviously the key here is "on average," because it is clearly the case that some 40+ applicants to entry level work do get hired, including at TXRH, where approximately 3,000 were hired during the relevant period. It is simply that fewer are hired based solely on their representation in the raw applicant flow data, which is fully expected based on duration dependence.[70]

96. It is important to stress once again that this line of reasoning does not in any way mean or imply that productivity declines with age or that 40+ workers are inherently unproductive. That is not what is happening, and in fact, the opposite is true. The issue is that 40+ workers in general are higher performing and often have more human capital than their younger counterparts. That is precisely why they progress to higher paying jobs over time. Thus, the most productive individuals currently in the 40+ are those that have previously moved up the job ladder, leaving behind their entry level colleagues who, even while they were young, were less productive or perhaps simply less motivated than other members of their same-aged group. Those who move up have acquired more skills or human capital over time. Those left seeking

[69] *Ibid*.

[70] This phenomenon is also observed in both promotion and workforce downsizing situations, where analysts would typically conduct analysis at the job level, where unobserved heterogeneity is present within given job buckets used in statistical analysis.

entry-level jobs did not become less productive with the passage of time, they were less productive than average when they started working and were young, and they have acquired less human capital over time than their higher performing more upwardly mobile counterparts. With the passage of time, these remaining lower performing and lower human capital workers age, and remain disproportionately mixed with other, generally younger applicants for entry-level positions. The next section presents some graphical depictions of how the duration dependence phenomenon works.

**VISUAL DEPICTION OF THE DURATION DEPENDENCE RELATIONSHIPS**

97. The visual example will assume a single company, but the same relationships would be obtained in the general workforce setting. Exhibit 39 assumes that a group of workers are hired into the same job, on the same day, at the same age. It is assumed that there exists a distribution of "productive characteristics" among these workers. Consequently, the individual workers will exhibit differing capacities to move upward. Some move quickly out of the initial job due to increases in their productive human capital, others more slowly, and some not at all, corresponding to the arrows on the right of the exhibit. Exhibit 40 focuses more clearly on the right hand portion of Exhibit 39. From the hire year forward, those with higher than average productivity move upward more than those with the average productivity, who move upward faster than those with the lowest productivity. If one were to plot the resultant distributions of productivity in the job title at year ten, the result would look conceptually like Exhibit 41. The right hand bell shaped curve depicts the distribution of productivity in this entry level job for new hires, while the left hand curve shows the productivity distribution for those entering the job ten years earlier, *but still in the same entry level job.* The minimum point of each distribution is the same, but the average for the ten year group is lower, as is their maximum.

98. Now assume that the economy as a whole is "the employer", with a productivity or performance-based hiring process, employees in the two pools, regardless of their ages, would face different probabilities of being selected for hire. If a statistical analysis mixes the two

groups in a hiring analysis, this essentially means that all employees face the same probability of hire. This is obviously inconsistent with reality. With respect to age, the passage of time will result in the employees depicted under the right hand bell curve being on average younger, while those under the left hand bell curve would be on average older. A statistical analysis mixing the two groups, and examining the relationship between hire and age would yield a “finding” that those in the upper curve (younger) are over-hired, while those in the lower curve (older) are under-hired. Neither result would be accurate.

99. In summary, the general idea is simple. *Within any given job or hierarchical level within the labor market as a whole*, there will emerge over time a natural correlation between worker productivity attributes and age. This correlation has nothing to do with workers age 40+ being inherently less capable and it actually has nothing to do with age per se – the age correlation is simply a by-product of the passage of time, and the more stationary nature of lower productivity workers. Those higher ability 40+ workers who at one time applied for entry-level jobs, are still working - they just occupy higher-level jobs. Some of them will in fact be running the companies to which similarly aged workers will still be applying at the entry level. We turn next to the analysis that was conducted to estimate the differences in the probabilities of hire for workers of different age groups, all applying for the same entry level job. Once this set of probabilities is obtained, it will be applied to the standard statistical model of the same type utilized by Dr. Crawford.

**AN ANALYSIS OF THE NATIONAL LONGITUDINAL STUDY DATA SHOWS THAT THE EXTERNAL LABOR MARKET EXHIBITS THE CHARACTERISTICS OF “DURATION DEPENDENCE”**

100. To measure the extent to which the external labor market exhibits the characteristics of “duration dependence” I turned to the National Longitudinal Study of Youth 1979 (“NLSY79”). The NLSY79 is a longitudinal dataset containing a large amount of information for a nationally representative sample of Americans born between 1957 and 1964, and tracked starting in 1979. The NLS is one of the most widely used datasets by economists and other social scientists, and

numerous articles and books have been written based on the data. The sample cohort originally included 12,686 respondents age 14-22 when first selected into the sample and first interviewed in 1979, and 9,964 remained as of the 2012 survey year. Respondents were surveyed each year from 1979 to 1993, and every other year from 1994 to 2012.[71]

101. The NLS data was used to identify employment and unemployment spells for all respondents and to track the characteristics of the respondents in each of the employment/unemployment spells. Information on age, race, gender, spell start and end dates, duration of the spells, starting/ending pay, occupation, and industry, among other characteristics were tracked for each respondent.

102. Given the longitudinal nature of the NLS data, wage growth profiles based on the data demonstrate clearly the different levels of observed productivity growth. Exhibit 42 depicts the wage growth profiles for NLS cohort members, stratified by their quintile of ending wage. One can see in the exhibit that there are persistent high performers, those in the middle, and those at the bottom. One can also see that these profiles emerged early in work histories, as there is wage separation right from the start. Exhibit 43 restricts to individuals in two different age categories who have worked in restaurant jobs. The Exhibit plots the wage growth for those persons who worked at some point in such a job while age 22 or younger, compared to those who worked in such a job when aged 40 or older. As can be seen in the Exhibit, those who worked in a restaurant job when 22 or younger experienced much higher wage growth, because many of these persons obtained additional human capital and moved upwards in the jobs hierarchy and probably no longer work in entry level jobs. Those still working such jobs while aged 40 or older have not substantially increased their wages over the course of their working lives.

[71] The NLSY79 was supplemented with the NLSY97 which is the same as NLSY79 but started in 1997 with a sample of 8,984 respondents born between 1980 and 1984 (ages 12-17), and sampled each year from 1997 to 2011, and then again in 2013 (where 7,141 remain). The addition of the NLSY97 data allows me to analyze a period of time where both 40+ and under 40 subjects are present together, removing the potential problem of employment characteristics changing over the period of time that those in the NLSY79 aged from under 40 to 40+, as well as allowing me to use unemployment durations that overlap in time with the class period.

103. The NLS and the employment/unemployment measures contained therein allow us to obtain measures we can associate with differences in average potential or expected productivity for 40+ workers in relation to their younger counterparts using the labor market as a whole. To best simulate the hiring environment in which TXRH operates, we specifically looked at the duration of unemployment for workers who engaged in a job search[72] after leaving jobs similar to those of the applicants to TXRH positions.[73] The time period of the unemployment spells analyzed was also limited from 2006 to 2013 and for the first year of active job search. Restricting the NLS data to only these unemployment spells allows us to model the hiring environment relevant to TXRH, which is applicants leaving entry-level type jobs, and who are potentially in the market for another entry-level job. By analyzing the relative difference in time to find a new job between 40+ and under 40 job seekers, we can approximate the relative likelihood of hire between the two groups, under a hypothesis that job seekers leaving entry level work are similarly seeking to be re-employed.[74]

104. To model this scenario, we employ the Cox proportional hazards statistical model, which is a type of "Survival Model", and is used to model situations where subjects have different times to some event or outcome of interest. In this case, it allows us to estimate in an age neutral setting the process of re-employment. Using the NLS data, we are able to track each subject's work history, including employment and unemployment spells. The event of interest for our

---

[72] In order to more accurately gauge the relative difference in the time spent looking for work between older and younger workers, only weeks spent actively looking for work are included for determining an unemployment spell (the NLS breaks up time between jobs as "looking for work" and "not looking for work").

[73] Unemployment spells resulting from the highest quartile of wages among the low skill occupations are not included in the analysis as they would be less likely candidates to be a TXRH entry level applicant.

[74] Note that in the NLS data, as in application situations for a company, are two categories of reasons a hire is not fully consummated. One is that the company decides not to make an offer to an applicant. The other is that the applicant turns down the offer, because they have decided another offer is better, or that they wish to search longer for a higher paying job, and thus do not accept the offer. Both effects are combined in the NLS data, but also implicitly in the TXRH data. The TXRH data does not permit a formal analysis of offers relative to acceptances, but it is notable that a number of applicants appear in the HR data as hires, but never appear in payroll data, implying they were "no-shows." While this is not the complete set of offers made that did not result in ultimate employment, this portion of offers is disproportionately over the age of 40 (3.53%), implying perhaps that applicants 40+, to the extent they have other offers, are taking them in greater proportions than those applicants under the age of 40.

model is "becoming employed" conditional on a spell of unemployment. Using weeks of unemployment between jobs, along with a variety of explanatory factors, the Cox model can compare the relative time it takes for two different groups to find employment (40+ vs under 40).

105. The hazard ratio is the resulting output from the Cox model. The hazard ratio is an expression of the chance of an event occurring in the 40+ group as a ratio to the chance of an event occurring in the under 40 group. Note that these ratios are comparisons between the two groups and give no indication of how long it takes for particular subjects in either group to find employment. A hazard ratio equal to one means that there is no difference between groups, whereas a hazard ratio greater than 1 indicates that the event is happening faster for the 40+ group than for the under 40 group. A hazard ratio less than 1 indicates that the event is occurring more slowly for the 40+ group than for the under 40 group. In our case, the hazard ratio provides the odds of a 40+ subject finding a new job relative the odds of an under 40 subject finding a new job. Unique to the Cox model, the hazard ratio is calculated in a way that the interpretation of the odds is considered to be constant at any given time during an unemployment spell, and for the entire duration of the spell.[75]

106. The model examines the weeks of unemployment until new employment is found. The model controls for age group, gender, race, education, previous occupation, previous industry, prior wage and the average Federal unemployment duration for each year.[76] The variable of

[75] Because of this assumption, which is fundamental to the interpretation of the hazard ratio, we perform diagnostic checks. The most common check is a graphical assessment of the time to event for each of the groups analyzed (40+ and under 40), which is referred to as the Kaplan-Meier plot. This plot should show the number of unemployment spells ongoing across the time period analyzed, and when compared across groups, the resulting curves should be roughly parallel across time, should not cross, and should start close and then diverge slowly. Similarly, the graph of the log(-log(unemployment)) vs log(time) should also result in parallel curves if the predictor (40+ vs under 40) is in fact proportional. Another popular method of determining proportionality is a plot of Schoenfeld residuals. By comparing the differences of each unemployment spell to the unemployment spells ongoing at each period of time, this plot allows one to evaluate whether the average of the differences seen between 40+ and under 40 unemployment spells changes over time. Lastly, by adding an interaction term to the Cox model that interacts time with the variable of interest, we can test if this interaction variable significantly effects the model, and if it does not, conclude that the assumption of proportionality holds for the variable studied. In all four of these robustness or diagnostic tests, the model estimated demonstrates proportionality, allowing our results to be interpreted and applied in a meaningful way.

[76] Keep in mind that the period analyzed has significant differences in the unemployment duration of workers due to

interest for this particular Cox regression is the 40+ dummy variable, which ultimately yields a hazard ratio of 0.41.[77] This is interpreted to mean, that at any given time, an unemployed individual 40+ years of age and seeking work after leaving an entry level job is 0.41 times as likely (59% lower chance) to become employed at a new job as an individual under age 40, after adjustment for the other explanatory variables in the model. Another way of viewing the result is that at any given time the odds of a worker from the 40+ group becoming employed is 0.41 for every 1.0 in the under 40 group. This hazard ratio of 0.41 can be used to modify the type of analysis performed by Dr. Crawford to account for the duration dependence phenomenon in the external labor market. We turn next to the application of these concepts and results to the analysis of hiring in this case.

**ONCE THE CORRECT ADJUSTMENT IS APPLIED TO THE TYPE OF ANALYSIS PERFORMED BY DR. CRAWFORD, THERE IS NO STATISTICALLY SIGNIFICANT SHORTFALL OF WORKERS 40+ WITH RESPECT TO FOH HIRING AT TXRH**

107. As discussed above, Dr. Crawford compares the actual number of 40+ hires to the expected number of 40+ hires as determined by the simple proportion of applicants who are age 40+. The results from the Cox model support the hypothesis that the expected number of 40+ hires is not the simple proportion of 40+ applicants, but instead should be estimated as the proportion of 40+ applicants adjusted by their *baseline* probability of being hired. This baseline accounts for the duration dependence phenomenon. Given that a hazard ratio is constant at any given time, the same 0.41 decrease in the odds of a 40+ applicant being hired is applied to each year.

108. I have conducted an adjusted aggregated analysis as rebuttal to Dr. Crawford's flawed attempt to do so. By constructing the proper statistical test, with adjustments for the duration dependence phenomenon, I show that there is no statistical evidence of a shortfall in the hiring of

---

the effects of the recession, and thus changes in the unemployment duration should be taken into account.

[77] The result is statistically significant with a p-value < .001

applicants aged 40+, even when the store by store results are aggregated to a bottom line result.

109. Given the data available, a common statistical method for obtaining an aggregated bottom line result is known as "multiple selection pools analysis" or "aggregated one-sample binomial Z-score analysis."[78] To perform such an analysis, the starting point is to determine the criteria that are thought to impact rates of hire, such as location, job, and year. Once these criteria are identified, employees are sorted into homogeneous subsets or "pools" with respect to these criteria. The employees in the pools are therefore differentiated only by age, and thus, under a hypothesis of no age related basis for selection, 40+ and under 40 applicants should be selected equally from these pools. Thus, if a particular pool contains 5% of applicants aged 40+, then 40+ selections for hire from that pool should also be 5%, give or take a statistical margin of error. This rate of selection is called the "expected" rate. What the Z-test allows one to do is separate random from systematic fluctuation associated with the observed margins of error. For example, if the actual selection rate from the pool mentioned above was 7%, the z-test would tell us whether or not 7% differed in a meaningful way from the expected rate of 5%. The Z-test can also be viewed as examining the difference between the actual and expected number of selections. Thus, assuming the total number of selections from the pool were 100, if 40+ representation is 5% we would expect five of the hires to be 40+. If seven are actually hired, the Z-test gives us the number of standard deviations of difference between the expected and the actual selections. A short reminder of the statistical concepts underlying selection pools analysis is useful at this point.

110. The concept of standard deviation is central to the subject of inferential statistics. Phenomena in the real world – e.g., income, age, education, or in this case, estimates of the expected number of hires – typically follow a distribution of possible values. These distributions can be characterized by their average value, or mean, and their degree of spread, or variance,

---

[78] Dr. Crawford also used a Multiple Selection Pools Approach in his analysis.

around the average. For normally distributed processes (the "bell shaped curve"), the degree of spread can be described by a statistical measure called the standard deviation. It is based on the inherent spread, or variance in the phenomenon or process under study, and the number of instances of the process that are observed. If very few observations are collected regarding the process, we will be less certain about the average nature of the process than if we collect many observations of the process. The mathematical principle of the "central limit theorem" leads to most processes "settling down" after a certain number of observations are measured, at which point statistical methods will be able to make inferences concerning the nature of the process.

111. A feature of the standard deviation is that in normally ("bell shaped") distributed processes, 68% of all process outcomes lie within one standard deviation of the mean, and 95% of all outcomes lie within approximately two standard deviations of the mean. This latter result is very useful, since we can simply measure the number of standard deviations of difference between the expected result and the actual result. If the actual is more than two standard deviations away from the expected result, statisticians generally conclude that the actual outcome is statistically significantly different from what was expected. The "two standard deviations" benchmark is typically used in employment litigation, and is equivalent to the 5% level of statistical significance. This can be restated to mean that since 95% of outcomes are within the two standard deviations "randomness range," only 5% lie outside. Therefore, if an actual outcome of a process is observed to lie outside of the two standard deviations range, there is said to be a less than one in twenty chance that this particular outcome is actually no different than the expected outcome. Therefore, we say that in such cases, the observed is statistically significantly different from what was expected.[79]

112. When using TXRH data to construct the "pools" needed for the proposed statistical analysis, it is important to use the proper statistical controls. Given the large variation in 40+

[79] Dr. Crawford also refers to the three standard deviation metric, which, instead of representing a less than one in 20 chance, represents a less than three out of 1,000 chance. Three standard deviations is equivalent to the 99.7% level of confidence, or the 0.003 level of statistical significance.

representation seen across the various TXRH locations, jobs, and years, like Dr. Crawford I find it necessary to control for applicants and hires to be from the same location, for the same job, and in the same year. This involves transforming the data into buckets of applicants by location, job, and year, and corresponding buckets of hires by location, job and year. To identify the relevant FOH hires for analysis, the electronic personnel data used by TXRH called UltiPro is required. Within this data there are employee history tables with the variable "DateOfLastHire" which indicates the hire date of each hire instance. There is also a location and a job associated with this hire date, but the first job listed may not always correspond to the job ultimately held by the hired employee. The job hired into must instead be inferred from a combination of the employee history tables and the pay tables.[80] The methodology used for assigning the hire job was to look at the first 100 non-Trainee hours worked for each hire, and determine which job was performed with the greatest frequency.[81] By combining these hire spells, it is possible to identify the location, job, and year of each hire. Dr. Crawford chose to only look at the first hire for each employee, and provided that it was to a FOH job, include it in his analyses. In addition to including known offers that did not result in hours worked, I also counted each employee's first

---

[80]The job titles from UltiPro were classified into 6 FOH job classifications in the following way:

Bartender: BARAM, BARNTS, BART, BARTENAM, BARTENDE, BARTRAIN, BRTRAINR

SA: FOHUTILT, SANTS, SERASSIS, SILVER, YFOHUTIL, YSERVAST, YSILVER, BARBACK, BARBKNTS, FOODRAM, FOODRUNN, FRNTS, FRTRAINR, SATRAINR, YFOODRUN

Host: HOST, HOSTAM, HOSTE, HOSTNTS, TOGOHOST, YHOST, YHOSTES, COUNTER, COUNTLD, HSTRAINR

Server: GAMESERV, HEADWAIT, SERBRNTS, SERVAM2, SERVER, AMSERVERS, TEAMSERV, YSERVER

FOH Other: FOHCOOR, FOHEVENT, FOHVAC, KEYHRLY

Train: TRAINEE, TRAINING, YTRAINEE, TRAINER, YTRAINER, YTRAINNG

[81]For hire spells with only Trainee hours, or hire spells not found in the pay tables (persons offered employment, but never working any hours), job title information from the employee history tables are relied upon. This subset of hires are classified as the first FOH job identified in the history tables, unless they were also classified as a Back Of House job during the hire spell, in which case the particular hire spell would not be considered a FOH hire due to the ambiguity of the information.

hire to a FOH job in an effort to mirror the hiring process at issue in this case.[82]

113. The reconstruction of the complete applicant flow to TXRH during the discovery period requires the combination of several data sources. The data available includes: SAJ applications (successful and unsuccessful)[83], paper applications (which are counts of unsuccessful applications by location and month), and UltiPro hiring data. While the successful SAJ applications are known, the successful paper applications are inferred by subtracting the SAJ hires from the total hires found in the UltiPro data. By combining the successful and unsuccessful SAJ applicants with the unsuccessful paper applicants and the inferred successful paper applicants, the complete set of applicants to TXRH is constructed. For unsuccessful paper applications not part of the sample Dr. Crawford sent to Accurint[84], only the month of submission is known as well as the location submitted to, making it necessary to estimate the job(s) applied to and the 40+ representation of these jobs within each store year. For store months in the sample, but with unsuccessful paper applications missing dates of birth, I use the 40+ representation by store, job, and year of the approximately 52,000 applications in Dr. Crawford's sample to extrapolate the representation of the remaining approximately 16,000 applications based on Dr. Crawford's analysis that concluded those applications not receiving an age from Accurint were not age biased. For the rest of the approximately 300,000 unsuccessful paper applications with only application counts by store and year, I use the 40+ representation by job and year of the approximately 52,000 applications in Dr. Crawford's sample to extrapolate the 40+ representation of each job, as well as the percentage of the total applications from each job. I do this based on the fact that Dr. Crawford chose his sample in a random and

[82] Dr. Crawford did not include those persons with no payroll records, but the fact that they appear in the Human Resources data means they received a job offer.

[83] SAJ data came from two sources: SQL from 2007 through 2012, and Mongo from 2013 through 2014. The combination of these two sources forms the complete electronic portion of TXRH's applicant flow data. For determining which applications ultimately led to a hire, applications were matched to the complete list of hires by name and other characteristics.

[84] Dr. Crawford took a sample of 321 store years and sent all of the unsuccessful paper applications found for those store years (68,908) to Accurint. Accurint returned 52,494 applications with DOB information.

representative manner. This allows me to estimate the job applied to, as well as the count of 40+ applications to that job for each of the location months available from the total population of unsuccessful paper applications.[85] After this process is completed for each store month, the added job proportions and relative 40+ representation of these remaining unsuccessful paper applications allows me to estimate the 40+ representation for each location, job, and year for all of the combined data.

114. The last step before conducting an aggregated analysis is to adjust the benchmark for 40+ applicants to reflect duration dependence. This requires the adjustment of the 40+ applicant representation by the relative odds of a 40+ applicant becoming employed which can be estimated as 0.41 for every one of the 40+ applicants. The unadjusted analysis, which I run first, compares the actual number of 40+ hires to the expected number of 40+ hires based only on the raw simple proportion of applicants who are age 40+. However, the results from the Cox model demonstrate that this number must be adjusted downwards, because the expected number of 40+ hires is not actually the proportion of 40+ applicants – for the hiring model to be accurate we must adjust by their relative *baseline* probability of being hired based on the duration dependence phenomenon. With the adjusted availability figures, I am then able to conduct an appropriate hiring analysis.

115. Before the hazard ratio adjustment is applied, an unadjusted analysis will be presented. The purpose for this is to demonstrate that I obtain results similar to what Dr. Crawford presented, in the sense that in the unadjusted model, there are substantial shortfalls.[86] If I instead

[85] To see this in practice, assume the Louisville 1 location of TXRH received 100 unsuccessful paper applications in each month of 2009. Also assume that in 2009 the approximately 6,500 paper applications from Dr. Crawford's sample had the following characteristics: 40% were for server (2.5% 40+), 20% for Server Assistant (5% 40+), 30% for Host (3.3% 40+), and 10% for the Bartender position (10% 40+). For each month in 2009 at the "Louisville 1" location, the results from the sample would be used to allocate the applications in the following way: 40 Server applications (one 40+), 20 Server Assistant applications (one 40+), 30 Host applications (one 40+), ten Bartender applications (one 40+).

[86] Despite the z-score standard deviation values resulting from these shortfalls appearing quite large, in reality the enormous sample size of hires in this case would result in almost any shortfall or surplus being significant. It is important to view the shortfalls in practical terms, which for these analyses that include 2,488 store years, resulting in a shortfall of only 1.4 hires aged 40+ per store year over the class period.

were to proceed straight to the adjusted model, the reader would not have the benefit of confirming that my unadjusted model and Dr. Crawford's model are quite similar in their conclusions when studying the TXRH applicant data. Putting the various mechanical errors made by Dr. Crawford aside, the most substantive difference between my final aggregated statistical results and Dr. Crawford's two sets of applicant data analyses is the hazard ratio adjustment. It is also important to note that I do not opine that the unadjusted results are a correct analysis. They are not, but they serve as the starting point for the adjusted analysis, and indeed, the unadjusted analysis must be performed in order to conduct the adjusted analysis, since the adjustment is arithmetically applied directly to the unadjusted analysis.

Unadjusted Z-score analyses of Hiring

116. We now turn to the statistical analysis of hiring to FOH positions at TXRH utilizing the unadjusted Z-score methodology. The Z-score analyses conducted here encompass the eight year period between 1/1/2007 and 12/31/2014. The results are presented overall, by year, by job, and by applicant source.

117. Exhibit 44 reports the unadjusted results from a comparison of the near complete pool of applicants to TXRH with all FOH hires at TXRH during the class period.[87] In other words, this analysis does not take the duration dependence factor into account, and simply uses the 40+ representation found in the various strata analyzed with no change. This first analysis includes all SAJ applications (successful and unsuccessful), and all paper applications (successful and unsuccessful). The resultant unadjusted analysis Z-score is -45.48. The unadjusted results by year indicate that statistically significant shortfalls in 40+ hiring to FOH positions occurred in all years. When viewed by job (Exhibit 45) the unadjusted results indicate statistically significant

[87] The use of a job control does not allow for 11,874 FOH hires to be included in the analyses. These hires are from employees who only ever worked as a Trainee/Trainer, or were hires into one of the other FOH positions not Server, Server Assistant, Bartender, or Host, and are thus unable to be compared to an equivalent job from the applicant flow data. Given that the 40+ representation of this 11,874 hires in 3.30% (higher than the representation of the rest of the hires analyzed), the omission of these hires serves to reduce the 40+ representation of the hires analyzed.

shortfalls in 40+ hiring to all jobs,[88] and when viewed by applicant source (Exhibit 46) the unadjusted results indicate statistically significant shortfalls in 40+ hiring for both applicant flow sources.

Adjusted and Corrected Z-score Analysis of Hiring

118. Exhibit 47 is based on the results from Exhibit 44, but with the duration dependence adjustment for the odds of a 40+ applicant becoming employed relative to under 40 applicants. By adjusting the 40+ representation of the applicants in each year by the proportional hazards ratio of 0.41, the benchmark for the weighted availability of 40+ applicants changes from 3.51% to 1.51%, which is very close to the actual percentage of 40+ applicants hired (1.56%) over the entire time period. When aggregated across the entire eight year period, the model does not find a statistically significant shortfall of hires. The resultant Z-score for the aggregated analysis in the adjusted model is 1.80. The results by year indicate that statistically significant shortfalls in 40+ hiring to FOH positions occurred in the years 2009, 2010, and 2011. There were statistically significant surpluses in 40+ hires in the years 2007, 2008, 2013, and 2014. In 2012, there was a shortfall of 40+ hires to FOH positions, but this shortfall was not statistically significant. Both yearly shortfalls and surpluses were very small in number, and statistical significance is found primarily due to the very large numbers of hires involved. In addition, the shortfalls in years 2009-2011 correspond with the period of time when there was higher unemployment. Greater numbers of 40+ displaced workers (as opposed to voluntary job seekers) may have been among those seeking employment, and to the extent that they were displaced from higher earning jobs, may have turned down offers at greater rates during these years, since they would have greater

[88] When including a control for locations with weekday lunch hours, the possibility of a job interest driven difference can be seen for the server position. Lunch locations have available work hours that are not in the evening, which might appeal to the age strata in different ways. As it turns out, 40+ applications to the server position for lunch locations is higher than to non-lunch locations (4.39% vs. 3.89%), they are hired at greater rates for lunch locations relative to non-lunch locations (3.01% vs. 1.87%), resulting in a larger percentage of those that apply becoming hired relative to non-lunch stores. These results also hold when looking at all FOH jobs combined to lunch locations vs non-lunch location.

chances of landing higher paying new jobs when compared to either lower earnings 40+ applicants or younger, less human capital level applicants. As noted above, there is no formal offer data, but we do know the rate at which hires in the UltiPro data fail to record any work time in payroll, since entry to UltiPro data typically precedes payroll records. 40+ hires fail to appear in payroll records at over double the rate of hires under age 40.

119. When viewed by job (Exhibit 48) the results indicate a statistically significant surplus in 40+ hiring for servers, no statistical significance for Bartenders or Server Assistants, and statistically significant shortfalls in 40+ hiring for hosts.. When viewed by applicant source (Exhibit 49) the results indicate a statistically significant surplus in 40+ hiring from SAJ applicants, and a statistically significant shortfall in 40+ hiring from paper applicants.. This is likely due to the fact that the paper applications cover the period 2009-2011, which the SAJ data do not.

120. My results, with or without the adjustment, continue to show wide variation in the hiring results store by store, such that they too are inconsistent with an argument of a pattern or practice, regardless of whether, as in my case, the final bottom line finding is that the aggregated average across stores is not one that is adverse to applicants aged 40+. Exhibits 50 through 54 are similar to those previously discussed that plotted Dr. Crawford's store level standard deviations against the median store. In my analysis, one also sees wide store level variation, likely due to the fact that market partners vary in the criteria they use in making hires, for which there are no available data in order to use as statistical controls. As noted previously, hiring decisions are made at the store level, and as we have seen above, substantial variations in hiring shortfalls/excesses exist across the many stores at TXRH. The next section presents the results of aggregated hiring analyses.

121. Taken in their aggregated form, these results do not support a hypothesis of discrimination against 40+ applicants for FOH positions at TXRH. Instead, once the proper controls are the put in place, the results show that there is no statistically significant difference in the hiring of applicants to FOH positions over the entire eight year discovery period.

122. Dr. Crawford does not consider any attributes of the applicants in his analyses. In his view they are all identical, save for their age category. However, duration dependence shows that applicants are not all identical, and that their characteristics will systematically differ, and likely will correlate with age.

123. In conclusion, the results and conclusions of Dr. Crawford's hiring analyses are not reliable, and do not allow one to draw inferences regarding either the presence of a statistically based pattern or practice, or an aggregated average outcome relative to selections of 40+ applicants for hire. I turn next to discussing a variety of other problems and errors in Dr. Crawford's analysis.

**DR. CRAWFORD'S BACKUP MATERIALS CONTAIN MULTIPLE ERRORS AND DO NOT ALLOW COMPLETE REPLICATION OF HIS WORK**

124. The backup materials provided by Dr. Crawford are incomplete and did not include all of the files necessary to replicate his results. Some of the files he produced appear to be old versions of the updated files used in his analyses.

125. Dr. Crawford processed the raw TXRH data using software called STATA. However, it appears that Dr. Crawford used multiple versions of STATA in conducting his analyses. We know this because EEOC's counsel provided this information after unsuccessful attempts were made to replicate some of Dr. Crawford's programs. Some of Dr. Crawford's programs would only run if an earlier version of STATA (i.e., Version 10) was used. Dr. Crawford used a different version of STATA (i.e., Version 13) for other programs in his backup materials. Dr. Crawford provided no indication in his report or backup materials which version of STATA was used for each analysis.

126. Some of Dr. Crawford's programs cannot be replicated because of coding errors present in the program. For example, Dr. Crawford's program "lookup2.do" contains several errors that do not allow the program to perform all of its commands and run to completion.[89] This means

[89] The program misspells variable names which causes an error and do not allow the program to run to completion.

that Dr. Crawford must have either provided a program different than the one he actually used to process the data for his report or corrected the errors in a subsequent version of the program and did not provide the corrected program. It also means that any data files created by this program (for possible use in other programs) were not created by the program code provided.

127. As another example, Dr. Crawford's program "TableC.do" does not run to completion because of a program error.[90] Again, Dr. Crawford must have either provided a program different than the one he actually used to process the data for his report or corrected the errors in a subsequent version of the program and did not provide the corrected program. And again this means that that any data files created by this program (for possible use in other programs) were not created by the program code provided.

128. In addition, the "TableC.do" program imports a file called "HVC.txt." This file has the hiring data that he uses in his external labor market benchmark comparisons. However, when "TableC.do" is run using the provided HVC.txt data input, the results that are generated for servers do not match the provided output file "T11_Hires_WAIT.txt" which contains the results which appear in Table 11. However, even if one re-runs the program "HVC.do" which generates the "HVC.txt" file, and then uses that result in the TableC.do program, the results are not the same as those in the T11_Hires_WAIT.txt output file, and in Table 11 of his report. This means that something is different between the "HVC.txt" file that was provided, and the one that was actually used to obtain the results presented in his report. Since we do not have the versions of the program that created the file he provided, there is no way to know what changes might have been made or to evaluate whether they were appropriate or not.

129. Dr. Crawford provided data files with variable names that were not created in his

---

In addition, typographical errors were also made that do not allow the program to run to completion (i.e., single equal sign instead of a double equal sign). The import statement also contained an error. A single error in a STATA program will cause the program to stop and not run to completion.

[90] A merge statement in this program causes an error because this statement creates a new variable (_merge) and Dr. Crawford's dataset already contained a variable with the same name.

program files. For example, his program "hires2.do" creates a file called "datatemp.dta." In the program code, the file "datatemp.dta" should not contain a variable called "c2007_iph". However, the backup materials provided by Dr. Crawford included a file called "datatemp.dta" that did include a variable called "c2007_iph". In fact, his hires2.do" program will only run to completion if one uses the "datatemp.dta" file provided by Dr. Crawford. It should be the case that the "datatemp.dta" file created within the program "hire2.do" matches the data file of the same name provided by Dr. Crawford. However, the data file created within the program does not match the data file provided by Dr. Crawford and the program will not run to completion without using the file he provided as opposed to using the file created by his program.

130. This issue is even more evident when comparing Dr. Crawford's data files with the same name. For example, Dr. Crawford produced two files named "hires_wide.dta", one in the batch entitled "Supporting Docs 2" and the other in the batch entitled "Supporting Docs 4."[91] Only one program, "hires_counts.do" was provided that creates the data file "hires_wide.dta" and it was produced in the "Supporting Docs 2" batch. No other program provided by Dr. Crawford creates or modifies the data file "hires_wide.dta." However, a comparison of the data file "hires_wide.dta" provided in the "Supporting Docs 2" batch shows that it is different from the data file, with the same name, provided in the "Supporting Docs 4" batch. Specifically, the data file from the "Supporting Docs 4" batch has one additional variable, "src", and several of the other variables have different names.[92] Changes to the data file "hires_wide.dta" were performed outside of the programs provided by Dr. Crawford. Complete replication of Dr. Crawford's work is not possible since the program code needed to make the changes to the "hires_wide.dta" file was not provided. Replication should follow directly from the

---

[91] See file entitled "listoffiles_20160223.xlsx" provided by the EEOC.

[92] The data file "hires_wide.dta" from the "Supporting Docs 2" batch includes the variables: storeid, tothr2007, tothr2008, tothr2009, tothr2010, tothr2011, tothr2012, tothr2013 and tothr2014. The data file "hires_wide.dta" from the "Supporting Docs 4" batch includes the variables: site, tot2007, tot2008, tot2009, tot2010, tot2011, tot2012, tot2013 and tot2014.

"hires_wide.dta" file created in the program "hires_counts.do." The "hires_wide.dta" file is subsequently used in the program "app_tally.do" from the "Supporting Docs 4" batch. The "app_tally.do" program will not run using the data file "hires_wide.dta" created from the program "hires_counts.do" since this version of the data file does not contain the same variables.

131. As another example, Dr. Crawford produced a data file named "SAJyear.dta", in the batch entitled "Supporting Docs 7"[93] Only one program, "SAJ.do" was provided that creates the data file "SAJyear.dta" and it was produced in the "Supporting Docs 7" batch. No other program provided by Dr. Crawford creates or modifies the data file "SAJyear.dta." The file "SAJyear.dta" is subsequently used in the program "HVSAJ.do." However, when the program "HVSAJ.do" is run using Dr. Crawford's file "SAJyear.dta", it does not run to completion because of an error.[94] Complete replication of Dr. Crawford's work is not possible since the program code does not run as intended even when using the data files provided by Dr. Crawford.

132. Finally, Dr. Crawford produced a document intended to explain the Mantel-Haenszel test produced by his proprietary Mulpools program. Included in this document were the formulas for calculating the Mantel-Haenszel test. Dr. Crawford does not provide any information on the source of the formula used in his Mulpools program, that is, the explanation does not state the foundation on which the formula is based. A review of the Mantel-Haenszel formulas from standard sources shows that the formula used by Dr. Crawford's proprietary Mulpools program is not consistent with the formulas from the standard sources.[95] For example, Dr. Crawford's proprietary Mulpools program rounds the sum of the expected number of protected group individuals selected down to the next lower integer. This "rounding" is not present in the

---

[93] See file entitled "listoffiles_20160223.xlsx" provided by the EEOC.

[94] An attempt to convert the variable "site" from a numeric to a string does not work because there are records with the "site" variable equal to "??" in the "SAJyear.dta" file provided by Dr. Crawford. Since "??" cannot be converted to a numeric value. Subsequently, a merge using the "site" variable causes the program to generate an error and stop because "site" is numeric in one dataset and string in the other dataset.

[95] See Piette, Michael J. and Paul F. White, "Approaches for Dealing with Small Sample Sizes in Employment Discrimination Litigation," *Journal of Forensic Economics* 12(1), 1999, pp. 43-56.

standard sources.[96]

**OTHER ASSUMPTIONS MADE BY DR. CRAWFORD ARE INAPPROPRIATE**

133. Dr. Crawford recognizes that his approach excludes applicants who were given an offer, and thus present in the Texas Roadhouse HR data, but did not end up working, that is, did not appear in the TXRH payroll data. He states "There were individuals who were included in the human resources table that could not be located in the payroll records. Such individuals were not counted as "hires" in any of my analyses."[97] He further states that "It could be argued that one should count offers of employment regardless of whether the offers led to actual employment." Lastly, Dr. Crawford said that it would have been possible to count such offers.

134. Clearly, applicants who 1) received an offer; 2) accepted the offer; and, 3) made it into TXRH's human resources data, should be considered to be a hire, even if these applicants never made it into the payroll data. In addition, contrary to Dr. Crawford's claim that he did not count such individuals as hires, in fact, he did count these individuals as hires for purposes of selecting his random sample of paper applicants.

135. Dr. Crawford's approach to selecting his random sample of paper applicants involved combining the data for hires with the paper application data. In particular, we assume Dr. Crawford wanted to ensure that he drew his sample from stores and years that had both hires and paper applications. His program "hire_counts.do" was used to generate the total number of hires per store and year. It is clear from this program that Dr. Crawford does not make use of the payroll data, since it does not include any references to that data. Because he does not use the payroll data, this data file includes individuals who 1) received an offer; 2) accepted the offer; and, 3) made it into TXRH's UltiPro HR data, but did not make it into TXRH's payroll

---

[96] Dr. Crawford's formula for the Mantel-Haenszel test shows "(VAR)" in the denominator. Instead of "(VAR)", the formula should have been Σ(VAR), that is the sum of the variances obtained in each stratum.

[97] See Amended Expert Report of David L. Crawford, Ph.D., February 25, 2016, page 5.

data. This methodology is in contrast to the one used in Dr. Crawford's program "hires2.do" which makes use of the payroll data to ensure that the hires, generated by this program, are present in both the HR and the payroll data. We turn next to the analysis of several other employment practices at TXRH.

**ANALYSIS OF OTHER EMPLOYMENT OUTCOMES INCONSISTENT WITH DR. CRAWFORD'S OPINIONS**

136. If it were the case that TXRH intentionally and systematically discriminates against 40+ individuals with respect to hiring, as alleged, one might also expect to see evidence of their differential treatment with respect to other employment practices. Therefore, it is worth examining the available data for other employment practices.

Promotions

137. The promotion analysis examines all those hired into FOH positions from 2007-2014. Using TXRH's UltiPro data, I considered each person's first entry level front-of-house role as well as their highest-level role in any subsequent jobs during this time period. I compared the proportions of workers age 40+ and those under 40 who received promotions from their entry-level positions to any supervisory or management roles.[98] The results indicate that 1.77% of 40+ workers received at least one promotion, compared to only 1.54% for those under 40, and this difference is statistically significant.

138. When narrowing to only those employees promoted to the middle and highest store level management roles, 40+ workers are also promoted more often than those under age 40.[99]

[98] The jobs to which FOH hires during the period were promoted include the following: Back Of House Coordinator, Back Of House Trainer, COR Trainer, Front Of House Coordinator, Front Of House Events, Head Server, Host Trainer, Key Holder Hourly, Local Store Marketer Coach, Product Coach, SA Trainer, SA Coordinator, Server Coach, Trainer, Y Trainer, AKM In Training, Assistant Kitchen Manager, Bar Manager, Kitchen Manager, Kitchen Manager In Training, INT Manager, OP Manager, SC Manager, SCSR Manager, Server Manager, Training Manager, Assistant Managing Partner, ASM In Training, Assistant Store Manager, Managing Partner, Managing Partner In Training, and Store Manager In Training.

[99] These positions include AKM In Training, Assistant Kitchen Manager, Bar Manager, Kitchen Manager, Kitchen Manager In Training, INT Manager, OP Manager, SC Manager, SCSR Manager, Server Manager, Training

Between 2007 and 2014, 0.95% of those 40+ were promoted to the store managerial ranks, while only 0.62% of those under 40 received such promotions. This difference is statistically significant. Finally, 0.60% of workers age 40-plus were promoted up to the highest store management level, whereas only 0.43% of those under 40 received such a promotion.[100] Both of these differences are statistically significant at the 5% level.

Stayer/Leaver

139. I used the Ultipro data covering the period 2007-2012 to determine whether or not an incumbent employee hired at any time during the relevant time period into an FOH job was still active at the end of 2014.[101] When comparing the proportions of workers age 40+ and those under 40 who left TXRH for any reason by the end of 2014, 82.95% of 40+ workers had left the company while 92.32% of those under 40 had departed. Thus, 40+ FOH hires during the period 2007-2012 were more likely to remain at TXRH.

Compensation

140. The analysis was of the initial starting pay for 40+ hires into FOH jobs compared to hires less than 40 years of age. The analysis was conducted on the group of hires considered in the hiring analyses conducted above. The method used for analysis is multiple regression, where starting base wage is the dependent variable, and the independent variables are year of hire, whether or not the state hired into is an FLSA tip credit state, job hired into, store, and finally, a variable for being age 40 or above at the time of hire.[102] It is my understanding that base pay is

---

Manager, Assistant Managing Partner, ASM in Training, Assistant Store Manager, Managing Partner, Managing Partner In Training, and Store Manager In Training.

[100] These positions include Assistant Managing Partner, ASM in Training, Assistant Store Manager, Managing Partner, Managing Partner In Training, and Store Manager In Training.

[101] The analysis was restricted only to hires through the end of 2012 in order to provide sufficient time to observe departures from hires during that period.

[102] Base wage, not wage including tips is used, since tips are not under the control of TXRH.

set by the Managing Partner of each particular TXRH location. The analysis shows that 40+ employees were statistically significantly paid more at the time of hire than those under 40. The difference is 1.74%.

141. There is no evidence that TXRH's other employment practices that can be analyzed with the data provided for this case impact 40+ hires adversely relative to those hires under the age of 40. To the contrary, there are employment practices in which 40+ workers do significantly better than those under age 40. If adverse age related systematic and intentional discrimination was present at TXRH, one might expect to see evidence of it across other employment practices. The findings with regard to the other employment practices studied are inconsistent with a hypothesis that TXRH treats its employees who are 40+ FOH employees worse than those under age 40.

## CONCLUSIONS

142. Dr. Crawford's own analyses reveal that there is no consistent statistical pattern that would support the proposition that there was an adverse pattern or practice in the hiring of 40+ applicants into FOH positions at TXRH. Instead, it appears that store level decisions were highly varying in how they relate to applicants aged 40+. It is my understanding that hiring decisions are made at the store level, and few store level statistical findings are statistically significant at the two standard deviations level, and even fewer at the three standard deviations level. Dr. Crawford points this out as well, but again interprets it in an aggregated context, not as an indicator that most stores, even under the flawed and overstated benchmarks Dr. Crawford uses, do not appear to treat their 40+ applicants differently from younger applicants.

143. Dr. Crawford handles the data involved in inconsistent and confusing ways, and with the backup he provided, many of his reported findings cannot be directly replicated without either rewriting his programs to fix errors, or creating new programs altogether.

144. Dr. Crawford's claims and/or suggestions that TXRH's applicant flow data are so incomplete as to require him to resort to external Census based benchmarks are without merit. The SAJ electronic online application system data provided by the company is essentially

complete from mid-2013 onwards, which is the time after which it came to be relied upon by TXRH, and the 350,000 unsuccessful paper applications, plus the approximately 140,000 successful applicants who were hired based on the paper applications, but whose actual applications could not be found together constitute almost 500,000 paper applications. Analysis of a random sample of stores and their accompanying paper applications demonstrates that these applications constitute an unbiased benchmark for comparison purposes in a hiring analysis. Thus with unbiased and very substantial paper applicant flow for the period of time 2007 through part of the year 2013 when it was gradually phased out, and complete electronic applicant flow for the period in mid-2013 through the end of the discovery period, there is simply no reason to resort to external measures, which cannot proxy for all of the nuances of actual applicant flow to a company.

145. Dr. Crawford's Census benchmarks are woefully incorrect, and overstate in some cases by an order of magnitude what the appropriate level of applicant flow should be. Dr. Crawford used the wrong Census data, and handled it incorrectly as well. He used summary tabulations designed for purposes different than the task at hand in this case. In addition, simple inspection of his Census benchmarks reveals enormous and obvious inaccuracies. His benchmarks, designed to proxy applicant flow to the same jobs to the different locations of the same company (TXRH), vary by fully 100% in some instances. This cannot possibly be correct. How is it possible that the labor market availability for bartenders over the age of 40 in some locations is 100%, but that in other locations there are no bartenders at all over the age of 40? For other positions and other locations, similarly stark comparisons are seen. Dr. Crawford's Census benchmarks are simply not credible on their face as a proxy for entry level jobs at an establishment like TXRH.

146. Finally, Dr. Crawford fails to consider an important labor market element unique to the analysis of selection practices involving age. The "duration dependence" process discussed at length above starts with the premise that older workers are higher performing in the labor market than younger employees, because they have acquired more human capital over time, and have

risen up in the labor market hierarchy and thus generally are no longer available for, or interested in, entry level work. Because the high performing 40+ workers who have moved up in their work lives are unavailable to TXRH, they obviously cannot be hired. They are simply not in the pool of entry-level applicants any longer. The 40+ applicants who are left in this pool are often those that, in spite of up to 20-30 years in the labor market, are still only qualified for (or perhaps interested in) entry level work. On the other hand, younger employees applying to these entry level positions have not had enough time in the labor market to develop the skills, experience, etc. (the "human capital") to rise up in the labor market hierarchy. In the younger ranks, there is more of a mix of low performing individuals, and high-performing individuals who just have not had enough time to demonstrate high performance and move to the same level as their 40+ counterparts. One is left with a candidate pool comprised more of a mix of high- and low-performing younger candidates on one hand, and those 40+ employees who have not or cannot moved beyond an entry-level job on the other. Put another way, if a random sample across the entire working population was to apply to TXRH, it is quite certain that 40+ applicants would be hired in much greater proportions than younger workers. But the actual applicant pool to TXRH is not comprised of simple random samples of under 40 and 40+ applicants. Yet Dr. Crawford treats them as if they were.

147. Analysis of a nationally representative longitudinal data set tracking thousands of people from their entry into the labor market over a 30 plus year period demonstrates the natural sorting process of workers, reflected by differential patterns of wage growth. This data can be used in an econometric model designed to estimate the relative odds of persons in different age categories getting hired upon leaving other entry level jobs. The analysis produces an adjustment factor, which when applied to the type of hiring model used by Dr. Crawford, eliminates the hiring disparity he finds, even when all of the stores and all of the years are aggregated to bottom line results. This finding, along with all of the other findings reported on in this case, indicate that there is no statistical evidence of a consistent and systematic pattern of adverse hiring outcomes across the hundreds of stores at TXRH, and even when all these diverse

locations are combined, there is no aggregate hiring shortfall in the numbers of applicants aged 40+.

148. As additional support for the latter finding, analysis of several other employment practices, including promotions, voluntary and involuntary terminations, and pay, show that these practices are either insignificantly different between those under 40 and 40+, or favor those 40+.

I declare under the penalty of perjury of the laws of the United States that the forgoing is true and correct. Executed in Los Angeles, California on this 22nd day of April 2016.

Ali Saad, Ph.D.

resolution economics LLC

9777 Wilshire Blvd
Suite 600
Beverly Hills, CA 90212
Office.310.275.9137
Fax.310.275.9086

# ALI SAAD, MANAGING PARTNER

Dr. Saad is the Managing Partner of Resolution Economics LLC. He has a Ph.D. in Economics from the University of Chicago. Prior to Resolution Economics, Dr. Saad was a partner at Deloitte & Touche LLP and at Altschuler, Melvoin and Glasser LLP. Before that he was in the litigation consulting group at Price Waterhouse, first in New York, and then in Los Angeles. Prior to his consulting career, Dr. Saad served as an Assistant Professor of Economics at Baruch College of the City University of New York (CUNY).

## Professional Experience

Dr. Saad's experience is extensive in the areas of statistical and economic analysis of liability and damages related to employment litigation matters, as well as consulting on a variety of non-litigation employment issues. He is experienced in designing, implementing, and analyzing surveys and observation studies related to exempt / non-exempt status, hours worked, uncompensated time, meal and rest breaks, and other wage and hour issues. He has also performed statistical and damages analyses for a broad range of litigation matters including breach of contract, insurance coverage, environmental claims, patent infringement, antitrust and real estate financing disputes. Dr. Saad has testified a number of times at deposition and trial.

## Employment Matters

Dr. Saad provides a variety of services related to employment litigation. His experience is extensive in conducting statistical and economic analysis related to issues of liability for employment discrimination matters. He also has designed and conducted many surveys and observational studies related to wage and hour issues. Dr. Saad has also performed analyses of economic damages in both class action and single plaintiff matters.

## Statistical Analysis of Discrimination Matters

Assignments representative of Dr. Saad's experience in performing analyses in connection with employment discrimination matters include the following:

- Consulting and expert witness services in national class action race discrimination matter involving issues of pay, promotion, work assignment, and a variety of other challenged employment practices. Services included creating databases from diverse and voluminous source materials, and conducting extensive statistical analyses.

- Consulting and expert witness services in national class action gender discrimination matter involving issues of job assignment and promotion. Services included creating databases from diverse and voluminous source materials, and conducting extensive statistical analyses.

- Consulting and expert witness services in a class action case alleging that contracts were misleading. Services included processing and analyzing large quantities of data, and performing statistical analysis of

the criteria determining class membership.

- Consulting and expert witness services in connection with a major class action alleging gender discrimination in pay and promotion at a large high-tech employer. Services included creating analytical databases, and developing economic and statistical arguments concerning the relationship between productivity-related variables, pay/promotion, and gender.

- Consulting and expert witness services in an antitrust and discrimination matter in which a group of businesses alleged violations of antitrust and discrimination laws by another group of businesses. Services included data construction, and statistical analysis related to issues of liability.

- Consulting and expert witness services on behalf of plaintiffs' counsel in a series of cases alleging race discrimination in hiring. Services included creating analytical databases, studying the relationship between race and hiring, and examining the features of the external labor market.

- Consulting and expert witness services in connection with a class action claim of discrimination based on age in connection with a series of layoffs resulting from the combination of two large retail chains. Services included creating analytical databases, studying the relationship between layoff and age, and examining the relationship between age and workforce composition over.

- Consulting and expert witness services in connection with EEOC allegations of race discrimination in recruiting, hiring, and initial placement at a large service providing company. Services included developing databases from diverse paper and electronic sources, and providing statistical arguments concerning the relationship between race and various other factors.

- Consulting and expert witness services to defendant's counsel in connection with a major class action alleging gender discrimination in multiple employment practices at a national retail chain. Services included developing a database from voluminous paper documents, and conducting analysis related to hiring, initial placement, and initial pay.

- Consulting and expert witness services to defendant's counsel in connection with an EEOC investigation of racial discrimination in hiring by a major service providing organization. Services included developing a database, and conducting statistical analysis related to hiring.

- Consulting services to defendant's counsel in connection with a U.S. Department of Labor OFCCP investigation of pay equity at a high-tech company. Services included design and oversight of a statistical analysis of pay equity, assessment of the OFCCP methodology, and participation in conciliation discussions between the company and the OFCCP.

- Consulting and expert witness services to defendant's counsel in connection with an allegation of age discrimination in terminations resulting from a series of mass layoffs. Services provided included developing statistical arguments concerning the relationship between age and termination.

- Consulting services to defendant's counsel in connection with a Department of Justice investigation regarding allegations of racial profiling by a large city police department. Analyzed departmental data related to over 130,000 traffic stops, pedestrian stops, and other types of police contacts that occurred in

four selected weeks in 1997 and four selected weeks in 1999. Cross-referenced traffic stops data with other information sources including human resources data, precinct level paper records, and the officer discipline system to test various hypotheses.

- Consulting services and expert testimony to defendant's counsel in connection with a multi-plaintiff matter alleging race and gender discrimination in promotion and placement into coveted positions by a large city police department. Performed statistical analysis of promotion and placement into coveted positions. Quantified economic damages for several plaintiffs under failure to promote and wrongful termination theories.

- Consulting services in a case against a city government alleging discrimination in recruiting and hiring of police and firefighters. Services included using Census and other large-scale data sources to assess labor market characteristics by detailed geographic location, and conducting extensive analysis of the impact of employment tests on hiring.

- Consulting and expert witness services to defendant's counsel in a matter where plaintiff alleged that defendant's hiring practices discriminated against women. Services included converting diverse paper source materials into a usable database, and developing statistical evidence concerning plaintiff's allegation.

- Consulting services in several class action recruiting and hiring matters. Services included use of detailed census and other data to estimate labor market availabilities by geographic location, and analyzing employment practices in light of these availability findings.

- Consulting services to a major bank involved in an analysis of its fair lending practices. Services included using bank data on applicants for mortgages and other loans, and adding various demographic and geographic information to assess if the bank made loans on the basis of race, or controlling for other, observable factors could explain patterns in loan making.

- Consulting services on behalf of defendant's counsel in a major class action matter involving allegations of gender discrimination in promotion. Services included building analytical database from many sources, using the database to conduct extensive statistical analysis of plaintiffs' allegations, and estimating damages resulting from non-promotion for approximately 3,000 women occupying different jobs over a ten-year period.

- Consulting and expert witness services on behalf of defendant's counsel in two related cases alleging age discrimination in termination. Prior to plaintiffs' vesting for certain long term benefits. Services included using defendant's human resource data to test plaintiffs' specific allegations, developing statistical arguments concerning the relationship between age and termination, and performing analyses of plaintiff's damages in each case.

- Consulting services on behalf of plaintiff's counsel in distribution of award in an age discrimination matter with 75 plaintiffs. Services included developing a method to efficiently compute damages for all plaintiffs, and working with counsel, an arbitrator, and a committee of plaintiffs to explain the process to the plaintiff group.

## Wage and Hour Matters

Assignments representative of Dr. Saad's experience in wage and hours matters include:

- Consulting and expert witness services to defense counsel in a national class-action wage and hour matter alleging that several thousand loan originators at a large financial institution were misclassified under FLSA. Conducted statistical analyses of hours worked records, compensation data, plaintiffs' declarations, and other data to determine if select groups of plaintiffs would be representative of the class.

- Consulting and expert witness services to defense counsel in a wage and hour matter alleging that several thousand General Managers and Assistant Managers at a large office supply retailer were misclassified as exempt employees. Services included designing and conducting a survey to examine whether class members were appropriately classified, analyzing the company's labor model and human resources data, and conducting statistical analyses related to a variety of class certification issues.

- Consulting and expert witness services to defense counsel in a wage and hour matter alleging that several thousand Assistant Managers at a large general merchandise retailer were misclassified as exempt employees. Services included designing and conducting both a survey and an observational study, to examine whether or not class members were appropriately classified. Services also included conducting extensive statistical analyses of the data collected by the survey and the observational study, and preparing materials for use in class certification proceedings.

- Consulting services to defense counsel in a class action matter alleging failure to pay overtime wages to independent sales and service representatives for a large national tool franchiser. Services included designing and implementing an hours survey to determine whether the additional hours worked claimed by some plaintiffs was representative of the additional hours worked by the class as a whole. Determined that the problem were isolated to certain geographic areas rather than nationwide.

- Consulting and expert witness services to defense counsel in a wage and hour matter alleging that several hundred store managers and assistant store managers at a chain of retail discount stores were misclassified. Services included creating and implementing a survey to examine whether class members were classified appropriately and conducting statistical analyses related to commonality of class-members and other class certification issues.

- Consulting services to defense counsel in a multi-plaintiff wage and hour matter alleging that the defendant employer failed to compensate security guards for uniform changing time and other claims of off-the-clock work. Services included designing and conducting an observation study to measure time associated with various activities.

- Consulting services to defense counsel in wage and hour matter alleging that store managers at a chain of convenience store/ gas station operations were misclassified as exempt workers. Services included designing and conducting a random sampling scheme and observational study to evaluate the amount of time that class members spent on exempt and non-exempt duties.

- Consulting services to defense counsel in a class-action wage and hour matter alleging uncompensated meal periods and breaks, unpaid overtime wages, and minimum wage violations at a field maintenance company. Services included creating a database of hours worked from paper and electronic records, and then providing damages estimates based on a variety of assumptions and legal theories.

- Consulting services to defense counsel in a class action matter alleging a variety of wage and hour violations for hourly workers at a chain of warehouse stores. Services included analyzing data to test allegations of improper time adjustments, missed meal and rest periods, uncompensated split shifts, reporting time violations, overtime and regular rate issues, and off-the-clock work.

## Employment Damages

Assignments representative of Dr. Saad's experience estimating economic damages include the following:

- Consulting services to plaintiff's counsel in a case involving a breach of employment contract allegation by a high-level executive in the emerging communications industry. Services included damages analysis based on valuation of stock options and estimation of future earnings.

- Consulting services to defendant's counsel in a case involving a wrongful termination allegation by a high-level executive in the telecommunication industry. Services included damages analysis based on valuation of stock options using the Black-Scholes Option Pricing Framework and a Monte Carlo Simulation Model.

- Consulting and expert witness services on behalf of defendant's counsel in a matter brought by a former executive who alleged wrongful termination and age discrimination against a major defense contractor following a reduction in force. Critiqued work product of the opposing expert, evaluated mitigation issues, calculated loss of earnings damages and valued losses related to stock options.

- Consulting and expert witness services on behalf of defendant's counsel in a medical malpractice action where the underlying damages issue was valuing an income stream from a closely held cash business. Performed accounting of plaintiff's financial records to determine the existence and the extent of fraud. Created financial models to calculate damages under a variety of scenarios.

- Consulting and expert witness services to defendant's counsel in a wrongful termination matter brought by senior executive of a high-tech company who alleged age discrimination. Performed analysis of mitigation factors, calculated loss of earnings, and valued future stock options.

## Commercial Litigation

Dr. Saad has assisted clients in a variety of commercial litigation matters, including patent infringement, insurance coverage, antitrust, breach of contract, and real estate financing. Assignments representative of Dr. Saad's experience in these areas include the following:

- Consulting and expert witness services in a series of cases involving the real property title insurance industry. Services included performing extensive statistical analyses in connection with both liability and damages issues.

- Consulting and expert witness services in a case alleging breach of loan commitment to a commercial real estate concern. Services included constructing financial models, developing economic arguments relating to fixed versus variable rate loans, and assisting counsel in deposing the opposing expert.

- Consulting and expert witness services in a case involving a breach of contract allegation in the computer hardware industry. Services consisted of performing a damages calculation, and rebutting the opposing expert's analysis.

- Consulting and expert witness services in a case alleging that one entity caused another entity's property to be misused. Services included database creation, and statistical analysis related to issues of causation. Results indicated that there was a statistically significant relationship between defendant's actions and plaintiff's economic condition.

- Consulting services on behalf of defendant's counsel in a breach of contract matter in the context of natural resource raw materials shipping. Services included developing economic arguments regarding the but-for pricing of both the shipping service as well as the material being shipped.

- Consulting and expert witness services on behalf of defendant's counsel in a major insurance coverage case, in which the underlying claims resulted from tens of thousands of asbestos claims. Services included developing strategy for dealing with large amounts of paper information, creating a database for analysis, and performing a variety of statistical analyses.

- Consulting services on behalf of plaintiff's counsel in an antitrust matter in the consumer electronics product market. The antitrust practice alleged was predatory pricing. Services included preparing a damage analysis.

- Consulting services on behalf of defendant's counsel in a patent infringement matter in the computer hardware industry. Services included researching transfer pricing issues and analyzing complex company P&L data in preparation for damages calculation.

- Consulting services on behalf of defendant's counsel in a real estate financing dispute. Dispute revolved around the financing of a major New York office property. Services included analysis of interest rates and their relationship to potential damages at various points in time, as well as the construction of a financial model of the property with the but-for financing in place.

- Consulting services on behalf of plaintiff's counsel in an antitrust matter involving allegations of non-competitive practices and predatory pricing in the home cable television market. Services included an analysis of "raising rivals costs", as well as a statistical analysis of pricing of complex products over time.

## Summary of Employment Experience

**Resolution Economics LLC:**
Managing Partner, October 1998 to date.

**University of Southern California**
Adjunct Associate Professor in the Department of Economics**,** January 1999 to September 2001.

**Deloitte & Touche, LLP:**
Partner, Dispute Consulting Services, (Los Angeles), 1998.

**Altschuler, Melvoin and Glasser LLP:**
Partner, Economics and Litigation Services, (Los Angeles), 1995 to 1998.

**Price Waterhouse LLP:**
Senior Manager, Manager, Litigation and Corporate Recovery Services Group, (New York and Los Angeles), January 1989 – November 1989, June 1990 to 1995.

**Olympia & York Companies (USA):**
Assistant VP and Senior Economist, (New York), November 1989 - June 1990.

**Baruch College, City University of New York (CUNY):**

Instructor and Assistant Professor of Economics, Department of Economics and Finance, 1982-1988; Center for the Study of Business and Government, Research Associate, 1983-1986; U.S. Small Business and Veterans Administrations, Consultant, 1985-1986.

## Education

Ph.D., Economics, The University of Chicago.

B.A., History, Economics, The University of Pennsylvania

## Publications

*Financial Success and Business Ownership among Vietnam and other Veterans* (with S. Lustgarten) SBA - 7210 - VA - 83, 1986.

"Schooling and Occupational Choice in 19th Century Urban America", Journal of Economic History, vol. 49, no. 2, June 1989.

"Employment Discrimination Litigation", chapter in Litigation Services Handbook, ed. by Roman Weil, et al., 1995, 2001, 2006, and 2012.

"Employment Discrimination", chapter in Litigation Support Report Writing, ed. by Jack P. Friedman, et al, 2003.

Paul Grossman, Paul Cane, and Ali Saad, "Lies, Damned Lies, and Statistics: How the Peter Principle Warps Statistical Analysis of Age Discrimination Claims", The Labor Lawyer, vol. 22, no. 3, Winter/Spring 2007, pp. 251-268.

Saad, Ali, "Beyond the Peter Principle – How Unobserved Heterogeneity in Employee Populations Affects Statistical Analysis in Age Discrimination Cases: Application to a Termination/RIF Case", AELC Conference Volume, 2007.

Saad, Ali, "Filling the Data Vacuum in Wage and Hour Litigation: The Example of Misclassification Cases, Emphasis on Class Certification", SIOP Annual Conference Proceedings, 2009.

Saad, Ali, "Wage and Hour Cases - Filling the Data Vacuum: Misclassification Cases and Other Observational Studies", SIOP Annual Conference Proceedings, 2012.

## Academic Honors

Finalist, Allan Nevins National Doctoral Dissertation Award
NIMH Doctoral Fellowship, The University of Chicago
Magna Cum Laude, The University of Pennsylvania
Honors in History, Economics, The University of Pennsylvania
Omicron Delta Epsilon, Honor Society in Economics

## Professional Affiliations

American Economic Association
American Statistical Association
American Bar Association (associate membership)

resolution economics LLC

# Ali I. Saad, Ph.D.
# Attachment to Resume

**Testimony, Expert Reports, and Declarations:**

In the matter of Luanna Scott, et al., v. Family Dollar Stores, Inc., Case No.:3:08-cv-540 (United States District Court for the Western District of North Carolina), in connection with allegations of gender discrimination. Report filed January 28, 2016, deposition February 10, 2016.

In the matter of Brown, et al., v. In-N-Out Burger, Inc., Case No.:RG12646351 (Superior Court for the State of California, County of Alameda), in connection with allegations of age discrimination. Report filed December 23, 2015.

In the matter of Valerie Horvath v. Western Refining Wholesale, Inc., Case no. Case No.:CIV-ds1311846 (Superior Court for the State of California, County of San Bernardino), in connection with allegations of age discrimination. Report filed November 19, 2015. Deposition January 14, 2016.

In the matter of Cortina, et al., v. North American Title Company, Case no. 07 CE CG 01169 JH, (Superior Court of the State of California, County of Fresno), in connection with class action employment matter. Reports filed May 11, 2012, June 25, 2012, and August 13, 19, 21, and 26, 2015. Deposition September 8 and 9, 2015. Trial testimony December 3 and December 10, 2015.

In the matter of Curley, et al., v. Savemart, et al. Case no RG13685740, (Superior Court of California, County of Alameda), in connection with class action wage and hour matter. Report filed September 2, 2015. Deposition December 18, 2015 and January 20, 2016.

In the matter of Gamble, et al., v. Boyd Gaming Corporation, et al., Case no. 2:13-cv-01009-JCM-PAL, (US District Court, District of Nevada), in connection with class action wage and hours claim. Report filed January 26, 2015.

In the matter of Chea, et al., v. Best Buy Stores. Case no 4:14-cv-0020-PJH, (United States District Court, Northern District of California, Oakland Division), in connection with class action wage and hour matter. Report filed March 13, 2015.

In the matter of Ruffin, et al., v. Avis Budget Car Rental LLC, et al., Case no. 11-01069-SDW-MCA, (US District Court, District of New Jersey), in connection with class action wage and hours claim. Report filed December 19, 2014.

In the matter of Campese v. County of Los Angeles, et al., Case no. BC-498147, (Superior Court of the State of California, County of Los Angeles), regarding analysis of data in connection with claim of age discrimination. Deposition October 4, 2014, Trial testimony, December 12, 2014.

In the matter of Ellis, et al., v. Costco Wholesale, Inc., Case no. C-04-3341-EMC, (United States District Court for the Northern District of California), regarding statistical analysis in employment discrimination class action. Reports filed June 22, 2006, August 18, 2006, October 16, 2014, November 14, 2014, and December 12, 2014. Deposition June 29, 2006.

In the matter of Melera, et al. v. Securitas Security Services, USA, Case no. BC-394708, (Superior Court of the State of California, County of Los Angeles), regarding analysis of data in connection with wage and hours claim. Deposition October 21, 2014.

In the matter of Becerra, et al., v. The McClatchy, et al., Case no. 08-CECG-04411-KCK, (Superior Court for the State of California, County of Fresno), regarding the use of statistical analysis in an employment matter. Deposition October 21, 2014.

In the matter of Salgado, et al., v. The Daily Breeze, et al., Case no. BC458074, (Superior Court for the State of California, County of Los Angeles), regarding the use of statistical analysis in a wage and hours matter. Report filed September 24, 2014.

In the matter of Hurt, et al., v. Commerce Energy, Inc, et al., Case no. 1:12-CV-00758, (United States District Court for the Northern District of Ohio), regarding analysis of data in connection with federal and state class action wage and hour claims. Reports filed May 29 and June 17, 2014. Deposition June 24, 2014

In the matter of Alequin, et al., v. Darden Restuarants, Inc., et al., Case no. 12-61742-CIV-ROSENBAUM/SELTZER, (United States District Court for the Southern District of Florida), regarding statistical sampling. Declaration filed December 16, 2013. Regarding analysis of employee work experiences, Report filed April 16, 2014, Deposition May 12, 2014.

In the matter of Kaanaana, et al., v. Barrett Business Services, et al., Case no. BC497090, (Superior Court for the State of California, County of Los Angeles CCW), regarding the use of statistical analysis in an employment matter. Report filed January 24, 2014. Deposition January 11, 2016

In the matter of Sawin, et al., v. The McClatchy, et al., Case no. 34-2009-00033950-CU-OE-GDS, (Superior Court for the State of California, County of Sacramento), regarding the use of statistical analysis in an employment matter. Report filed November 1, 2013, deposition December 5, 2013.

In the matter of Andrews, et al., v. Lawrence Livermore National Security, LLC, Case no. RG09453596, (Superior Court for the State of California, County of Alameda), regarding statistical analysis in an employment discrimination matter), Deposition October 16, 2013, Trial testimony December 12, 2013.

In the matter of Rahmon Momoh v. CPUC, Case no. CGC-12-519287, (Superior Court for the State of California, County of San Francisco), regarding the use of statistical analysis in an employment discrimination matter. Report filed June 28, 2013.

In the matter of Robert Zator and Carlos Garcia, et al., v. Sprint/United Management Case no. 37-2009-00098691-CU-OE-CTL, (Superior Court for the State of California, County of San Diego), regarding the use of statistical analysis in a PAGA claim related to expense reimbursements. Report filed June 26, 2013.

In the matter of Benjamin Paparella, et al. v. JPMorgan Chase Bank, Case no. 30-2010-00370146-CU-OE-CXC, (Superior Court of the State of California, County of Orange), in connection with plaintiffs' proposed trial management statistical sampling plan. Report filed July 3, 2013, Deposition August 8, 2013.

In the matter of Romo, et al. v. GMRI, Inc, dba Olive Garden, et al., Case no. EDCV 12-00715 JLQ-SPX, (United States District Court, Central District of California), in connection with statistical analysis in a wage and hours claim. Report filed July 11, 2013, Deposition August 21, 2013.

In the matter of Leona Counter-Young v. Pacific Maritime Association, Case no. BC 479455, (Superior Court of the State of California, County of Los Angeles), in connection with class action employment matter. Report filed April 5, 2013.

In the matter of Fitzgerald, et al., v. California State Automobile Association, et al., Case no. C – 10-03173, (Superior Court for the State of California, County of Contra Costa), related to statistical analysis in connection with class action employment matter. Report filed March 7, 2013.

In the matter of Sankey, et al., v. Aeropostale West, Inc., Case no. BC457468, (Superior Court of the State of California, County of Los Angeles), in connection with class action employment matter. Report filed May 27, 2012.

In the matter of Hall, et al., v. Rite Aid Corporation, Case no. 37-2009-000 87938-CU-OE-CTL, (Superior Court of the State of California, County of San Diego), in connection with class action employment matter. Deposition January 20, 2012.

In the matter of Jones, et al., v. National Council of the YMCA of the USA, Case no. CV 09—CV-6437, (U.S. District Court for the Northern District of Illinois), related to statistical analysis in connection with class action employment matter. Reports filed December 14, 2011 and March 15, 2012; deposition January 18, 2012 and March 28, 2012.

In the matter of Hageman, et al., v. Accenture LLP, Case no. CV 10—CV-01759, (U.S. District Court for the District of Minnesota), related to statistical analysis in connection with class action employment matter. Report filed November 17, 2011, deposition December 12, 2011.

In the matter of Ely, et al., v. Davey Tree Surgery, et al. Case no. RG08398173, (Superior Court for the State of California), related to statistical analysis in connection with class action employment matter. Report filed November 16, 2011.

In the matter of Gover, et al., v. Best Buy, Inc., Case no. CV 10-9988 VBF (RZx), (U.S. District Court for the Central District of California), related to statistical analysis in connection with class action employment matter. Report filed July 8, 2011, deposition July 26, 2011.

In the matter of Ealy, et al., v. Pinkerton Government Services, Inc., Case no. 10-CV-775-PJM, (U.S. District Court for the District of Maryland), related to statistical analysis in connection with class action employment matter. Report filed June 14, 2011.

In the matter of Holland, et al., v. Securitas Security Services USA, Inc., Case no. BC-394-708 (Superior Court of the State of California for the County of Los Angeles), related to statistical analysis in connection with class action employment matter. Report filed May 18, 2011.

**Attachment B – List of Documents**

**Court Documents**

Amended Complaint in the matter of EEOC v. Texas Roadhouse, Inc., et al.

**Dr. Crawford**

Expert Report of David L. Crawford, Ph.D., dated February 19, 2016
Amended Expert Report of David L. Crawford, Ph.D., amended February 25, 2016
Backup materials associated with Dr. Crawford's reports

**NLS**

Federal Mean Duration of Unemployment Annually

- https://research.stlouisfed.org/fred2/series/LNU03008275

NLS Data

- https://www.nlsinfo.org/investigator/pages/search.jsp

Implicit Price Deflator (Table 1.1.9)

- http://www.bea.gov/iTable/iTable.cfm?ReqID=9&step=1#reqid=9&step=3&isuri=1&903=13&904=1947&906=a&905=2015&910=x&911=0
    - Pulled when table had last been updated as of 2015-05-29 8:47 AM CDT

Census Codes and Crosswalk

- https://www.nlsinfo.org/sites/nlsinfo.org/files/attachments/121217/Attachment%203-1970%20Industry%20and%20Occupational%20Codes.pdf
- https://www.nlsinfo.org/sites/nlsinfo.org/files/attachments/121217/att300.pdf
- http://www.bls.gov/nls/quex/r1/y97r1cbka1.pdf
- https://usa.ipums.org/usa/resources/volii/documents/occ1990_xwalk.xls
- http://mcdc.missouri.edu/websas/geocorr12.html

**UltiPro**

Company.csv
Empcomp.csv
Emphcomp.csv
Iemppers.csv
Ipearhist.csv
Payregdata.csv
Payregkeys.csv
Person.csv

**Census**

https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS_Information_Guide.pdf.
https://www.census.gov/history/www/programs/demographic/american_community_survey.html
http://www.census.gov/people/eeotabulation/
http://www.census.gov/newsroom/releases/archives/employment_occupations/cb12-225.html
http://www.census.gov/people/eeotabulation/about/
https://www.census.gov/programs-surveys/acs/data/pums.html
https://cps.ipums.org/cps/jt_sample_notes.shtml
https://cps.ipums.org/cps-action/variables/JTYEARS#availability_section
CPS Data: https://cps.ipums.org/cps/index.shtml
ACS Data: https://www.census.gov/programs-surveys/acs/data/pums.html

**TXRH Internal Documents**

TXRH1361606, *Interviewing and Hiring Legendary People*
TXRH0720056, *Interviewing and Hiring Legendary People*

Videos:

TXRH2405481_CONFIDENTIAL
TXRH2405486_CONFIDENTIAL
TXRH2405499_CONFIDENTIAL
TXRH2405501_CONFIDENTIAL
TXRH2405505_CONFIDENTIAL
TXRH2405506_CONFIDENTIAL
TXRH2405509_CONFIDENTIAL
TXRH2405512_CONFIDENTIAL
TXRH2405524_CONFIDENTIAL
TXRH2405526_CONFIDENTIAL
TXRH2405527_CONFIDENTIAL
TXRH2405530_CONFIDENTIAL
TXRH2416392_CONFIDENTIAL
TXRH2416393_CONFIDENTIAL
TXRH2417443_Confidential
TXRH2417444_Confidential
TXRH2417445_Confidential
TXRH2417446_Confidential
TXRH2417447_Confidential

**Other Case Documents**

TXRH 2015 Annual Report
Roll up List 2007 June 2014.csv
TXRH1594635_Confidential.csv
TXRH2401554_CONFIDENTIAL.csv
Paper Application Documents Summary (Produced Through August 31, 2015) (v2).csv

TXRH2426297_CONFIDENTIAL_Earning Code Listing.xlsx
Ultipro Job Codes and Job Titles.xlsx
20071206-TXRH2401663_CONFIDENTIAL.csv
20081208-TXRH2401778_CONFIDENTIAL.csv
20091207-TXRH2401777_CONFIDENTIAL.csv
20101201-TXRH2401776_CONFIDENTIAL.csv
20111115-TXRH2401763_CONFIDENTIAL.csv
20121116-TXRH2401764_CONFIDENTIAL.csv
20131210-TXRH2401774_CONFIDENTIAL.csv
20141020-TXRH2401751_CONFIDENTIAL.csv

**Applicant Flow**

Unsuccessful Paper Applications

- Bates Range TXRH0003698 - TXRH0007470
- Bates Range TXRH0069498 - TXRH0218275
- Bates Range TXRH0218276 - TXRH0238261
- Bates Range TXRH0239153 - TXRH0568367
- Bates Range TXRH0568482 - TXRH0608966
- Bates Range TXRH0608967 – TXRH0639747
- Bates Range TXRH0639759 - TXRH0719371
- Bates Range TXRH1566522 - TXRH1594633
- Bates Range TXRH2401794 - TXRH2404520

SQL/Mongo Files

- SubpoenaInfo_TexasRoadhouse_SQL.csv
- 283,995 JSON files from Snagajob database “Mongo”

**Literature Cites**

*Litigation Services Handbook: The Role of the Financial Expert*, Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, eds.

“Statistical Evidence in Pattern and Practice Litigation” by Oswald B. Cousins, 2009, Orrick, Herrinton & Sutcliffe LLP.

Gastwirth, Joseph L. "Estimating the demographic mix of the available labor force." *Monthly Lab. Rev*. 104 (1981): 50.

Jovanovic, B. “Job Matching and the Theory of Turnover.” *The Journal of Political Economy*, Vol. 87, No. 5, October, 1979: pp. 972-990.

Ehrenberg, Ronald G. and Robert B. Smith, *Modern Labor Economics*, Scott Foresman and Company, 1988.

“How Estimates Can Miss the Mark on Age Discrimination,” by Stephen G. Bronars and Nathan D. Woods http://www.law360.com/articles/712535/how-estimates-can-miss-the-mark-on-age-discrimination.

Grossman, Paul, Paul W. Cane and Ali Saad, "Lies, Damned Lies, and Statistics": How *The Peter Principle* Warps Statistical Analysis of Age Discrimination Claims," *The Labor Lawyer*, Vol. 22, No. 3, Winter/Spring 2007, pp. 251-268.

Kiefer, Nicholas M., "Economic Duration Data and Hazard Functions." *Journal of Economic Literature*, 26, June 1988, pp. 646-79.

Barnes, et al., v. The Hershey Company, United States District Court for the Northern District of California, No. 3:12-cv-01334-CRB.

Michael, John R. (1999). *The Flow of Ability through a Job Group*, Doctoral Dissertation, UMI Number 9943968.

"Interpreting Relationships Between Age and Promotion in Age-Discrimination Cases," by Robert D. Pritchard, Scott E. Maxwell and W. Carl Jordan, *Journal of Applied Psychology*, 1984, Vol. 69, No. 2, 199-206.

Laurence J. Peter and Raymond Hull, *The Peter Principle: Why Things Always Go Wrong*, (1969).

Edward P. Lazear, *The Peter Principle: Promotions and Declining Productivity*, 24 (NBER, 2001).

Lazear, Edward P. "The Peter Principle: A Theory of Decline." *Journal of Political Economy* 112 (2004): 141-163.

Piette, Michael J. and Paul F. White, "Approaches for Dealing with Small Sample Sizes in Employment Discrimination Litigation." *Journal of Forensic Economics* 12(1), 1999, pp. 43-56.

**Online Cites**

https://www.restaurant.org/Downloads/PDFs/News-Research/Factbook2013_LetterSize.pdf

http://www.restaurant.org/News-Research/News/Employee-turnover-rate-tops-70-in-2015

http://www.bls.gov/ooh/food-preparation-and-serving/food-and-beverage-serving-and-related-workers.htm#tab-3

http://www.restaurant.org/Industry-Impact/Employing-America/Jobs-Careers-Powerhouse

http://www.Zagat.com (on line guide)

**Depositions**

19221372_1_Deposition of Victor Hanan (3-5-15).pdf
19605782_1_EEOC v. TXRH_ Deposition of Denis Berney (3-24-15).pdf
19605899_1_EEOC v. TXRH_ Deposition of Mark Hymes (3-27-15).pdf
19624954_1_EEOC v. TXRH_ Deposition of Kevin Vanliew (3-27-15).pdf
20236943_1_EEOC v. TXRH_ Deposition of Doug Thompson (6-17-15).pdf

20873385_1_EEOC v. TXRH - Deposition of Rick Kaskel (6-26-15).pdf
21004879_1_EEOC v. TXRH - Deposition of Gregory Beckel (6-3-15).pdf
Kramer, Amanda (10-23-13).pdf
Amanda Kramer-Exhibit 1.pdf – Amanda Kramer-Exhibit 25.pdf

**Declarations**

24821415_1_Abbott, Jason Declaration 2015-08-21.PDF
24821416_1_Allen, Bobby Declaration 2015-08-29.PDF
24821417_1_Allen, Joshua Declaration 2015-07-13.PDF
24821418_1_Allman, Eric Declaration 2015-08-31.PDF
24821420_1_Alvarez, Gelasio Declaration 2015-07-16.PDF
24821421_1_Anderson, Ginger Declaration 2015-07-15.PDF
24821423_1_Arreola, Gloria Declaration 2015-09-03.PDF
24821424_1_Ault, Shirley Jean Declaration 2015-07-22.PDF
24821426_1_Bacorn, Michael Declaration 2015-08-18.PDF
24821427_1_Bagwell, Kathleen Declaration 2015-08-21.PDF
24821428_1_Barrera, Hector Declaration 2015-09-09.PDF
24821429_1_Ball, Sharon Declaration 2015-08-18.PDF
24821430_1_Barton, Deborah Declaration 2015-08-26.PDF
24821431_1_Barton, Tonya Declaration 2015-07-13.PDF
24821433_1_Becker, Sherri Declaration 2015-07-16.PDF
24821434_1_Bennington, Becky Declaration 2015-09-10.PDF
24821435_1_Benton, Johanna Declaration 2015-10-12.PDF
24821436_1_Benson, Kathleen Declaration 2015-09-03.PDF
24821437_1_Bessent, Melissa Declaration 2015-08-29.PDF
24821439_1_Bigelow, Josephine Declaration 2015-10-08.PDF
24821440_1_Blasdel, Canada Declaration 2015-09-23.PDF
24821441_1_Boaman, Jeffrey Declaration 2015-07-15.PDF
24821442_1_Boroff, Chad Declaration, 2015-08-26.PDF
24821443_1_Brock, Gloria Declaration 2015-08-06.PDF
24821444_1_Brown, Debbie Declaration 2015-09-02.PDF
24821445_1_Brown, Trudy Declaration 2015-08-31.PDF
24821446_1_Bruey, Christine Declaration 2015-07-23.PDF
24821447_1_Bruno, Gloria Declaration 2015-07-16.PDF
24821448_1_Buchmelter, Debra Declaration 2015-07-22.PDF
24821449_1_Byrd, Gary Declaration 2015-09-23.PDF
24821450_1_Calcaterra, Claudia Declaration 2015-10-17.PDF
24821451_1_Caldwell, Megan Declaration 2015-08-27.PDF
24821452_1_Carman, Angela Declaration 2015-08-21.PDF
24821453_1_Carson, Donna Declaration 2015-08-27.PDF
24821454_1_Caston, Leslie Declaration 2015-07-15.PDF
24821455_1_Caton, Georgie Declaration 2015-09-10.PDF
24821456_1_Chavez, Maria Declaration 2015-09-24.PDF
24821457_1_Cochran Sr Jeffrey Declaration 2015-10-15.PDF
24821458_1_Cofield, Danielle Declaration 2015-07-30.PDF
24821459_1_Connelly, Nicole Declaration 2015-10-17.PDF
24821460_1_Corcoran, Angi Declaration 2015-08-19.PDF
24821461_1_Cothern, Andrea Declaration 2015-09-09.PDF
24821462_1_Couch, Patina Declaration 2015-08-19.PDF
24821463_1_Council, Fatemeh Declaration 2015-07-22.PDF

24821465_1_Cranfil Amy Declaration 2015-07-10.PDF
24821466_1_Courtright, Joseph Declaration 2015-07-30.PDF
24821467_1_Dailey, Bobby Declaration 2015-08-27.PDF
24821468_1_Datria, Timothy Declaration 2015-08-27.PDF
24821469_1_Davis, Susan Declaration 2015-07-31.PDF
24821470_1_Deladia, Floresima Declaration 2015-08-27.PDF
24821471_1_Dennison, Deborah Declaration 2015-09-11.PDF
24821472_1_Dent, Kami Declaration 2015-09-23.PDF
24821473_1_Dewell-Mesey, Heather Declaration 2015-07-16.PDF
24821474_1_Dewsnup, Jennifer Declaration 2015-08-14.PDF
24821475_1_Didomizo, David Declaration 2015-09-17.PDF
24821476_1_Diehl, Jenifer Declaration 2015-07-10.PDF
24821477_1_Dizanni, Brenda Declaration 2015-09-15.PDF
24821478_1_Dodea, Lori Declaration 201-09-18.PDF
24821479_1_Dominguez, Jon Declaration 2015-07-22.PDF
24821480_1_Dominguez, Synnove Declaration 2015-09-01.PDF
24821481_1_Downey, Michael Declaration  2015-09-11.PDF
24821482_1_Downing, Angie Declaration 2015-09-02.PDF
24821483_1_Engels, Melissa Declaration 2015-09-03.PDF
24821484_1_Ericks, Joleen Decalartion 2015-09-24.PDF
24821485_1_Essig, Dawn Declaration 2015-09-03.PDF
24821486_1_Estes, Heidi Declaration 2015-08-05.PDF
24821487_1_Euhus, Dayna Declaration 2015-08-12.PDF
24821488_1_Familetti, Christine Declaration 2015-09-03.PDF
24821489_1_Fenner, Carrie Declaration 2015-10-08.PDF
24821490_1_Flowers, Bonnie Declaration 2015-07-18.PDF
24821491_1_Flynn, Annette Declaration 2015-08-23.PDF
24821492_1_Foster, Cedric Declaration 2015-07-22.PDF
24821493_1_Fox, Raymond Declaration 2015-08-21.PDF
24821494_1_Freeman, Kim Declaration 2015-07-15.PDF
24821495_1_Freeman, Lisa Declaration 2015-09-04.PDF
24821497_1_Fulton, Ruth Michelle Declaration 2015-10-18.PDF
24821498_1_Gabric, Amy Declaration 2015-08-14.PDF
24821500_1_Garner, Karin  Declaration 2015-08-21.PDF
24821501_1_Garner, Shannon Declaration 2015-09-10.PDF
24821502_1_Gee, Carolyn  Declaration 2015-07-29.PDF
24821503_1_Gibbon, Nancy Declaration 2015-10-15.PDF
24821504_1_Gintz, Tammy Declaration 2015-08-14.PDF
24821506_1_Glines, Shirley Declaration 2015-07-13.PDF
24821508_1_Goins, Exiomara Hope Declaration 2015-09-30.PDF
24821509_1_Goodnight, Debra Declaration 2015-10-02.PDF
24821510_1_Gracia, Leisa Declaration 2015-08-27.PDF
24821511_1_Graves, Heather Declaration 2015-08-27.PDF
24821512_1_Green, Cindy Declaration 2015-09-02.PDF
24821513_1_Green, Jeff Declaration 2015-09-11.PDF
24821514_1_Greenawalt, Sonja Declaration 2015-09-13.PDF
24821515_1_Hadley, Paula Declaration 2015-08-31 (Possibly Confidential).PDF
24821516_1_Hall, David Declaration 2015-08-27.PDF
24821517_1_Hagerthey, Joyce Declaration 2015-09-08.PDF
24821518_1_Hall, Jennifer  Declaration 2015-08-21.PDF
24821519_1_Hall, Jessica Declaration  2015-10-18.PDF

24821520_1_Hamilton, Shelly Declaration 2015-09-24.PDF
24821521_1_Harbeck Brian Declaration 2015-07-17.PDF
24821522_1_Harris, Stacy Declaration 2015-09-11.PDF
24821523_1_Hart, Christy Declaration 2015-08-31.PDF
24821524_1_Hayes, Elke Declaration 2015-09-23.PDF
24821525_1_Hayes, Joyce Declaration 2015-09-09.PDF
24821526_1_Herr, April Declaration 2015-07-22.PDF
24821527_1_Herrera, Melissa Declaration 2015-10-18.PDF
24821528_1_Hess, Chad Declaration 2015-08-28.PDF
24821529_1_Hicks, Michelle Declaration 2015-08-27.PDF
24821530_1_Hilton, Juli Declaration 215-08-26.PDF
24821531_1_Hinton, Tammi Declaration 2015-07-14.PDF
24821532_1_Hockenhull, Tara Declaration 2015-10-18.PDF
24821533_1_Hoffman, Donald Declaration 2015-09-23.PDF
24821534_1_House, Scott Declaration 2015-08-31.PDF
24821535_1_Howard, Valarie Declaration 2015-07-08.PDF
24821536_1_Hughes, Travis Declaration 2015-09-15.PDF
24821537_1_Isaac, Shannon Declaration 2015-08-06.PDF
24821538_1_Jarnot, Natali Declaration 2015-07-14.PDF
24821539_1_Jenniges, Trinity Declaration 2015-09-24.PDF
24821541_1_Jhair, Gigi Declaration 2015-08-05.PDF
24821542_1_Joslin, Kari Declaration 2015-09-04.PDF
24821543_1_Keefe, John Declaration 2015-09-11.PDF
24821544_1_Kehner, Kathleen Declaration 2015-08-14.PDF
24821545_1_Keiser, Kimberly Declaration 2015-07-17.PDF
24821546_1_Keller, Kellie Declaration 2015-09-04.PDF
24821548_1_Kelsey, Manuela Declaration 2015-09-11.PDF
24821550_1_Kester, Amy Declaration 2015-09-10.PDF
24821552_1_King, Charles Chad Declaration 2015-09-18.PDF
24821553_1_Kirk, Deborah Declaration 2015-08-28.PDF
24821554_1_Klarkowski, Bernie Declaration 2015-07-15.PDF
24821556_1_Koontz, Michelle Declaration 2015-11-05.PDF
24821557_1_Krackow, Chrissy Declaration 2015-07-22.PDF
24821559_1_Krol, Nanci Declaration 2015-07-15.PDF
24821560_1_Kruse, Donna Declaration 2015-10-22.PDF
24821562_1_Kuzma, Julie Declaration 2015-09-15.PDF
24821563_1_Lachky, Amy Declaration 2015-10-08.PDF
24821564_1_Ladd, Roy Declaration 2015-08-27.PDF
24821567_1_Lanauze, Henry Declaration 2015-09-25.PDF
24821569_1_Landrum, Kimberly Declaration 2015-07-22.PDF
24821570_1_Lanier, Terry Declaration 2015-09-04.PDF
24821571_1_LaPointe, Pamela Declaration 2015-09-25.PDF
24821572_1_Laudicina, John Declaration 2015-10-16.PDF
24821573_1_Laws, Russell Declaration 2015-09-03.PDF
24821574_1_Levay, Thomas Declaration 2015-09-03.PDF
24821576_1_Leyva-Montoya Andres Declaration 2015-08-28.PDF
24821577_1_Lorent-Migiliorese, Donna Declaration 2015-09-15.PDF
24821578_1_Lovato, Patty Declaration 2015-09-25.PDF
24821579_1_Mackey, Tanya Declaration 2015-10-17.PDF
24821580_1_Lyall, Angela 2015.07.13.PDF
24821581_1_Manzanares, Kay 2015-10-12.PDF

24821582_1_Marin, Melodie Declaration 2015-10-18.PDF
24821583_1_Maroudas, Kyriaki Sandy Declaration 2015-09-23.PDF
24821584_1_Marquez, Inez Declaration 2015-09-24.PDF
24821585_1_Martin, Amber Declaration 2015-09-09.PDF
24821586_1_Martin, Cheryl Declaration 2015-09-15.PDF
24821588_1_Martin, Michael Declaration 2015-08-20.PDF
24821590_1_Martz, Julie Declaration 2015-08-15.PDF
24821591_1_Matchette, Leslie Declaration 2015-07-15.PDF
24821592_1_McDaniel, Jennifer Declaration 2015-09-15.PDF
24821593_1_McGill, Kathy Declaration 2015-09-02.PDF
24821594_1_McMahon, Karen Declaration 2015-08-04.PDF
24821595_1_McNeal, Michelle 2015-08-27.PDF
24821596_1_Merriman, Chris Declaration 2015-08-05.PDF
24821597_1_Milan, Francisca Declaration 2015-07-16.PDF
24821598_1_Milburn, Diane Declaration 2015-07-09.PDF
24821599_1_Miller, Toni Tiso Declaration 2015-10-14.PDF
24821600_1_Mink, Rhonda Declaration 2015-07-31.PDF
24821601_1_Mitchell, David Declaration 2015-08-20.PDF
24821603_1_Mojica, Perfecto Declaration 2015-07-16.PDF
24821604_1_Morrill, Catherine Declaration 2015-09-30.PDF
24821605_1_Morris, Susan Declaration 2015-09-04.PDF
24821606_1_Newman, Michael Declaration 2015-10-08.PDF
24821607_1_Nole, Lisa Declaration 2015-09-30.PDF
24821608_1_Nordquist, Rhonda Declaration 2015-09-25.PDF
24821609_1_Noteman, Duke Declaration 2015-07-15.PDF
24821610_1_O_Connell, Nichole Declaration 2015-07-13.PDF
24821611_1_Ottinger, Cheryl Declaration 2015-09-03.PDF
24821612_1_Painter, Debra Declaration 2015-07-22.PDF
24821613_1_Page, Ernest Jay Declaration 2015-09-05.PDF
24821614_1_Parmerlee, Jonissa Declaration 2015-09-05.PDF
24821615_1_Peeper, Bonnie Lori Declaration 2015-09-09.PDF
24821616_1_Perez, Bertha Declaration 2015-07-18.PDF
24821617_1_Perez, Moises Declaration 2015-09-23.PDF
24821619_1_Phillips, Jamie Declaration 2015-09-22.PDF
24821620_1_Pilon, Tino Declaration 2015-07-22.PDF
24821621_1_Pridgen, Keith Declaration 2015-09-11.PDF
24821622_1_Quick, Brian Declaration 2015-09-03.PDF
24821623_1_Ramirez, Altagracia Declaration 2015-07-24.PDF
24821624_1_Reed, Dana Declaration 2015-07-22.PDF
24821625_1_Rhodes, Kimberly Declaration 2015-09-24.PDF
24821626_1_Roddy, Michael Declaration 2015-09-24.PDF
24821629_1_Roe, Lisa Declaration 2015-08-06.PDF
24821630_1_Roland, Jeri Declaration 2015-10-02.PDF
24821631_1_Romero, Yunrae Jinhee Declaration 2015-09-24.PDF
24821632_1_Roney, Michael Declaration 2015-07-09.PDF
24821634_1_San Miguel, Marisol Declaration 2015-08-05.PDF
24821635_1_Salguero, Jaime Declaration 2015-07-31.PDF
24821636_1_Sanabria, Trish Declaration 2015-08-19.PDF
24821638_1_Santiago, Shalese Declaration 2015-09-29.PDF
24821639_1_Schneider, Eric Declaration 2015-25-09.PDF
24821640_1_Scott, Randy Declaration 2015-08-27.PDF

24821641_1_Sheehan, Doreen Declaration 2015-09-25.PDF
24821642_1_Shelton, Revonda Declaration 2015-08-29.PDF
24821643_1_Sims, Lynda Declaration 2015-08-18.PDF
24821644_1_Skare, Stephen Declaration 2015-07-21.PDF
24821645_1_Slayton, Kathy Declaration 2015-08-20.PDF
24821646_1_Sprouse, Donald Declaration 2015-07-11.PDF
24821647_1_Stalcup, Becky Declaration 2015-08-27.PDF
24821648_1_Stallings, Kim Declaration 2015-08-18.PDF
24821649_1_Steeneck, Elizabeth Declaration 2015-07-15.PDF
24821651_1_Stephenson, Milton Declaration 2015-25-09.PDF
24821652_1_Stoeckl, Raymond Declaration 2015-07-15.PDF
24821653_1_Stommel, Greg Declaration 2015-25-09.PDF
24821654_1_Strauss, Tami Declaration 2015-07-10.PDF
24821656_1_Streby, Howard Declaration 2015-09-05.PDF
24821657_1_Sturgis, Lisa Declaration 2015-09-23.PDF
24821658_1_Sweat, Valinda Declaration 2015-07-09.PDF
24821659_1_Sweeney, Amelia Declaration 2015-08-28.PDF
24821661_1_Swingle, Debra Declaration 2015-07-31.PDF
24821662_1_Tarver, Kathy Declaration 2015-09-22.PDF
24821663_1_Tharp, Teresa Declaration 2015-07-22.PDF
24821664_1_Thompson , Tina Declaration 2015-09-23.PDF
24821665_1_Thompson, Krystal Declaration 2015-10-18.PDF
24821666_1_Tidwell, Tiffany Declaration 2015-09-04.PDF
24821667_1_Torres, Maria Declaration 2015-09-05.PDF
24821668_1_Trieu, Tuyet Declaration 2015-08-21.PDF
24821669_1_Tropea, Patricia Declaration 2015-10-08.PDF
24821670_1_Ulrich, Peter Declaration 2015-07-11.PDF
24821671_1_Turner, Lee Declaration 2015-09-08.PDF
24821672_1_Vicente Franscico, Emma Declaration 2015-09-10.PDF
24821673_1_Walker, Craig Declaration 2015-09-24.PDF
24821674_1_Warfield, Larry Declaration 2015-07-08.PDF
24821675_1_Walls, Jennifer Declaration 2015-07-16.PDF
24821676_1_Watkins, Andrea Declaration 2015-09-10.PDF
24821677_1_Weil, Sheila 2015-10-12.PDF
24821678_1_Wells, Kimberly Declaration 2015-08-17.PDF
24821679_1_Whilby Carmen Fraser Declaration 2015-10-14.PDF
24821680_1_White, Elbert Declaration 2015-07-26.PDF
24821681_1_Whitehead, Rodregus Declaration 2015-09-18.PDF
24821683_1_Whitford, Calvin Declaration 2015-07-14.PDF
24821684_1_Wilhite, Robert Declaration 2015-08-19.PDF
24821685_1_Wilkinson, Troy Declaration 2015-10-18.PDF
24821686_1_Williams, Caroline Declaration 2015-08-27.PDF
24821687_1_Williams, Kenneth Declaration 2015-09-22.PDF
24821688_1_Williams, Sharon Declaration 2015-09-02.PDF
24821689_1_Willis-Hart Susanna Declaration 2015-08-26.PDF
24821690_1_Wilson, Darrick Declaration 2015-09-12.PDF
24821691_1_Wright, Nikki Declaration 2015-07-22.PDF
24821692_1_Zervos, Margaret Declaration 2015-09-15.PDF
24821693_1_Zirillo, Theresa Declaration 2015-07-22.PDF
24821694_1_Zuckernick, Celeste Declaration 2015-09-09.PDF
24821695_1_Zurbriggen, Rebecca Declaration 2015-07-17.PDF

EEOC v. TXRH

## Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

**- Paper Applicant Pool -**

**- All FOH Jobs Combined -**

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 7 | 2 | 28.6% | 5 | 71.4% |
| **2008** | 20 | 10 | 50.0% | 10 | 50.0% |
| **2009** | 20 | 1 | 5.0% | 19 | 95.0% |
| **2010** | 44 | 10 | 22.7% | 34 | 77.3% |
| **2011** | 50 | 16 | 32.0% | 34 | 68.0% |
| **2012** | 50 | 13 | 26.0% | 37 | 74.0% |
| **2013** | 52 | 12 | 23.1% | 40 | 76.9% |
| **2014** | 3 | 0 | 0.0% | 3 | 100.0% |
| **Total** | 246 | 64 | 26.0% | 182 | 74.0% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 22

Exhibit 1

# Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

## - Paper Applicant Pool -

## - Server Jobs -

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 6 | 1 | 16.7% | 5 | 83.3% |
| **2008** | 18 | 9 | 50.0% | 9 | 50.0% |
| **2009** | 19 | 2 | 10.5% | 17 | 89.5% |
| **2010** | 39 | 7 | 17.9% | 32 | 82.1% |
| **2011** | 48 | 16 | 33.3% | 32 | 66.7% |
| **2012** | 48 | 17 | 35.4% | 31 | 64.6% |
| **2013** | 46 | 12 | 26.1% | 34 | 73.9% |
| **2014** | 2 | 0 | 0.0% | 2 | 100.0% |
| **Total** | 226 | 64 | 28.3% | 162 | 71.7% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 19

Exhibit 2

## Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

**- Paper Applicant Pool -**

**- Host Jobs -**

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 4 | 0 | 0.0% | 4 | 100.0% |
| **2008** | 5 | 1 | 20.0% | 4 | 80.0% |
| **2009** | 0 | 0 | | 0 | |
| **2010** | 4 | 1 | 25.0% | 3 | 75.0% |
| **2011** | 12 | 1 | 8.3% | 11 | 91.7% |
| **2012** | 7 | 1 | 14.3% | 6 | 85.7% |
| **2013** | 6 | 0 | 0.0% | 6 | 100.0% |
| **2014** | 0 | 0 | | 0 | |
| **Total** | 38 | 4 | 10.5% | 34 | 89.5% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 21

Exhibit 3

EEOC v. TXRH

# Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

## - Paper Applicant Pool -

## - Server Assistant Jobs -

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 2 | 0 | 0.0% | 2 | 100.0% |
| **2008** | 2 | 0 | 0.0% | 2 | 100.0% |
| **2009** | 1 | 0 | 0.0% | 1 | 100.0% |
| **2010** | 0 | 0 | | 0 | |
| **2011** | 1 | 0 | 0.0% | 1 | 100.0% |
| **2012** | 3 | 1 | 33.3% | 2 | 66.7% |
| **2013** | 1 | 1 | 100.0% | 0 | 0.0% |
| **2014** | 0 | 0 | | 0 | |
| **Total** | 10 | 2 | 20.0% | 8 | 80.0% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 20

Exhibit 4

EEOC v. TXRH

# Summary of Dr. Crawford's Statistical Results Store by Store By Job

**- Paper Applicant Pool -**

**- Across Years -**

| Job | Number of Stores with No Statistically Significant Shortfalls in Any Year | Number of Stores with Statistically Significant Shortfall in Only One Year | Number of Stores with Statistically Significant Shortfalls in Two Years | Number of Stores with Statistically Significant Shortfalls in Three or More Years |
|---|---|---|---|---|
| **Server** | 108 | 58 | 3 | 0 |
| **Server Assistant** | 7 | 2 | 0 | 0 |
| **Host** | 32 | 4 | 0 | 0 |

Note: Numbers compiled from Dr. Crawford's Amended Report, Tables 19, 20 and 21

# Summary of Dr. Crawford's Statistical Results Store by Store By Year

**- Paper Applicant Pool -**

**- Across Jobs -**

| Year | Number of Stores with No Statistically Significant Shortfalls in Any Job | Number of Stores with Statistically Significant Shortfall in Only One Job | Number of Stores with Statistically Significant Shortfalls In Two Jobs | Number of Stores with Statistically Significant Shortfalls In All Three Jobs |
|---|---|---|---|---|
| **2007** | 5 | 1 | 0 | 0 |
| **2008** | 9 | 8 | 1 | 0 |
| **2009** | 17 | 2 | 0 | 0 |
| **2010** | 32 | 6 | 1 | 0 |
| **2011** | 32 | 15 | 1 | 0 |
| **2012** | 30 | 17 | 1 | 0 |
| **2013** | 34 | 11 | 1 | 0 |
| **2014** | 2 | 0 | 0 | 0 |

Note: Numbers compiled from Dr. Crawford's Amended Report, Tables 19, 20 and 21

Exhibit 6

EEOC v. TXRH

# Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

## - Snag-A-Job Applicant Pool -

## - All FOH Jobs Combined -

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 17 | 13 | 76.5% | 4 | 23.5% |
| **2008** | 58 | 29 | 50.0% | 29 | 50.0% |
| **2009** | 27 | 11 | 40.7% | 16 | 59.3% |
| **2010** | 18 | 6 | 33.3% | 12 | 66.7% |
| **2011** | 19 | 9 | 47.4% | 10 | 52.6% |
| **2012** | 32 | 15 | 46.9% | 17 | 53.1% |
| **2013** | 318 | 36 | 11.3% | 282 | 88.7% |
| **2014** | 376 | 18 | 4.8% | 358 | 95.2% |
| **Total** | 865 | 137 | 15.8% | 728 | 84.2% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 18

Exhibit 7

## Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

**- Snag-A-Job Applicant Pool -**

**- Server Jobs -**

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 2 | 0 | 0.0% | 2 | 100.0% |
| **2008** | 40 | 19 | 47.5% | 21 | 52.5% |
| **2009** | 23 | 8 | 34.8% | 15 | 65.2% |
| **2010** | 16 | 7 | 43.8% | 9 | 56.3% |
| **2011** | 18 | 8 | 44.4% | 10 | 55.6% |
| **2012** | 24 | 11 | 45.8% | 13 | 54.2% |
| **2013** | 225 | 16 | 7.1% | 209 | 92.9% |
| **2014** | 207 | 3 | 1.4% | 204 | 98.6% |
| **Total** | 555 | 72 | 13.0% | 483 | 87.0% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 15

Exhibit 8

EEOC v. TXRH

## Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

### - Snag-A-Job Applicant Pool -

### - Host Jobs -

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 0 | 0 | | 0 | |
| **2008** | 15 | 3 | 20.0% | 12 | 80.0% |
| **2009** | 4 | 0 | 0.0% | 4 | 100.0% |
| **2010** | 2 | 0 | 0.0% | 2 | 100.0% |
| **2011** | 1 | 0 | 0.0% | 1 | 100.0% |
| **2012** | 3 | 1 | 33.3% | 2 | 66.7% |
| **2013** | 36 | 0 | 0.0% | 36 | 100.0% |
| **2014** | 63 | 2 | 3.2% | 61 | 96.8% |
| **Total** | 124 | 6 | 4.8% | 118 | 95.2% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 17

Exhibit 9

## Summary of Dr. Crawford's Statistical Results Store by Store Over the Period 2007-2014

**- Snag-A-Job Applicant Pool -**

**- Server Assistant Jobs -**

| Year | Number of Stores Analyzed | Number of Stores with Differences Greater than 2 Standard Deviations | Percentage | Number of Stores with Differences Less than 2 Standard Deviations | Percentage |
|---|---|---|---|---|---|
| **2007** | 0 | 0 | | 0 | |
| **2008** | 1 | 0 | 0.0% | 1 | 100.0% |
| **2009** | 1 | 0 | 0.0% | 1 | 100.0% |
| **2010** | 0 | 0 | | 0 | |
| **2011** | 0 | 0 | | 0 | |
| **2012** | 0 | 0 | | 0 | |
| **2013** | 14 | 0 | 0.0% | 14 | 100.0% |
| **2014** | 28 | 1 | 3.6% | 27 | 96.4% |
| **Total** | 44 | 1 | 2.3% | 43 | 97.7% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 16

Exhibit 10

# Summary of Dr. Crawford's Statistical Results Store by Store By Job

**- Snag-a-Job Applicant Pool -**

**- Across Years -**

| Job | Number of Stores with No Statistically Significant Shortfalls in Any Year | Number of Stores with Statistically Significant Shortfall in Only One Year | Number of Stores with Statistically Significant Shortfalls in Only Two Years | Number of Stores with Statistically Significant Shortfalls in Three Years |
|---|---|---|---|---|
| **Server** | 273 | 41 | 11 | 3 |
| **Server Assistant** | 34 | 1 | 0 | 0 |
| **Host** | 91 | 6 | 0 | 0 |

Note: Numbers compiled from Dr. Crawford's Amended Report, Tables 15, 16 and 17

EEOC v. TXRH

## Summary of Dr. Crawford's Statistical Results Store by Store By Year

**- Snag-a-Job Applicant Pool -**

**- Across Jobs -**

| Year | Number of Stores with No Statistically Significant Shortfalls in Any Job | Number of Stores with Statistically Significant Shortfall in Only One Job | Number of Stores with Statistically Significant Shortfalls in Two Jobs | Number of Stores with Statistically Significant Shortfalls in All Three Jobs |
|---|---|---|---|---|
| **2007** | 2 | 0 | 0 | 0 |
| **2008** | 20 | 18 | 2 | 0 |
| **2009** | 15 | 8 | 0 | 0 |
| **2010** | 9 | 7 | 0 | 0 |
| **2011** | 10 | 8 | 0 | 0 |
| **2012** | 13 | 10 | 1 | 0 |
| **2013** | 216 | 16 | 0 | 0 |
| **2014** | 215 | 4 | 1 | 0 |

Note: Numbers compiled from Dr. Crawford's Amended Report, Tables 15, 16 and 17

Exhibit 12


The Percentage of Stores In Dr. Crawford's Analyses with Differences Greater than Two Standard Deviations is Small
- Paper Applicant Pool -
-By Job, All Years Combined -
100.0%
90.0%
80.0%
70.0%
60.0%
50.0%
40.0%
30.0%
20.0%
10.0%
0.0%
26.0%
74.0%
28.3%
71.7%
10.5%
89.5%
20.0%
80.0%
All FOH Jobs
Server/Waiter Jobs
Hosts and Hostesses
Server Assistants
Percent of Stores with Differences Greater than 2 Standard Deviations
Percent of Stores with DifferencesLess than 2 Standard Deviations

Exhibit 13


The Percentage of Stores In Dr. Crawford's Analyses with Differences Greater than Two Standard Deviations is Small
- Snag-a-Job Applicant Pool -
- By Job, All Years Combined -
100.0%
90.0%
80.0%
70.0%
60.0%
50.0%
40.0%
30.0%
20.0%
10.0%
0.0%
15.8%
84.2%
13.0%
87.0%
4.8%
95.2%
2.3%
97.7%
All FOH Jobs
Server/Waiter Jobs
Hosts and Hostesses
Server Assistants
Percent of Stores with Differences Greater than 2 Standard Deviations
Percent of Stores with DifferencesLess than 2 Standard Deviations

Exhibit 14

# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Paper Standard Deviations Taken from Dr. Crawford's Table 22 -

## - Job 1111 - All FOH Positions -



# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Paper Standard Deviations Taken from Dr. Crawford's Table 22 -

## - Job 4110 - Servers -



# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Paper Standard Deviations Taken from Dr. Crawford's Table 22 -

## - Job 4130 - Server Assistants -



# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Paper Standard Deviations Taken from Dr. Crawford's Table 22 -

## - Job 4150 - Hosts -



# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Snag-A-Job Standard Deviations Taken from Dr. Crawford's Table 18 -

## - Job 1111 - All FOH Positions -




Exhibit 19

# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Snag-A-Job Standard Deviations Taken from Dr. Crawford's Table 18 -

## - Job 4110 - Servers -




Exhibit 20

# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Snag-A-Job Standard Deviations Taken from Dr. Crawford's Table 18 -

## - Job 4130 - Server Assistants -




Exhibit 21

# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Snag-A-Job Standard Deviations Taken from Dr. Crawford's Table 18 -

## - Job 4150 - Hosts -



# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Census Standard Deviations Taken from Dr. Crawford's Table 14 -

## - All FOH Positions -




Exhibit 23

# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Census Standard Deviations Taken from Dr. Crawford's Table 11 -

## - Servers -




Exhibit 24

# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Census Standard Deviations Taken from Dr. Crawford's Table 12 -

## - Server Assistants -



# There are Large Store by Store Variations in Standard Deviation Outcomes Underlying the "Average Store" Hiring Results

## - Census Standard Deviations Taken from Dr. Crawford's Table 13 -

## - Hosts -



# Paper Was the Primary Application Source from 2007-2012, After Which Snag-a-Job Became the Primary Source. The Rate of Hire from Snag-a-Job During 2013-2014 was Approximately 10 Times Larger than It Was During 2007-2012




Exhibit 27

# Dr. Crawford's Paper Applications Benchmarks
## By Job and Year
## Average Percent Age 40 and Above

| Job | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Servers/Waiters | 2.0% | 5.6% | 6.7% | 5.4% | 7.6% | 6.9% | 5.8% | 8.6% |
| Server Assistant | 2.8% | 9.0% | 5.9% | 5.0% | 6.2% | 5.6% | 5.7% | 10.2% |
| Host | 1.4% | 4.8% | 4.4% | 3.4% | 4.3% | 3.7% | 3.6% | 13.4% |
| Bartender | 3.0% | 8.5% | 8.5% | 7.3% | 7.7% | 9.7% | 6.4% | 16.2% |
| All FOH Jobs | 1.9% | 5.5% | 6.3% | 5.2% | 7.2% | 5.9% | 5.2% | 6.3% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 19, 20, 21 and 22

Exhibit 28

# Dr. Crawford's Snag-a-Job Applications Benchmarks
## By Job and Year
## Average Percent Age 40 and Above

| Job | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Servers/Waiters | 6.8% | 6.5% | 7.2% | 6.7% | 6.8% | 7.2% | 4.0% | 3.5% |
| Server Assistant | 5.7% | 6.7% | 7.3% | 5.0% | 7.5% | 7.4% | 3.0% | 2.7% |
| Host | 4.5% | 5.1% | 6.2% | 5.8% | 5.3% | 4.9% | 3.6% | 3.0% |
| Bartender | 13.9% | 10.7% | 10.1% | 13.3% | 0.0% | 15.5% | 6.2% | 5.0% |
| All FOH Jobs | 7.8% | 7.0% | 7.3% | 6.9% | 6.7% | 7.4% | 4.4% | 3.7% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 15, 16, 17 and 18

# Average Percent Age 40 and Above
# By Job and Year
# Dr. Crawford's U.S. Census Benchmarks

| Job | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| **Servers/Waiters** | 16.3% | 16.3% | 16.3% | 16.3% | 16.3% | 16.3% | 16.3% | 16.3% |
| **Server Assistant** | 30.9% | 30.9% | 30.9% | 30.9% | 30.9% | 30.9% | 30.9% | 30.9% |
| **Host** | 12.6% | 12.6% | 12.6% | 12.6% | 12.6% | 12.6% | 12.6% | 12.6% |
| **Bartender** | 24.3% | 24.3% | 24.3% | 24.3% | 24.3% | 24.3% | 24.3% | 24.3% |
| **All FOH Jobs** | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% |

Note: Numbers compiled from Dr. Crawford's Amended Report, Table 4

Exhibit 30

# A Comparison of Dr. Crawford's Census Benchmark to the Corrected Census Benchmark and the Unadjusted TXRH Applicant Flow Benchmark




Note: Corrected Census Benchmark averages the four FOH jobs.

Exhibit 31

# A Multiple Regression Analysis Demonstrates that Several Other Factors are Correlated to the Volume of Paper Applications Produced But Age is Not Correlated

## - Analysis of Dr. Crawford's Paper Application Sample -

| Regression Model | Control Variables Added Sequentially by Model | Is the Additional Control Statistically Significant in Explaining the Volume of Applications Produced? | R-Square |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| 1 | Number of Hires | Yes, Positive | 12.69% |
| 2 | Add Year | Yes, Positive | 14.23% |
| 3 | Add Pre- or Post- Store Opening | Yes, Positive | 22.44% |
| 4 | Add Store Location | Yes, Positive/Negative | 30.84% |
| 5 | Add Percent of Aged 40 or Above | No | 30.89% |

Note:

Paper applications analyzed are Dr. Crawford's paper application sample of 321 store-years. 51,730 applications with an Accurint DOB are included in this analysis. Four applications for stores without store opening date information are excluded. The unit of analysis is store-month. A total of 2,782 store-months with one or more paper applications are analyzed. The store opening month is classified as pre-store opening. There are 213 unique stores in this study, 25 are newly opened stores during the period. The dependent variable is the monthly number of paper applications retained, produced and with an Accurint DOB. The independent variables are listed under the column "control variable." Statistical significance refers to the 0.05 level.

## *Distribution of Tenure by Age Group*

| | *Average* | *Minimum* | *25th Percentile* | *Median* | *75th Percentile* | *Maximum* | *Sample Size (N)* |
|---|---|---|---|---|---|---|---|
| **Servers** | | | | | | | |
| **Age < 40** | 1.44 | 0.00 | 0.42 | 1 | 2 | 17 | 1,926 |
| **Age >= 40** | 8.22 | 0.06 | 2.00 | 5 | 13 | 35 | 86 |
| **Assistant** | | | | | | | |
| **Age < 40** | 1.17 | 0.00 | 0.33 | 0.75 | 1.58 | 10 | 1,159 |
| **Age >= 40** | 3.55 | 0.17 | 1.17 | 2 | 5 | 10 | 10 |
| **Host/Hostess** | | | | | | | |
| **Age < 40** | 1.15 | 0.00 | 0.33 | 0.75 | 1.5 | 6 | 1,122 |
| **Age >= 40** | 1.55 | 0.58 | 0.58 | 1.25 | 3 | 3 | 6 |
| **Bartender** | | | | | | | |
| **Age < 40** | 1.38 | 0.00 | 0.42 | 1 | 2 | 15 | 1,795 |
| **Age >= 40** | 4.9 | 0.02 | 3.00 | 4 | 7 | 12 | 23 |

Note: Data from January CPS, 2008, 2010 and 2012

Exhibit 33

# External Labor Market Availability by Restaurant, Age 40 and Over: Corrected Census Estimate vs. Crawford Estimate: SERVERS

## - Sorted by Restaurant Number -




Exhibit 34


External Labor Market Availability by Restaurant, Age 40 and Over:
Corrected Census Estimate vs. Crawford Estimate: ASSISTANTS
- Sorted by Restaurant Number -
Corrected Estimate
Crawford Estimate
100%
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
40 and Over Availability
1
15
30
37
45
56
66
74
84
92
100
111
118
129
139
147
156
163
170
177
185
194
201
208
216
223
232
239
246
254
261
268
276
284
291
299
309
319
326
333
340
350
360
367
374
385
392
401
409
416
427
435
443
456
467
475
485
Restaurant Number

Exhibit 35


External Labor Market Availability by Restaurant, Age 40 and Over:
Corrected Census Estimate vs. Crawford Estimate: HOSTS
- Sorted by Restaurant Number -
Corrected Estimate
Crawford Estimate
40 and Over Availability
50%
45%
40%
35%
30%
25%
20%
15%
10%
5%
0%
Restaurant Number

Exhibit 36


External Labor Market Availability by Restaurant, Age 40 and Over:
Corrected Census Estimate vs. Crawford Estimate: BARTENDERS
- Sorted by Restaurant Number -
Corrected Estimate
Crawford Estimate
100%
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
40 and Over Availability
1 15 30 37 45 56 66 74 84 92 100 111 118 129 139 147 156 163 170 177 185 194 201 208 216 223 232 239 246 254 261 268 276 284 291 299 309 319 326 333 340 350 360 367 374 385 392 401 409 416 427 435 443 456 467 475 485
Restaurant Number

Exhibit 37

# Comparison of Dr. Crawford's Census Benchmarks to the Corrected Census Benchmarks by Job




Exhibit 38

# The Process of Employee Productivity Sorting Over Time In a Job Hierarchy



# The Process of Employee Productivity Sorting Over Time In a Job Hierarchy



# Comparison of the Productivity Distribution for Employees Newly Hired into a Job and an Existing Cohort Hired into that Same Job a Number of Years Earlier




Median Hourly Wages by Year and Quintile
- Quintile Defined by 2012 Wages -
Hourly Wages
45
40
35
30
25
20
15
10
5
0
5 - High
4
3 - Middle
2
1 - Low
1979 1980 1981 1982 1983 1984 1985 1986 1987 1988 1989 1990 1991 1992 1993 1994 1996 1998 2000 2002 2004 2006 2008 2010 2012
Year

Exhibit 42

## - Cross Sectional Analysis of NLS Data Median Wages -

### - Hourly Wage Has Been Adjusted to Account for the Year -



## Summary of Z-Score Analysis for Hiring of Applicants 40+ Years of Age By Year

### - UNADJUSTED -

**- Controls for Year, Location, Job, and Application Source -**

| Year | Total Applicants | 40+ Applicants | Total Ultipro Hires | Ultipro 40+ Hires | Weighted Availability of 40+ Applicants | Actual 40+ Hire Percentage | Expected 40+ Hires | Surplus (+) / Shortfall (-) | Z-Score |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] = [4]*[6] | [9] = [5]-[8] | [10] |
| **2007** | 35,351 | 570 | 24,550 | 239 | 1.22% | 0.97% | 300 | -60 | -3.56 |
| **2008** | 61,371 | 2,817 | 23,852 | 306 | 2.52% | 1.28% | 601 | -294 | -12.41 |
| **2009** | 85,238 | 4,667 | 17,898 | 224 | 3.70% | 1.25% | 662 | -437 | -17.51 |
| **2010** | 116,540 | 6,189 | 17,387 | 223 | 4.41% | 1.28% | 767 | -543 | -20.18 |
| **2011** | 121,438 | 7,435 | 20,189 | 304 | 5.00% | 1.51% | 1,010 | -705 | -22.95 |
| **2012** | 109,697 | 6,050 | 22,509 | 421 | 4.53% | 1.87% | 1,019 | -597 | -19.34 |
| **2013** | 219,008 | 9,534 | 24,195 | 491 | 4.09% | 2.03% | 990 | -498 | -16.41 |
| **2014** | 424,939 | 13,455 | 27,704 | 572 | 3.30% | 2.06% | 915 | -343 | -11.79 |
| **All** | 1,173,582 | 50,716 | 178,284 | 2,780 | 3.51% | 1.56% | 6,262 | -3,482 | -45.48 |

Notes:
(1) Only looks at the first hire that occurred for each person within the class period
(2) Data is restricted to the 396 in-scope stores, with roll-up dates (where applicable) taken into account

# Summary of Z-Score Analysis for Hiring of Applicants 40+ Years of Age By Job

## - UNADJUSTED -

### - Controls for Year, Location, Job, and Application Source -

| Job | Total Applicants | 40+ Applicants | Total Ultipro Hires | Ultipro 40+ Hires | Weighted Availability of 40+ Applicants | Actual 40+ Hire Percentage | Expected 40+ Hires | Surplus (+) / Shortfall (-) | Z-Score |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] = [4]*[6] | [9] = [5]-[8] | [10] |
| **Bartender** | 30,135 | 2,631 | 1,737 | 52 | 6.55% | 2.99% | 114 | -62 | -6.17 |
| **Host** | 393,405 | 12,194 | 54,389 | 156 | 2.27% | 0.29% | 1,235 | -1,079 | -31.34 |
| **SA** | 279,262 | 12,574 | 41,099 | 756 | 3.96% | 1.84% | 1,626 | -870 | -22.44 |
| **Server** | 470,781 | 23,318 | 81,059 | 1,816 | 4.05% | 2.24% | 3,287 | -1,471 | -26.52 |
| | | | | | | | | | |
| **All** | 1,173,582 | 50,716 | 178,284 | 2,780 | 3.51% | 1.56% | 6,262 | -3,482 | -45.48 |

Notes:
(1) Only looks at the first hire that occurred for each person within the class period
(2) Data is restricted to the 396 in-scope stores, with roll-up dates (where applicable) taken into account

Exhibit 45

# Summary of Z-Score Analysis for Hiring of Applicants 40+ Years of Age By Source

## - UNADJUSTED -

### - Controls for Year, Location, Job, and Application Source -

| Application Source | Total Applicants | 40+ Applicants | Total Ultipro Hires | Ultipro 40+ Hires | Weighted Availability of 40+ Applicants | Actual 40+ Hire Percentage | Expected 40+ Hires | Surplus (+) / Shortfall (-) | Z-Score |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] = [4]*[6] | [9] = [5]-[8] | [10] |
| **PAPER** | 542,224 | 27,575 | 143,071 | 2,117 | 3.51% | 1.48% | 5,025 | -2,908 | -42.43 |
| **SAJ** | 631,358 | 23,141 | 35,213 | 663 | 3.51% | 1.88% | 1,237 | -574 | -16.81 |
| **All** | 1,173,582 | 50,716 | 178,284 | 2,780 | 3.51% | 1.56% | 6,262 | -3,482 | -45.48 |

Notes:

(1) Only looks at the first hire that occurred for each person within the class period

(2) Data is restricted to the 396 in-scope stores, with roll-up dates (where applicable) taken into account

## Summary of Z-Score Analysis for Hiring of Applicants 40+ Years of Age By Year

### - ADJUSTED -

**- Controls for Year, Location, Job, and Application Source -**

| Year | Total Applicants | 40+ Applicants | Total Ultipro Hires | Ultipro 40+ Hires | Weighted Availability of 40+ Applicants | Actual 40+ Hire Percentage | Expected 40+ Hires | Surplus (+) / Shortfall (-) | Z-Score (with Odds Ratio of 0.412) |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] = [4]*[6] | [9] = [5]-[8] | [10] |
| **2007** | 35,351 | 570 | 24,550 | 239 | 0.52% | 0.97% | 127 | 111 | 9.97 |
| **2008** | 61,371 | 2,817 | 23,852 | 306 | 1.08% | 1.28% | 258 | 48 | 3.03 |
| **2009** | 85,238 | 4,667 | 17,898 | 224 | 1.58% | 1.25% | 282 | -58 | -3.48 |
| **2010** | 116,540 | 6,189 | 17,387 | 223 | 1.88% | 1.28% | 326 | -103 | -5.76 |
| **2011** | 121,438 | 7,435 | 20,189 | 304 | 2.14% | 1.51% | 433 | -128 | -6.25 |
| **2012** | 109,697 | 6,050 | 22,509 | 421 | 1.94% | 1.87% | 437 | -15 | -0.74 |
| **2013** | 219,008 | 9,534 | 24,195 | 491 | 1.76% | 2.03% | 426 | 65 | 3.20 |
| **2014** | 424,939 | 13,455 | 27,704 | 572 | 1.44% | 2.06% | 399 | 172 | 8.89 |
| **All** | 1,173,582 | 50,716 | 178,284 | 2,780 | 1.51% | 1.56% | 2,688 | 92 | 1.80 |

Notes:
(1) Only looks at the first hire that occurred for each person within the class period
(2) Data is restricted to the 396 in-scope stores, with roll-up dates (where applicable) taken into account

Exhibit 47

# Summary of Z-Score Analysis for Hiring of Applicants 40+ Years of Age By Job

## - ADJUSTED -

### - Controls for Year, Location, Job, and Application Source -

| Job | Total Applicants | 40+ Applicants | Total Ultipro Hires | Ultipro 40+ Hires | Weighted Availability of 40+ Applicants | Actual 40+ Hire Percentage | Expected 40+ Hires | Surplus (+) / Shortfall (-) | Z-Score (with Odds Ratio of 0.412) |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] = [4]*[6] | [9] = [5]-[8] | [10] |
| **Bartender** | 30,135 | 2,631 | 1,737 | 52 | 2.98% | 2.99% | 52 | 0 | 0.00 |
| **Host** | 393,405 | 12,194 | 54,389 | 156 | 0.96% | 0.29% | 522 | -366 | -16.13 |
| **SA** | 279,262 | 12,574 | 41,099 | 756 | 1.71% | 1.84% | 704 | 52 | 1.98 |
| **Server** | 470,781 | 23,318 | 81,059 | 1,816 | 1.74% | 2.24% | 1,410 | 406 | 10.97 |
| **All** | 1,173,582 | 50,716 | 178,284 | 2,780 | 1.51% | 1.56% | 2,688 | 92 | 1.80 |

Notes:

(1) Only looks at the first hire that occurred for each person within the class period

(2) Data is restricted to the 396 in-scope stores, with roll-up dates (where applicable) taken into account

## Summary of Z-Score Analysis for Hiring of Applicants 40+ Years of Age By Source

## - ADJUSTED -

### - Controls for Year, Location, Job, and Application Source -

| Application Source | Total Applicants | 40+ Applicants | Total Ultipro Hires | Ultipro 40+ Hires | Weighted Availability of 40+ Applicants | Actual 40+ Hire Percentage | Expected 40+ Hires | Surplus (+) / Shortfall (-) | Z-Score (with Odds Ratio of 0.412) |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] = [4]*[6] | [9] = [5]-[8] | [10] |
| **PAPER** | 542,224 | 27,575 | 143,071 | 2,117 | 1.51% | 1.48% | 2,159 | -42 | -0.91 |
| **SAJ** | 631,358 | 23,141 | 35,213 | 663 | 1.50% | 1.88% | 528 | 135 | 5.91 |
| **All** | 1,173,582 | 50,716 | 178,284 | 2,780 | 1.51% | 1.56% | 2,688 | 92 | 1.80 |

Notes:

(1) Only looks at the first hire that occurred for each person within the class period

(2) Data is restricted to the 396 in-scope stores, with roll-up dates (where applicable) taken into account

# There are Large Store by Store Variations in Statistical Outcomes Underlying the "Average Store" Hiring Results

## - Standard Deviations Taken from Z-Score Analysis-

## - Server, Server Assistant, Bartender, and Host -



# There are Large Store by Store Variations in Statistical Outcomes Underlying the "Average Store" Hiring Results

## - Standard Deviations Taken from Z-Score Analysis-

## - Server -



# There are Large Store by Store Variations in Statistical Outcomes Underlying the "Average Store" Hiring Results

## - Standard Deviations Taken from Z-Score Analysis-

## - Server Assistants -



# There are Large Store by Store Variations in Statistical Outcomes Underlying the "Average Store" Hiring Results

## - Standard Deviations Taken from Z-Score Analysis-

## - Hosts -




Exhibit 53

# There are Large Store by Store Variations in Statistical Outcomes Underlying the "Average Store" Hiring Results

## - Standard Deviations Taken from Z-Score Analysis-

## - Bartenders -

