HEINONLINE

Citation: 34 Jurimetrics J. 153 1993-1994
Provided by:
Seyfarth Shaw Libraries

Content downloaded/printed from HeinOnline

Thu Sep 15 11:13:55 2016

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from uncorrected OCR text.

-- To obtain permission to use this article beyond the scope of your HeinOnline license, please use:

Copyright Information

ARTICLES

# PROPORTIONAL HAZARD MODELS FOR AGE DISCRIMINATION CASES

**Michael O. Finkelstein**
**Bruce Levin***

**ABSTRACT:** The common method for measuring age discrimination in employment involves a comparison of some aggregate statistic — hires, promotions, terminations — for those employees over age 40 with those under 40. This approach has drawbacks because it fails to reflect differences in treatment within the over-40 group and usually requires aggregation of data across departments or over time in order to assemble large enough numbers for reliable estimation. Such aggregation may create bias and does create barriers to significance testing. Using terminations as an example, we suggest that it is more useful to fit a proportional hazards model to the data. The model we demonstrate assumes a constant percentage increase in risk of termination with each year of age, with the percentage estimated by the method of maximum likelihood from the data of terminations at each point in time and for each department. The results of the method are calculated for an example involving 15 terminations.

**CITATION:** Michael O. Finkelstein & Bruce Levin, Proportional Hazard Models for Age Discrimination Cases, 34 Jurimetrics J. 153-171 (1994).

---

*Michael O. Finkelstein is a member of the New York Bar and Adjunct Lecturer in Law, Columbia Law School. Bruce Levin is Associate Professor, Division of Biostatistics, Columbia University School of Public Health. The authors thank Pamela Edwards for her assistance in preparing this article. A version of this Article was presented at the Second International Conference on Forensic Statistics, Tempe, Arizona, March 1993.

Statistical evidence is frequently a key element of proof in claims of age discrimination in employment. The common method is to gather some aggregate statistic — hires, promotions, terminations — for employees age 40 and over, which is the protected class under the Age Discrimination in Employment Act,[1] and to compare that statistic with the same measure for those under 40. By thus dichotomizing age, the expert witness can contrast the treatment of the two groups and test for the statistical significance of the difference. The analysis is familiar and approved from race and sex discrimination cases. That is a merit, but there are drawbacks in the age context. As one court aptly observed, "[a]ge discrimination is qualitatively different from race or sex discrimination because the basis of discrimination is not a discrete and immutable characteristic, but a continuum along which the distinctions between employees are often subtle and relative ones."[2] The fact that age is a continuum suggests that the dichotomous statistical tools used in race and sex cases are less appropriate in the age context. We propose a different way of measuring discrimination, one that takes account of the continuum of age and the possibility of increasing discrimination as age progresses.

Prior articles on the use of statistics in age discrimination cases have focused on the problem of testing for statistical significance.[3] Our focus is, instead, on the measurement of discrimination. We propose a measure that is well adapted to cases in which employees have been terminated either because of reduction-in-force or because of employee involuntary turnover. Such cases are likely to become increasingly important due to the pressure of unemployment and the removal of the upper age limitation on the protected class.[4] The same methods may be applied, mutatis mutandis, to other employment decisions, such as hiring or promotion.

---

1. Codified, as amended, in 29 U.S.C.A. §§ 621-633a (1992).

2. Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435, 1442 (11th Cir.), *cert denied*, 474 U.S. 1005 (1985).

3. *See, e.g.*, Gregory L. Harper, *Statistics as Evidence of Age Discrimination*, 32 HASTINGS L.J. 1347 (1981); Richard C. Singleton, *Use of Statistics in Age Discrimination Litigation*, in EMPLOYMENT LAW, at 177, PLI Litig. and Admin. Practice Course Handbook Series No. 372, 1989n.

4. The Age Discrimination Act originally cut off protection at age 65. 81 Stat. 607, § 12. In 1978 the upper age limit was raised to 70, 92 Stat. 189, 190, § 3(a), and in 1986 it was eliminated, with certain exceptions. 100 Stat. 3342, § 2(c). The elimination of the 70 age limit for tenured faculty becomes effective on December 31, 1993. 100 Stat. 3342, 3344, §§ 6(a) and (b).

## I.

Comparisons of the involuntary terminations of employees age 40 and over ("over-40") with those under 40 can be made in various ways. One may simply compare the proportions of those discharged in the two groups.[5] Alternatively, one may compare the proportions of the over-40 group among those discharged and in the workforce.[6] The comparative statistics are introduced in disparate impact cases to demonstrate the disparate impact on older employees of some challenged employer practice,[7] and in disparate treatment cases to demonstrate the employer's intent to discriminate.[8]

Whichever way the comparison is made, an overall statistic comparing over-40 with under-40 employees may be only generally relevant to the probability that a particular plaintiff who is over 40 suffered discrimination. For example, if discrimination suffered by the over-40 group occurred by reason of the discharge of those in their 50s or 60s, and the plaintiff is in her early 40s, the inference that the increase in risk of termination observed for older employees would apply to her is speculative. In race and sex cases the race and gender disparities are assumed to relate equally to all protected group members, but this assumption cannot fairly be made in age cases. In addition, if discrimination lies within the protected group, the simple under-40 to over-40 comparison may not reveal it. If there is discrimination against employees between ages 50 and 60 and the pattern is concealed by favoring those between 40 and 50, the discrimination would not be detected by the simple under-40 and over-40 dichotomy.

Recognizing these possibilities, plaintiffs have offered multiple age break points to expose discrimination against older subgroups within the protected

---

5. *See*, *e.g.*, Blum v. Witco Chemical Corp., 829 F.2d 367 (3rd Cir. 1987).

6. *See*, *e.g.*, Mistretta v. Sandia Corp., 15 FEP Cases 1690, 1706 (D. New Mexico 1977) (53% of involuntary terminations came from the 52-64 age group, which was only 20% of the employee population), *aff'd sub nom.*, EEOC v. Sandia Corp., 639 F.2d 600 (10th Cir. 1980) (hereinafter *Sandia*). The parties sometimes also introduce statistics showing the usually small change in average age resulting from the terminations. *See*, *e.g.*, Rose v. Wells Fargo & Co., 902 F.2d 1417, 1423 n.5 (9th Cir. 1990). This is a flawed measure of discrimination because it depends on the extraneous factor of the number of terminated employees compared with the size of the workforce.

7. *See*, *e.g.*, Geller v. Markham, 635 F.2d 1027 (2d Cir. 1980) (a "sixth step" policy that disqualified teacher applicants with more than five years' experience held to be discriminatory because it applied to 92.6% of teachers between 40 and 65, but only 62% of teachers under 40).

8. *See*, *e.g.*, Bruno v. W. B. Saunders Co., 882 F.2d 760, 766-767 (3rd Cir. 1989); Polstroff v. Fletcher, 452 F.Supp. 17, 22 (N.D. Ala. 1978).

class.[9] This is a reasonable thing to do, but there are drawbacks. First, the opposing party will charge that the selection of break points was manipulated to produce a desired result.[10] Second, the post hoc selection of a break point to produce the greatest difference between the two groups will invalidate the usual tests of statistical significance.[11] Third, if the older subgroup is small or data are subdivided into multiple age strata, the numbers in each stratum are likely to become so small that the resulting risk estimates will be unreliable.[12]

The small number problem is exacerbated if the discharges occur over a period of time or in different departments of an employer. Pooling the data over different points in time or departments is a tempting strategy but creates the well-known risk of aggregation bias.[13] In addition, aggregating data

---

9. *See, e.g.*, Barnes v. Gencorp., Inc., 896 F.2d 1457, 1466 (6th Cir. 1990); Marshall v. Sun Oil Co., 605 F.2d 1331, 1333 (5th Cir. 1979) (two comparisons done, one with the employees subdivided at age 50 and another at age 60). Such subgroup analysis, however, has been held not to apply to disparate impact cases. Lowe v. Commack Union Free School Dist., 886 F.2d 1364 (2d Cir. 1989).

10. In *Barnes v. Gencorp., Inc.*, 896 F.2d 1457 (6th Cir. 1990), for example, plaintiffs introduced discharge data for employees 48 and over, 52 and over, and 55 and over and compared that with employees under 48, 52, and 55 respectively. Defendants countered that plaintiffs artificially manipulated the statistics by choosing arbitrary age categories. But since these break points apparently corresponded to the ages of some of the seven plaintiffs, the court defended the groupings by observing that "[i]f employees younger than a specific plaintiff have a statistically significant lowered discharge rate, then it is obvious that the statistics — absent another explanation for the discharge — are probative of discrimination." *Id.* at 1467. The break point selection may not be arbitrary, but the inference of discrimination from break point groups based on a plaintiff's age is not at all obvious. It depends on the arbitrary assumption that the plaintiff at the break point shares the risk characteristic of the older rather than the younger group. The court seemed to recognize this in a footnote. *Id.* at 1467 n.13.

11. Even if the employer were non-discriminatory, it would be possible by selecting the worst break point to create a statistically significant difference between the two groups. Rupert G. Miller & David O. Siegmund, *Maximally Selected Chi-Square Statistics*, 38 BIOMETRICS 1011 (1982).

12. In most age discrimination cases the numbers terminated at any one time are relatively small. There are exceptions, however. *See, e.g.*, Marshall v. Sun Oil Co., 605 F.2d 1331 (5th Cir. 1979) (121); Polstroff v. Fletcher, 452 F. Supp. 17 (D. Ala. 1978) (350); Sandia, 639 F.2d 600 (10th Cir. 1980) (306).

13. For example, suppose that in Department A the work force consists of 700 over-40 and 300 under-40 employees. The employer discharges ten percent of each group: 70 of the over-40 employees and 30 of the under-40 employees. In Department B the employer has 150 over-40 and 350 under-40 employees. Two percent of them are discharged: 3 of the over-40 employees and 7 of the under-40

over time generally involves multiple counting of the same employees, which invalidates the usual statistical tests of significance. To avoid such problems, each time of discharge in each department should be analyzed separately and the results combined.

## II.

To satisfy these requirements, we need a measure of the increase (if any) in the risk of termination with each year of age so that there is a basis for appraising the degree of discrimination applicable to plaintiffs of varying ages. In addition, as stated, our measure should combine evidence from all terminations. If very large numbers of employees of varying ages were discharged at a single time, one could simply observe the discharge rates at each age or narrow grouping of ages. But in the usual case, we need a model of the progression of risk with age that depends on one or two parameters that can be reliably estimated from relatively few termination events.

A class of models known as proportional hazards models meets these requirements.[14] Variants of such models have been used (and apparently misunderstood) in some notable cases,[15] but not to our knowledge in an age discrimination case. Commonly used in actuarial and biostatistical applications, they are also appropriate in the context of age discrimination.

To implement a proportional hazards model, consider the risk of discharge as a hazard, which it surely is. Define a "baseline" risk of discharge, denoted as $\theta(t)$, as the risk of discharge at time $t$ for employees of a reference age at time $t$. Risk of discharge can be defined alternatively

---

employees. Then the pooled discharge rate for the two departments would be (70+3)/(700+150) = 8.59% for the over-40 group and (30+7)/(300+350) = 5.69% for the under-40 group. The rate for the older group is thus 50% larger than that for the younger group (8.59/5.69 = 1.51) even though the discharge percentages for the two groups are the same in each department separately.

14. These models are also known as "Cox" models because they were first proposed by D.R. Cox in *Regression Models in Life Tables*, 34 J. ROYAL STAT. SOC'Y (Series B) 187 (1972).

15. Probably the best known is *McCleskey v. Zant*, 481 U.S. 279 (1987), in which the Supreme Court rejected an attack on Georgia's death penalty based on statistics which showed that the penalty was disproportionately imposed on those convicted of killing whites. Petitioner's evidence included a multiple logistic regression model, which is a relative of the models discussed in this article. *See* M. FINKELSTEIN & B. LEVIN, STATISTICS FOR LAWYERS § 12.35 (1990). For applications of logistic regression in cases challenging initial assignments of faculty, *see* Coser v. Moore, 585 F.Supp. 572 (E.D.N.Y. 1983); Craik v. Minnesota University Bd., 731 F.2d 465, (8th Cir. 1984).

as the probability of discharge,[16] or the odds on discharge. The odds on discharge are defined as the probability of discharge divided by the probability of nondischarge. Henceforth, we shall use the term "risk" to refer specifically to the odds on discharge.[17] Define X(t) as years of age at time *t* above the reference age, so that *X* is O for employees at the reference age. For convenience, we choose 40 as the reference age; the choice is arbitrary and does not affect risks calculated from the model. In addition, for reasons discussed later, we truncate *X* to its value at age 40 for employees younger than 40.

In the simplest proportional hazards model, which we use here, the baseline odds on discharge are multiplied by a proportionality factor so that the odds on discharge increase by the same percentage for each year of age above the truncation age. This factor is conveniently expressed as $e^{BX(t)}$ where *e* is the base of natural logarithms (2.718...), and *B* reflects the degree to which risk increases with age. The risk of discharge at time *t* for age X(*t*) is thus $\Theta(t)e^{BX(t)}$. The effect of this model is that each year of age above the truncation age increases the odds on discharge by a factor of $e^B$. If $B=0$, $e^B=1$ and there is no increase in risk of discharge with age. If $B=0.25$, $e^{.25} = 1.28$, which is a 28% per year increase. When *B* is small, 100B is approximately equal to the annual percentage increase in the odds per year of age.[18]

To see how the model works, assume for the sake of simplicity that at time *t* all the at-risk employees are either age 40 or age 55 exactly. Assume further that 15% of the 40-year-old employees are discharged but 35% of the 55-year-old employees are discharged. Let 40 be the reference age. The odds on discharge at age 40 are 0.15/0.85 = 0.176 and at 55 are 0.35/0.65 = 0.538. Under the proportional hazards model, the baseline risk at 40 is $\Theta(t) = 0.176$, and the risk at 55 is $0.176\,e^{15B} = 0.538$. Solving for *B*,[19] we find

---

16. Among current employees at time *t*. That is, the denominator comprises employees still at risk of termination at time *t*, as opposed to a larger cohort of workers previously, but not currently, employed.

17. The model uses odds on discharge rather than probability of discharge for technical reasons. One reason is that the model might generate a predicted risk in excess of 1, which would be impossible for probabilities but not for odds. For further discussion, see FINKELSTEIN & LEVIN, *supra* note 15, § 12.34 at 448-449. It is easy to translate probabilities into odds or odds into probabilities. If *p* is the probability of an event, then the odds on the event are p/(1-p). Conversely, if $\Omega$ are the odds on the event, $p=\Omega/(1+\Omega)$. It will usually be desirable to convert odds into probabilities for purposes of interpretation.

18. This follows from the mathematical fact that when *x* is close to zero, $e^x$ is approximately equal to $1 + x$.

19. Taking natural logs of both sides yields $15B = \ln(.538/.176) = 1.118$, so

$B = 0.0745$. Thus, the risk of discharge increases each year by $e^{0.0745} = 1.077$, or about 8%. The odds for a 50-year-old employee would be interpolated at $(1.077)^{10} = 2.100$, or about twice that for a 40-year-old employee.[20]

In the more general case, when terminated employees differ in age, $B$ can be estimated by the method of maximum likelihood. The estimate of $B$ is the value that maximizes the probability that the employees who are discharged at times $t_1, t_2, \ldots$ would have been selected given that those numbers of employees are discharged from among the employees at risk at those times. For example, if 15 employees are discharged all at a single time, $B$ is selected to maximize the probability that those 15 would have been selected, given that some 15 are discharged.

To be more specific, consider an employer that has $N$ employees and discharges $r$ of them, one at a time, over a period of two years. For each discharge, we write an expression for the conditional probability that the employee would be selected for discharge given that some employee is discharged from among those still employed and presumably at risk (we refer to this group as the "risk set"). The model assumes that age is the only factor that might cause one employee to be selected over another, and that the effect of age is captured by the proportional hazards relation.[21] The odds on discharge for an employee age $X(t_1)$ years above the reference age at the time of the first discharge, $t_1$, are $\Theta(t_1)e^{BX(t_1)}$, where $\Theta(t_1)$ is the baseline risk for that department at time $t_1$. The conditional probability is obtained by dividing this expression for the given employee by the sum of such terms for each employee in the risk set. Since all employees have a risk of discharge that is measured from the same baseline at a given time, the baseline cancels out leaving the conditional probability that the employee is discharged, given that some employee is discharged at time $t_1$ as equal to $e^{BX(t_1)}/\Sigma e^{BX_i(t_1)}$ where $X_i(t_1)$ is the age of the $i$th employee in years above the reference age at $t_1$ and the summation is over the employees at risk at time $t_1$. In other words, the conditional probability that the employee age $X$ years

---

$B = 0.0745$.

20. We note that the increase in probability of discharge is not constant from year to year as the odds are. For example, the increase in probability is 6.7% per year (from 0.150 to 0.160) from age 40 to 41 and 4.9% per year (from 0.350 to 0.367) from age 55 to 56.

21. In addition, the model assumes that other features of the employment process are uninformative as to the value of $B$. This may not be true if, for example, employees leave voluntarily to avoid being discharged, but such terminations are not counted as involuntary and serve merely to reduce the size of the risk set.

above the reference age would be selected for discharge given that someone is discharged is proportional to $e^{BX}$ and is unaffected by the baseline risk.[22]

Each of the $r$ discharged employees has a conditional probability of having been discharged given that someone is discharged from the risk sets at times $t_1,\ldots,t_r$. The product of these probabilities is called the partial likelihood function, which depends for its value on the parameter $B$. The maximum likelihood estimate (mle) of $B$ is the value that maximizes the partial likelihood function.

If more than one employee is terminated at a time, the conditional probability to be included in the partial likelihood function is the probability that those employees would be discharged given that that number of employees is discharged. For example, if two employees of ages $X_1$ and $X_2$ at time $t$ are discharged, the conditional probability would be written as $e^{BX_1}e^{BX_2}/\sum_{ij} e^{BX_i}e^{BX_j}$, where $i$ and $j$ range over all N(N-1)/2 combinations of two distinct employees at risk out of N=N($t$). When there are discharges in separate departments, the partial likelihood function is the product of the department-specific partial likelihoods. In these complex situations, the mle of $B$ and its standard error are determined by computer iteration.[23]

Since the baseline odds drop out of the calculations, the model is robust in that it does not depend on any assumption that the baseline risk is the same at different times or for different departments, or that it has any specific functional form. The model does assume, however, that $B$ is constant over time and across employees and departments. Is this reasonable? The first question is whether, at a given time or for a given department, it is reasonable to assume that if there is discrimination it takes the form of a constant percentage increase in risk with age. The answer is probably "no," if the full range of ages in the work force is included, since in the lower ranges there is likely to be little or no discrimination, even if there is discrimination in the upper ranges. However, in the over-40 group the assumption becomes more plausible. In the *Sandia* case, in which there were sufficient data to test the proportional hazards model, approximate calculations show a close fit for the model for ages 40-65, but no increase with age in the under-40 group.[24] If that were a general pattern, the mle for $B$, being

---

22. A mathematical derivation of this useful result is available from the authors.

23. The first step in the iteration process is sometimes used as a convenient closed-form approximation for the mle of $B$. *See* FINKELSTEIN & LEVIN, *supra* note 15, §10.6 at 294. Usually three or four steps are sufficient for high accuracy.

24. If the proportional hazards model is correct, then $\ln \theta(X) = \ln \theta(40) + BX$, where $\ln \theta(X)$ is the log of risk at age $X$ and $\ln \theta(40)$ is the log of the baseline risk at age 40. This is a straight line on semi-log graph paper. In *Sandia*, the odds based

a kind of average over the two age intervals, would underestimate *B* for the 40-65 group and overestimate it for the under-40 group. To avoid that bias we set the truncation point at age 40, at which point X=0.[25] This truncation is in effect an assumption that the relative risk of termination remains constant at unity throughout the under-40 group, an assumption which is consistent with the congressional finding that age discrimination was not "evident" (except, at that time, for airline stewardesses) under age 40.[26]

The plausibility of the proportional hazards assumption must be appraised in the context of litigation in which some implicit or explicit assumption seems inevitable. If the plaintiff is a 42-year-old, and many of those discharged are in their 50s, plaintiff's implicit assumption is that the average discharge rate for the older group applies to her. This seems unrealistic since discrimination on the basis of age is likely to increase with age. At the other extreme, the defendant employer will argue that the extra risk for older employees has no application to the younger plaintiff. This too seems unrealistic since the data demonstrate the employer's willingness at some point to take age into consideration. The assumption of a constant percentage increase in risk lies between these extremes and would seem to be a reasonable hypothesis to adopt in the absence of more specific evidence. Presumably the assumption would be stated explicitly by the expert, and the jury would be free either to reject the testimony or to use the expert's risk assessment merely as a benchmark for their own assessment based on the statistics and other evidence.

In cases in which terminations occur at different times or in different departments, a percentage increase in risk with age is assumed to be constant

---

on percentages terminated at each year of age closely follow such a straight line for the over-40 group. Pls. Exh. 74-5.

25. Unlike the choice of reference age, the choice of truncation age may affect the risks calculated from the model. As a result, if there is evidence indicating that discrimination began at some greater age, the truncation age should be set at that point. Note that if the truncation age would be set at 40 when ages are measured accurately in terms of years and days since last birthday, it should be set at 39 if ages are measured solely as of last birthday; this should be done to allow for increased risk in the year after the 40th birthday. Age 40 can also be used as the truncation age if, in lieu of accurate age measurement, one half is added to each age as of last birthday. Whatever truncation age is selected, the reference age is conveniently set at the same figure, so that X(t)=0 for employees at or below the truncation age.

26. H.R. Rep. No. 805, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.C.C.A.N. 2213, 2219. The employer could argue that the risk of termination was larger at 40 than the truncated statistic would indicate (and hence *B* for the older group was smaller) only by asserting that it had engaged in age discrimination with respect to the under-40 employees. This is an unlikely position, particularly if the employer denies discrimination against the older group.

at those times and across departments. Again, this is not an unreasonable assumption in the absence of specific evidence. The factors that cause changes in baseline risk — such as economic conditions — would not necessarily affect the way risk of termination increased with age. The overall number to be discharged reflects the firm's economic condition while the relative age distribution of those discharged reflects the employer's assessment of cost and productivity at different ages. An employer who discharges 10 employees at $t_1$ would not necessarily change the relative age distribution of those affected if it has to discharge 20 employees at $t_1$.

Of course these assumptions may be wrong and the process might be better modeled in some other way. If there are enough data the assumptions can and should be tested. If the data indicate that the model does not fit, it may be possible to formulate an alternative model that is more acceptable. For example, the assumption that the percentage increase per year of age remains constant over the age span of the protected group can be tested by dividing the data into age subgroups and testing whether the log odds of discharge increases in a linear fashion. If the percentage increase in risk declines with age, the square root of age is one possible substitute as a more appropriate form of the age variable. The assumption of a constant $B$ independent of department can be tested by adding dummy variables for the various departments and testing the statistical significance of the dummy coefficients. The assumption of a constant $B$ independent of time can be tested by using a more general model in which the proportionality factor is time dependent. A simple example is $[B+Ct)]X(t)$ where $C$ reflects increasing or decreasing trends in the degree of discrimination. If $C$ is not statistically significant the assumption of a constant risk factor over time would not be unreasonable.[27] If $C$ is significant it can be kept in the model. However, refinements of the sort discussed in this paragraph should be made with caution, and only if necessary, because they make the model harder to explain and understand and generally require large samples to estimate accurately.

In hiring, promotion, and employee turnover cases, perhaps more than in reduction-in-force cases, employee qualification factors may correlate with age and thus explain part or all of an age effect. To isolate the age factor, explanatory factors relating to qualifications would have to be added to the model, much as they are in race and sex discrimination cases.[28]

---

27. The use of assumptions that are not rejected by statistical tests becomes more secure if there are sufficient data so that the tests of statistical significance have adequate power or if there are non-statistical reasons to accept the assumptions.

28. *See* cases cited *supra* note 15.

## III.

Not every increase in risk of termination with age makes out a prima facie case of age discrimination. The increase must be "sufficiently substantial" in disparate impact cases to raise an inference that the termination was caused by plaintiff's age.[29] In disparate treatment cases, the disparity must be sufficient to infer an intent to discriminate.[30] There are two justifications for requiring substantiality. The first is that if the increase is small, there is a greater possibility that it may be explained by legally innocent factors that correlate with age, but not age itself. Second, the courts have held that age must be "a determinative factor" in the discharge — by which it is meant that "but for" the age factor the employee would not have been discharged.[31]

What increase in risk of termination meets these requirements? One can argue that the risk should be at least double that of the baseline. If there were no evidence except the statistics tending to show that plaintiff was selected for termination because of her age, one should require at least a doubling of the probability of termination to satisfy the "but for" causation standard by a preponderance of the evidence. A plaintiff picked at random from among those discharged is more likely than not to have been discharged because of her age only if the probability of discharge for employees of her age is more than double that probability for the under-40 group.[32] When probabilities of termination are low (e.g., less than 5%), the ratio of the odds on termination approximates the ratio of the probabilities of termination. Hence a doubling of odds may be used to approximate a doubling of probabilities. When probabilities of termination are greater, the approximate relation between probabilities and odds no longer holds, and a doubling of probabilities implies more than a doubling of odds. Thus, one can argue that an actionable increase in risk requires at least a doubling of odds. This is a

29. *See, e.g.*, Rose v. Wells Fargo & Co., 902 F.2d 1417, 1424 (9th Cir. 1990).

30. International Bhd. of Teamsters v. United States, 431 U.S. 324, 339-40 n.20 (1977) (race discrimination).

31. *See, e.g.*, Loeb v. Textron, 600 F.2d 1003, 1019 (1st Cir. 1979) (plaintiff must prove that age was a "'determining factor' in his discharge in the sense that 'but for' his employer's motive to discriminate against him because of age, he would not have been discharged"); *see also* Geller v. Markham, 635 F.2d 1027, 1035 (2d Cir. 1980) (citing cases).

32. The ratio of the probability of discharge in plaintiff's age group to the probability of discharge in the reference group would generally be called the relative risk or rate ratio ("RR") of discharge with respect to the reference group. In the absence of particular evidence, the probability that a plaintiff was discharged because of her age is 1 - 1/RR. If RR = 2, this probability is 1/2.

fairly stringent requirement. If the odds on discharge increase by 9% a year, a doubling of odds would require approximately 8 years over the truncation age.

Of course, one can convert odds into probabilities and simply require a doubling of probabilities. However, a difficulty intrudes here. While the value of baseline odds does not affect the time required for the estimated annual percentage increase in odds to double the odds, the value of the baseline probability does affect the time required for a doubling of probability. Under the proportional hazards model, when there is a doubling in probability, the ratio of the odds at the doubling age to the odds at age 40 is $[2p/(1-2p)]/[p(1-p)] = e^{BX}$, where $p$ is the baseline probability. One cannot solve this equation for $X$, the years over age 40, without knowledge of $p$.[33]

The problem with estimating the baseline risk directly is that there are likely to be too few employees at the reference age (or truncated to the reference age) at any time for reliable estimation of their risk of termination. The alternative is to estimate the baseline risk using the proportional hazards model, in which case all employees in the risk set at that time become informative. To do this, we write a likelihood function, for each time of discharge, consisting of the product of the probabilities that the terminated employee would have been terminated and the other employees not terminated. These probabilities are calculated from the proportional hazards model using the previously estimated value for $B$. The value of the likelihood function depends on $\theta(t)$, and the mle for $\theta(t)$ at time $t$ is the value that maximizes the function. Each time of discharge has a separate estimate for $\theta$. Computer iteration is required.

In most cases, however, there will be particular evidence in addition to the statistics. In such cases the doubling standard should be viewed more as a general guide than a rigid cutoff, and for such purposes the odds statistic may be sufficient even when the risk of termination is substantial. Moreover, if the courts apply the "motivating factor" test to age discrimination that the 1991 Civil Rights Act adopted for race, sex, religion or national origin cases,[34] plaintiff need not prove that "but for" age she would not have been discharged, but only that age was "a motivating factor" even though other

---

33. Note also that when the rate ratio is 2, the odds ratio is $2[(1-p)/(1-2p)]$. Since $p$ is less than 1, the odds ratio will be greater than 2, which shows that the odds ratio exceeds the rate ratio, as previously stated.

34. 42 U.S.C.A. § 2000e-2(m). In such a mixed-motive case the employer may avoid compensatory and punitive damages as well as equitable relief compelling reinstatement, etc., if it proves that it would have taken the same action in the absence of an impermissible motivating factor. *Id.* § 2000e-5(g)(B).

factors also motivated the decision. In that case, a substantial increase in risk would not necessarily involve a doubling of probability, but merely an increase large enough to make it unlikely that the explanation lies in some other factors correlated with age. How large that would be would depend on the other evidence in the case.

## IV.

Courts generally require a showing of statistical significance with respect to a difference between two groups that is offered to prove discrimination. In the context of a proportional hazards model, the question is whether the estimate of $B$ is statistically significantly different from 0. A test statistic is computed by dividing the estimate of $B$ by its standard error.[35] The result is commonly referred to as a z-score or a Wald test. In sufficiently large samples the statistic has a standard normal distribution so that values in excess of 1.96 are significant at the two-sided 5% level. Alternatively, one may construct a traditional two-sided 95% confidence interval using $B \pm 1.96$ standard errors.[36]

There is another commonly used test statistic that is intuitively appealing to test the null hypothesis that $B=0$, and avoids the testing problems inherent in aggregated data. Under that null hypothesis, the employees selected for termination are at random with respect to age. This generates an expected age for a terminated employee equal to the average age of all employees at risk at that time. If $M$ employees are terminated at a point in time, the mathematically expected sum of their ages is $M$ times the average age of employees at risk at that time. The difference between the observed sum of ages of those terminated and the expected sum of ages over all risk sets is a measure of departure from expectation and is the basis for a test statistic called the score test. (When the difference is divided by the total number of terminated employees it becomes the average excess in years of age for those

35. The standard error of $B$ measures the variability in the estimate of $B$ that would arise if repeated samples of employees for termination were drawn from those at risk with probabilities of selection based on the proportional hazards model at the estimated value for $B$. Each such sample leads to a new mle for $B$.

36. A two-sided test, in this context, tests whether the employer discriminated against either older or younger employees. Since the court would take no action if there were discrimination against younger employees, the only errors the court would make in falsely concluding there was discrimination would be with respect to older employees. This suggests that the test should be one-sided. In that case the critical value for a 5% test or a one-sided confidence interval would be 1.645 standard errors. For a discussion of one-sided vs. two-sided tests see FINKELSTEIN & LEVIN, *supra* note 15, § 4.5.

terminated over their expected years of age under the null hypothesis.) To test for statistical significance, the aggregate difference is divided by the standard error of the difference.[37] The result in sufficiently large samples has a standard normal distribution to which the previous discussion applies.

## V.

We now apply the proportional hazards model to actual data. The data, shown in the Appendix, involve terminations of art directors and copywriters at a large advertising firm. There were 8 terminations of art directors and 7 terminations of copywriters over approximately a two-year period. These are not sufficient to estimate a risk of termination at any particular age at any particular termination time.

To calculate $B$ in the proportional hazards model, the discharges at each time of discharge and in each department are treated as separate events; there are thus 14 conditional probabilities whose product is maximized to estimate $B$. In the conditional probabilities, $X$ is equal to years of age plus one-half minus 40, and is truncated to 0 for ages under 40. Computer iteration yields $B$=0.0828, with a standard error of 0.0347. At 2.39 standard errors, $B$ is statistically significant at the 0.02 two-tailed level. The average excess years of age over the expected age for the 15 terminated employees is 3.81. The score test statistic is 2.52, in general agreement with the Wald test. The odds of termination increase by the factor $e^{0.0828} = 1.086$, or 8.6% for each year of age over 40. The 95% confidence interval for this percentage increase factor is between 1.5% and 16.3%.

Table 1 shows for each of the 8 over-40 terminated employees (i) the relative odds on termination (i.e., the odds on termination for an employee of that age divided by the baseline odds on termination for the under-40 employees), and (ii) the baseline probability and rate ratio with respect to termination (i.e., the probability of termination for an employee of that age divided by the baseline probability of termination, with the baseline computed by the method of maximum likelihood).

37. Let $N_i$ denote the number of employees at risk at the ith time of termination and $\mu_i$ their average age at that time. Let $M_i$ denote the number of employees terminated at that time. Let $S_i^2$ denote the variance of ages in the at-risk population at that time, i.e., $S_i^2 = \Sigma_j (X_{ij}-\mu_i)^2/N_i$ where $X_{ij}$ denotes the age of the jth employee at the ith time. Then the standard error of the total excess of observed minus expected ages of terminated employees is $(\Sigma V_i^2)^{1/2}$, where the summation is over the termination times and $V_i^2 = M_i S_i^2(N_i- M_i)/(N_i- 1)$.

**Table 1**
**Relative Odds and Rate Ratios for Over-40 Terminated Employees**

| No. | Dept. | Date of Term. | Age at Term. | Relative Odds[38] | Baseline Probability | Rate Ratio |
|---|---|---|---|---|---|---|
| 1 | C | 1-03-84 | 49 | 2.1952 | 0.0441 | 2.0853 |
| 2 | C | 6-29-84 | 47 | 1.8603 | 0.0461 | 1.7893 |
| 3 | A | 11-19-84 | 48 | 2.0208 | 0.0407 | 1.9402 |
| 4 | C | 11-20-84 | 53 | 3.0567 | 0.0492 | 2.7758 |
| 5 | C | 12-31-84 | 63 | 6.9936 | 0.0506 | 5.3662 |
| 6 | A | 12-31-84 | 56 | 3.9182 | 0.0928 | 3.0832 |
| 7 | A | 12-31-84 | 56 | 3.9182 | 0.0928 | 3.0832 |
| 8 | C | 3-01-85 | 48 | 2.0208 | 0.0651 | 1.8949 |

Table 1 shows that for seven of the eight over-40 employees, the relative odds are more than two. The evidence is strongest for the 63-year old copywriter who was discharged on December 31, 1984. The odds on termination for this employee are almost seven times greater than the odds on termination for an under-40 employee. The evidence is weakest for the 47-year old copywriter who was discharged on June 29, 1984. Her relative odds on termination are 1.86, which means that the odds on her termination are not even double those for the under-40 group.

The rate ratios are in each case less than the relative odds, but the differences would not appear to be substantive, with two possible exceptions. The 48-year old art director who was discharged on November 19, 1984 and the 48-year old copywriter who was discharged on March 1, 1985 have relative odds that are a hair over 2, but rate ratios that are somewhat less than 2. Whether odds or probabilities are used might make a difference in their cases, particularly if a doubling of probability of termination is required.

We note that because a substantial proportion (7 out of 15) of those terminated were under 40 and no discrimination is apparent with respect to them, truncation removes a downward bias that would otherwise affect the estimate of $B$. Without truncation (that is, taking each age as shown in the data), the estimate of $B$ drops to 0.060, with $e^{0.060} = 1.062$. The increase in

38. For the reasons previously discussed, in computing relative odds and rate ratios, one-half is added to each employee's age. If the birth dates are known, the exact ages of the employees should be used instead.

risk is thus 6.2% per year of age with a 95% confidence interval from 1.0% to 11.6%. The better estimate for the over-40 group uses the truncated data.

## VI.

In age discrimination cases the parties are entitled to a jury trial.[39] The uninitiated reader who has plowed his way through this article may reasonably question whether proportional hazards models and maximum likelihood estimation are too complex for jury comprehension. The theory we have described here is almost certainly that, but an expert's testimony based on that theory should be accessible. The idea of a risk that grows with age is not foreign to jurors and would in any event have to be understood regardless of the method used. Quantification of the increase as an annual percentage is another step, but one that is hardly a leap. Maximum likelihood estimation by which the percentage figure is derived cannot be described in detail, but it can be explained that the estimate is based on an accepted and objective method in which a computer is used to calculate a value for the increase in risk that is most consistent with the data. This should be sufficient because the method of estimation is not likely to be a point of much dispute.

To be sure, as one descends into the details there are complications that may create barriers to jury comprehension or acceptance of a proportional hazards model. If risk is expressed in odds, the jurors may not understand them, except in a very general sense, because odds are less intuitively accessible than probabilities. However, a general understanding may be sufficient for the case, and in any event odds may be translated into probabilities, as we have discussed. A dispute over the appropriateness of the proportional hazards assumption could lead to the introduction of more complex models that the jury would find harder - perhaps much harder - to understand. It is quite possible, however, that more refined and complex models would not change the risk estimates sufficiently to make a difference to the decision, in which case the jury would not have to decide whether the refinements were necessary and which model was superior.

One technique that should help jurors to understand the expert's testimony is to show that the results of the model are reasonably related to simple data comparisons that are more accessible. For example, in the advertising firm data we analyzed, a simple comparison using the aggregate data for all terminations across time and department shows that the rate of terminations for the over-40 group is about 2.3 times the rate for the under-40 group.[40] This can be thought of as a (possibly biased) estimate of the

---

39. 29 U.S.C.A. § 626(c)(2)(1992).

40. The aggregate data show that of the 121 instances in which employees over-

average increase in risk for the over-40 group. A proportional hazards model, without stratification by department, estimates an increasing risk with age in this group, but at the average age for the group (48.8) the probability of termination is estimated as 2.2 times the rate for the under-40 group.[41] The concurrence of these estimates indicates that aggregation bias is not a problem in these data. It can also be used to show the jury that the model estimates are reasonable, and represent a more specific and probably more accurate parceling-out of risk by age than would the simple application of the over-40 average risk to all members of that group.

Of course, despite the best of explanations, certain features of a proportional hazards model may not be understood. But this undeniable drawback should not, in appropriate cases, outweigh the benefits of a more focused measure of discrimination offered by the model, one that captures an aspect of the "subtle and relative" distinctions of age.

---

40 were at risk of termination, 8/121 = 6.61% were discharged, while of the 242 instances in which employees under-40 were at risk of termination 7/242 = 2.89% were discharged. The ratio of these rates is 6.61/2.89 = 2.29.

41. Using as the baseline 2.85%, the average of the baseline probabilities of termination computed from the proportional hazards model ignoring department. With stratification by department, the rate ratio computed from the model is quite similar, 2.0.

# APPENDIX

## Ages of Copywriters by Dates of Involuntary Termination

| | Jan 3 1984 | Jan 6 | Jun 29 | Jul 27 | Oct 5 | Nov 19 | Nov 20 | Dec 31 | Mar 1 1985 | Mar 29 | Jun 7 | Dec 11 | Jan 21 1986 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 37 | 37 | 37 |
| 2 | 52 | 52 | 52 | 52 | 52 | 53 | 53* | | | | | | |
| 3 | | | 36 | 36* | | | | | | | | | |
| 4 | | | | | 28 | 28 | 28 | 28 | 28 | 28 | 28 | | |
| 5 | | | | | | | | 41 | 41 | 41 | 41 | 41 | 42 |
| 6 | | | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 31 | 31 |
| 7 | 49* | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | 27 | 28 |
| 9 | 47 | 47 | 47* | | | | | | | | | | |
| 10 | 34 | 34* | | | | | | | | | | | |
| 11 | | | | | | | | | | | | 44 | 44 |
| 12 | | | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 41 | 41 | 41 |
| 13 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 48 | 48* | | | | |
| 14 | | | | | | | | | | | | 36 | 36 |
| 15 | | | | | | | | | | 36 | 36 | 36 | 37 |
| 16 | 62 | 62 | 62 | 62 | 62 | 63 | 63 | 63* | | | | | |
| 17 | 33 | 33 | 33 | 33 | 33 | 34 | 34 | 34 | 34 | 34 | 34 | 35 | 35 |
| 18 | | | | | | | | 26 | 26 | 26* | | | |
| 19 | 29 | 29 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 31 | 31 |
| 20 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 29 | 29 | 29 | 29 | 30 | 30 |
| 21 | 42 | 42 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 44 | | | |
| 22 | 24 | 24 | | | | | | | | | | | |
| 23 | | | | | | | | | 26 | 27 | 27 | 27 | 27 |
| 24 | 35 | 35 | 35 | 35 | | | | | | | | | |
| 25 | 23 | 23 | 24 | 24 | 24 | 24 | 24 | 24 | 25 | 25 | 25 | 25 | 25 |
| 26 | 30 | 30 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | | | |

*Involuntary termination

Reprinted with permission from FINKELSTEIN & LEVIN, *supra* note 15, at 251.

## Ages of Art Directors by Dates of Involuntary Termination

| | Jan 3 1984 | Jan 6 | Jun 29 | Jul 27 | Oct 5 | Nov 19 | Nov 20 | Dec 31 | Mar 1 1985 | Mar 29 | Jun 7 | Dec 11 | Jan 21 1986 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 47 | 47 | 47 | 47 | 47 | 48* | | | | | | | |
| 2 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 35 | 35 | 35 | 35 | 36* | |
| 3 | | | | | | | | 24 | 24 | 24 | 25 | 25 | 25 |
| 4 | 38 | 38 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 40 | 40 | 40 |
| 5 | 36 | 36 | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | 52 |
| 7 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 56* | | | | | |
| 8 | 55 | 55 | 56 | 56 | 56 | 56 | 56 | 56* | | | | | |
| 9 | | | | | | | | | | | | 24 | 24 |
| 10 | 34 | 34 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 36 | 36 | 36 | 36 |
| 11 | 30 | 30 | 30 | 31 | 31* | | | | | | | | |
| 12 | | | | | | | | | | | | 28 | 28 |
| 13 | 38 | 38 | 38 | 38 | 39 | 39 | 39 | 39 | | | | | |
| 14 | | | | | | | | | | | | | 33* |
| 15 | | | | | | | | | 34 | 35 | 35 | 35 | 35 |
| 16 | | | | | | | | | | 37 | 37* | | |
| 17 | | | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 36 | 36 |
| 18 | | | | | | 31 | 31 | 31 | 32 | 32 | 32 | | |
| 19 | 27 | 27 | 28 | 28 | 28 | 28 | 28 | | | | | | |
| 20 | | | | | | | | | 39 | 39 | 39 | 39 | 40 |
| 21 | 24 | 24 | 24 | 24 | | | | | | | | | |
| 22 | 35 | 35 | 35 | 35 | 36 | 36 | 36 | 36 | 36 | | | | |
| 23 | 48 | 48 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 50 | 50 |
| 24 | 34 | 34 | 35 | 35 | 35 | | | | | | | | |
| 25 | 52 | 52 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 54 | | |
| 26 | | | | | | | | | | | | 25 | 25 |
| 27 | 30 | 30 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 32 | | | |
| 28 | 47 | 47 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 49 | 49 |

*Involuntary termination

Reprinted with permission from FINKELSTEIN & LEVIN, *supra* note 15, at 252.