## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **EQUAL EMPLOYMENT** | ) | |
| **OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 11-11732-DJC** |
| **TEXAS ROADHOUSE, INC., TEXAS** | ) | |
| **ROADHOUSE HOLDINGS LLC AND** | ) | |
| **TEXAS ROADHOUSE MANAGEMENT** | ) | |
| **CORP., d/b/a TEXAS ROADHOUSE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

## <u>MEMORANDUM AND ORDER</u>

**CASPER, J.**                                                                **October 19, 2016**

## I.     Introduction

Plaintiff Equal Employment Opportunity Commission ("EEOC") has filed this lawsuit against Defendants Texas Roadhouse, Inc., Texas Roadhouse Holdings LLC and Texas Roadhouse Management Corp. (collectively, "Texas Roadhouse") alleging a pattern or practice of age discrimination under the Age Discrimination in Employment Act ("ADEA"). The EEOC alleges that between 2007 and 2014, Texas Roadhouse engaged in a pattern or practice of discrimination by which its standard operating procedure was to discriminate against individuals over age 40— the protected age group ("PAG")—for front-of-house ("FOH") positions nationwide. D. 35 ¶¶ 26-28. As explained below, the Court ALLOWS in part and DENIES in part Texas Roadhouse's motion to strike the reports and anticipated testimony of Dr. David L. Crawford, D. 584, DENIES EEOC's motion to strike portions of the expert report and proffered testimony of Dr. Ali Saad, D.

1

593, DENIES EEOC's motion to strike expert report and proposed testimony of Dr. Eric Dunleavy, D. 600, and DENIES Texas Roadhouse's motion for summary judgment, D. 587.

## II.     Standard of Review

### A.     Motion to Strike Expert Testimony

Pursuant to Fed. R. Evid. 702, a qualified expert witness can testify "in the form of an opinion, or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (quoting Fed. R. Evid. 702). This rule "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Cipollone v. Yale Indus. Prod., Inc., 202 F.3d 376, 380 (1st Cir. 2000) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)). "[T]he district court must perform [this] gatekeeping function by preliminarily assessing 'whether the reasoning or methodology is . . . valid and . . . properly can be applied to the facts in issue'" by examining multiple factors through a flexible, case-specific inquiry. Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co., 295 F.3d 68, 80-81 (1st Cir. 2002) (quoting Daubert, 509 U.S. at 592-93). Ultimately, the purpose of the inquiry is "to determine whether the testimony of the expert would be helpful to the jury." Cipollone, 202 F.3d at 380. As long as the expert's testimony is found to rest upon reliable grounds, "the traditional and appropriate means of attacking shaky but admissible evidence" is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011) (quoting Daubert, 590 U.S. at 590).

### B.     Motion for Summary Judgment

The Court will grant summary judgment when there is no genuine dispute on any material

fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).  The movant "bears the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  If the moving party meets this burden, then the non-movant must "with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). "The test is whether, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (internal quotation mark and citation omitted).  In deciding a summary judgment motion, the Court views the record in the light most favorable to the non-moving party, drawing all reasonable inferences in his favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).  This standard is no different in a pattern-or-practice discrimination case.

## III.    Factual Background

The following facts are drawn from the parties' statements of material facts, D. 589, D. 616, D. 617, D. 644, and supporting documents and are undisputed unless otherwise noted.

### A.      The Texas Roadhouse Corporate Structure

As of December 30, 2014, Texas Roadhouse owned and operated 368 Texas Roadhouse restaurant locations and franchised another 79 restaurants.  D. 617 ¶ 2; D. 644 ¶ 2.  Its founder, chairman and CEO is W. Kent Taylor ("Taylor").  Id.

The "Support Center," Texas Roadhouse's headquarters,  D. 589 ¶ 5; D. 616 ¶ 5; D. 617 ¶ 10; D. 644 ¶ 10, dispatches the Market Partners, the Regional Market Partners, Training Managers and Regional Human Resources and Marketing employees to its locations all over the country.  D. 617 ¶¶ 10-11; D. 644 ¶¶ 10-11.

Each individual Texas Roadhouse restaurant generally has one salaried Service Manager ("SM") with primary responsibility for managing FOH operations, one salaried Kitchen Manager ("KM") with primary responsibility for managing back-of-the-house ("BOH") operations and one Managing Partner with primary responsibility for the day-to-day operations of the entire restaurant.[1]  D. 589 ¶¶ 16-17; D. 616 ¶¶ 16-17; D. 617 ¶ 9; D. 644 ¶ 9.  The Managing Partner is the overall manager for a single restaurant location.  D. 589 ¶ 16; D. 616 ¶ 16.  Managing Partners must follow Texas Roadhouse recipes and conform to the company guidelines and policies.  D. 617 ¶ 6; D. 644 ¶ 6; D. 618-20 at 99-100.

Texas Roadhouse restaurants are grouped into "markets" of up to fifteen restaurants per market, each of which is assigned to a Market Partner.  D. 589 ¶ 18; D. 616 ¶ 18.  Each Market Partner supervises the operation of all of the restaurants in his market and is responsible for ensuring adherence to all aspects of the Texas Roadhouse concept, strategy and standards of quality, which includes weekly visits and oversight of the hiring and development of each restaurant's management team.  D. 589 ¶¶ 18-19; D. 616 ¶¶ 18-19; D. 617 ¶ 12; D. 644 ¶ 12; D. 618-10 at 5-6; D. 618-26 at 30-31.  Market Partner duties generally include overseeing the operations of the restaurant locations, hiring and developing each restaurant's management team, overseeing the hiring of staff lower-level managerial positions in the restaurants alongside one of

---

[1] Some restaurants may also have other management team members, including additional SMs or KMs, Assistant SMs, Assistant KMs and/or "key hourly" employees.  D. 589 ¶ 17; 616 ¶ 17.

the Support Center's Field Support Staffing Manager and are generally on-site during hiring for a new store opening. D. 617 ¶¶ 12-13, 15-16; D. 644 ¶¶ 12-13, 15-16; D. 618-21 at 11-12. Each Market Partner's job includes ensuring that the Managing Partners are focused on and executing the company-wide operational goals, including training and employee image. D. 589 ¶ 14; D. 616 ¶ 14; D. 617 ¶¶ 3, 5; D. 644 ¶¶ 3, 5. A Market Partner has the authority to fire a Managing Partner for bad performance or not adhering to company standards. D. 617 ¶ 14; D. 644 ¶ 14. Market Partners themselves can be terminated for failing to follow the directions and policies of the company. D. 617 ¶ 23; D. 644 ¶ 23.

A set of markets are further grouped into regions, each assigned to a Regional Market Partner. D. 589 ¶ 20; 616 ¶ 20. Regional Market Partners supervise Market Partners. D. 589 ¶ 21; D. 616 ¶ 21; D. 617 ¶ 21; D. 644 ¶ 21. One aspect of the Regional Market Partners' job is to ensure that Managing Partners are executing the company's overall operational goals, including training and employee image. D. 617 ¶¶ 3, 5; D. 644 ¶¶ 3, 5. The majority of Regional Market Partners make visits to restaurants to observe what is going on in each restaurant. D. 617 ¶ 22; D. 644 ¶ 22.

Steve Ortiz ("Ortiz") was the former Chief Operating Officer of Texas Roadhouse. D. 617 ¶ 24; D. 644 ¶ 24. In his role, he supervised all of the employees in operations including all of the Managing Partners, Market Partners, Regional Partners and the Vice President of Training, Juanita Coleman. Id. Ortiz reported to the CEO, Taylor. D. 617 ¶ 27; D. 644 ¶ 27. During the 2007 to 2014 period, Ortiz was responsible for building the Texas Roadhouse brand, which included training and supervising the Managing Partners, Market Partners and Regional Market Partners. D. 618-4 at 10; D. 618-20 at 31-32; D. 618-21 at 17. In addition to Ortiz, Taylor was a hands-on CEO who visits at least three to four Texas Roadhouse locations per month and provides feedback

on a variety of issues he identifies at those restaurants directly to Managing Partners and Market Partners.  D. 617 ¶¶ 31-35; D. 644 ¶¶ 31-35.  Beyond Ortiz and Taylor, Training Managers conduct regular visits to their assigned restaurants and human resources staff conduct "culture checks" at store locations when a particular restaurant has received complaints or when a Market Partner requests such a check.  D. 617 ¶¶ 43-44; D. 644 ¶¶ 43-44.

### B.    Texas Roadhouse Training

As mentioned, Texas Roadhouse has a company-wide set of "operational goals" that include "training" and "employee image."  D. 617 ¶ 3; D. 644 ¶ 3.  Texas Roadhouse has devoted resources to recruiting and training managers and hourly employees and its trainings include teaching managers on hiring for their store locations.  D. 617 ¶ 48; D. 644 ¶ 48.  Texas Roadhouse provides ten to twelve months of training to new Managing Partners which includes four months in the Manager in Training ("MIT") program and attending the Legendary Learning and MP101 programs at the Support Center that includes receiving "Kent's Top Ten," a document written by Taylor that instructs managers about the mood, look and character of Texas Roadhouse restaurants. D. 617 ¶¶ 49, 54; D. 644 ¶¶ 49, 54.  The Legendary Learning program is a five-day program where Managing Partners, service managers, kitchen managers and others are taught Texas Roadhouse's operational goals and the company's culture.  D. 617 ¶ 55; D. 644 ¶ 55.  Texas Roadhouse further trains managers in training centers—store locations with management teams that train new managers—across the country in the MIT program before sending managers to their assigned locations.  D. 617 ¶¶ 57-58; D. 644 ¶¶ 57-58.  When new managers complete their training, Texas Roadhouse confirms that each person has the knowledge and ability to be a manager according to criteria in the Texas Roadhouse MIT Workbook. D. 617 ¶ 60; D. 644 ¶ 60.  Texas Roadhouse

expects Managing Partners to operate his or her location in a manner consistent with the training provided.  D. 617 ¶ 52; D. 644 ¶ 52.

As part of their overall training, Managing Partners receive training on how to hire for different positions including FOH positions comprised of hosts, servers, server assistants and bussers and bartenders.  D. 589 ¶ 58; D. 616 ¶ 58; D. 617 ¶ 61; D. 644 ¶ 61.  Managers in training are validated on legendary hiring, behavioral interviewing and "hiring for Image and Heart."  D. 617 ¶ 62; D. 644 ¶ 62.  Texas Roadhouse also provided interviewing and hiring handouts to all attendees of Legendary Learning and Service Manager University.  D. 617 ¶ 63; D. 644 ¶ 63. Texas Roadhouse also provides hiring training to managers at Market meetings.  D. 617 ¶ 64; D. 644 ¶ 64.  Texas Roadhouse believes it is important that all Texas Roadhouse managers with hiring responsibility receive and apply consistent hiring practices.  D. 617 ¶¶ 66-68; D. 644 ¶¶ 66-68.

At some point throughout this training, Texas Roadhouse provides managers with at least some training concerning anti-discrimination laws.  D. 589 ¶ 35; D. 616 ¶ 35.  In addition, the Texas Roadhouse Interviewing and Hiring Guide for managers also provides examples of improper questions based upon age.  D. 589 ¶ 50; D. 616 ¶ 50.

**C.**     **Texas Roadhouse's Management of Hiring**

The People Department has developed the Company's Equal Employment Opportunity Policy and Harassment and Discrimination Policy, D. 589 ¶ 23; D. 616 ¶ 23, and Texas Roadhouse has published written non-discrimination policies in various documents made available to its employees, D. 589 ¶¶ 25, 29; D. 616 ¶¶ 25, 29.  Company template applications also include language that indicates age discrimination is prohibited and that the company is an equal opportunity employer.  D. 589 ¶ 31, 33; D. 616 ¶ 31, 33.

Texas Roadhouse believes that hiring for FOH positions is important because those positions are a reflection of the company's brand and culture.  D. 617 ¶ 78; D. 644 ¶ 78.  In its goals and training, Texas Roadhouse emphasizes that a key to success at each store location was focusing on image which includes hosts who are happy and attractive, bartenders who are all-American types and servers who are great looking, although the parties dispute the exact contours of this "image."  D. 617 ¶¶ 80-81; D. 644 ¶¶ 80-81.  Hiring poor image employees could result in a Managing Partner receiving a 30-day notice, a precursor to termination.  D. 617 ¶ 84; D. 644 ¶ 84.

While the parties dispute the extent of top-down control over hiring by Texas Roadhouse, both sides agree that there is some deviation in practice as to hiring practices at the local level.  For instance, Managing Partners at the local restaurant level do not consider applications for uniform periods of time such that applications may be considered anywhere between five days to a year depending on the particular Managing Partner.  D. 589 ¶ 67; D. 616 ¶ 67. In addition, different Managing Partners may use different criteria to hire a server as opposed to a host, or a server assistant or a bartender.  D. 589 ¶ 69; D. 616 ¶ 69.

### D.      The Experts' Statistical Analysis

Over the course of 2007 to 2014, there were 181,583 FOH hires across the relevant Texas Roadhouse locations, 1.62% of which were FOH hires of those individuals over age 40 (the PAG hires).  D. 617 ¶ 144; D. 644 ¶ 144.  For each of the four FOH positions, the percent of PAG hires were:  1.49% for servers; 1.85% for server assistants; 0.28% for hosts; and 3.08% for bartenders.  Id.  For most of this time period, Texas Roadhouse predominantly accepted paper applications; halfway through 2013, Texas Roadhouse predominantly used electronic applications it received through the website *Snagajob*.  D. 617 ¶ 147; D. 644 ¶ 147.

The parties each offer statistical analysis from their own experts and dispute the reliability and admissibility of the other experts (as discussed below when addressing their respective Daubert motions). The EEOC's expert, Dr. David Crawford ("Crawford") applied statistical tests to each position for each store-year for which he had sufficient data against three different benchmarks, census data, paper applications and electronic applications.[2]  D. 617 ¶ 150; D. 644 ¶ 150.  As a result, he concluded that if hiring had been age-neutral, the probability of the aforementioned PAG hire rate results for each position would be equivalent of more than seven standard deviations (i.e. a likelihood of more than 1 in 781,000,000,000).  D. 617 ¶ 150; D. 644 ¶ 150.  Even after Crawford revised his calculations, his results were still statistically significant at greater than seven standard deviations.  D. 617 ¶ 151; D. 644 ¶ 151.  Using the census benchmark data, Crawford also calculated shortfalls[3] in the number of PAG individuals who would have been hired if there had been age-neutral hiring.  D. 617 ¶ 154; D. 644 ¶ 154.  As a result, he found that the total shortfalls for servers, server assistants, hosts and bartenders were 14,604; 10,477; 4,685; and 260, respectively.  D. 617 ¶ 154; D. 644 ¶ 154.

Crawford additionally concluded that when considering position-specific comparisons of hires to the paper application benchmark, there were shortfalls in PAG hiring of 95.6%, 97.4% and 90.0% of the store-years for servers, hosts and server assistants.  D. 617 ¶ 159; D. 644 ¶ 159; D. 622-20 at 3-5; D. 586-4 ¶¶ 22, 23.  He further found that the probability of those results are less

---

[2] Crawford did so by analyzing store-year data.  Crawford defines a store-year as data for a particular store in a particular year.  As he explains "Store X can have as many as 8 store-years of data:  X-2008, X-2009, X-2010, X-2011, X-2012, X-2013 and X-2014.  Store Y can also have as many as 8 store-years of data:  Y-2007, Y-2008, Y-2009, Y-2010, Y-2011, Y-2012, Y-2013 and Y-2014.  So 100 stores could have as many as 800 (100 times 8) store-years."  D. 586-2 at 9 n.16.

[3] "Shortfall" refers to the difference between the actual number of PAG hires for each position and an expected number of PAG hires based upon census data and/or analysis of the PAG applicant pool.  D. 586-2 ¶¶ 56-60, 102, 104.

than 1 in 781,000,000,000 for servers, 1 in 7,048,151,460 for hosts and 1 in 93 for server assistants if there were a process of age-neutral hiring.  D. 617 ¶ 159; D. 644 ¶ 159; D. 586-3 ¶ 22; D. 586-4 ¶ 22. Crawford also found shortfalls when comparing the PAG hires for FOH positions when compared against electronic *Snagajob* applications; he specifically found shortfalls in 83.5% of the store-years tested and stated that the probability of those results being generated by an age-neutral hiring process is less than 1 in 781,000,000,000.  D. 617 ¶ 160; D 644 ¶ 160; D. 586-2 ¶ 82(a).

Texas Roadhouse's expert, Saad, explained some drawbacks and errors in Crawford's analysis, including frailties in Crawford's calculations due to store-by-store variations and his use of external census data instead of the applicant flow data otherwise available through the paper and electronic applications.  See, e.g., D. 595-2 ¶¶ 9-13, 36-42, 48-49, 58-60, 66, 73-74.  Saad also formulated an alternative statistical analysis that utilizes the theory of "duration dependence" and applied that theory to the application data using a Cox proportional hazard ratio.  See id. ¶¶ 84-96, 103-04, 107-08.   After applying this analysis—which he said more properly accounted for distinctions between the under 40 and over 40 applicant pools—Saad found that there was no statistically significant shortfall across the entire eight-year period and that the years of 2007, 2008, 2013, and 2014 had significant surpluses in PAG hiring. Id. ¶¶ 104-118.

### E.     Purported Anecdotes of Discrimination and Non-Discrimination

In addition to the statistical analysis upon which it relies to show discriminatory intent, the EEOC also relies upon direct or circumstantial evidence that age bias undergirded a nationwide discriminatory hiring practice at Texas Roadhouse.  This evidence includes images of young-looking people used in management training, the "Examiner" and other written materials distributed to managers and the cover sheet used for some applications.  See, e.g., D. 616 ¶¶ 93,

95, 99, 106; D. 644 ¶ 93, 95, 99, 106.  It also includes testimony from a Texas Roadhouse trainer and service manager regarding the image for which Texas Roadhouse hired and testimony from individuals over 40 who unsuccessfully applied for FOH positions and heard age-related comments made during their interviews.  See, e.g., D. 617 ¶¶ 170, 175, 176; D. 644 ¶¶ 170, 175, 176.

By contrast, Texas Roadhouse presents declarations from 372 Managing Partners who attest that they understood that Texas Roadhouse maintained non-discrimination policies that prohibited age discrimination and that they were not aware of any company practices to refuse to hire PAG applications for FOH positions.  D. 589 ¶¶ 70, 73; D. 616 ¶¶ 70, 73.  In addition, roughly 45 Market Partners and Regional Market Partners have filed declarations stating that they understand that Texas Roadhouse maintains non-discriminatory policies that prohibit against age discrimination in hiring and that they were not part of any practice at Texas Roadhouse to discourage or reject PAG applicants from FOH positions.  D. 589 ¶ 75; D. 616 ¶ 75. Finally, 234 workers age 40 and over who were hired for FOH positions at Texas Roadhouse declare that they have never witnessed or experienced any age discrimination.  D. 589 ¶¶ 140, 142; D. 616 ¶¶ 140, 142.

## IV.    Procedural History

In March 2009, the EEOC initiated an agency charge of age discrimination against Texas Roadhouse.  D. 589 ¶ 108; D. 616 ¶ 108.  The EEOC then instituted this action on September 30, 2011.  D. 1.  On August 2, 2016, Texas Roadhouse moved for summary judgment.  D. 587.  Texas Roadhouse also moved to strike the reports and testimony of the EEOC's expert, Crawford.  D. 584.  The EEOC filed a motion to strike portions of the expert report and proffered testimony of Texas Roadhouse's expert, Saad, D. 593, and also moved to strike the expert report and proposed

testimony of Texas Roadhouse's other expert, Dr. Eric Dunleavy ("Dunleavy"), D. 600.  The Court

heard the parties on the pending motions on October 5, 2016 and took these matters under

advisement.  D. 648.

## V.     Motions to Strike Expert Testimony

### A.     <u>Texas Roadhouse's Motion to Strike Crawford's Proffered Opinion</u>

#### 1.     *Use of Census Data Benchmarks*

To determine whether the Texas Roadhouse hiring decisions were age-neutral, Crawford,

an economist engaged by the EEOC, analyzed the rates of actual PAG hires at Texas Roadhouse,

D. 586-2 ¶¶ 14-17, 20, against three different sets of data:  (1) census data for occupation codes

similar but not exactly matched to those of FOH positions at Texas Roadhouse, <u>id.</u> ¶¶ 14, 29; D.

586-9; (2) the *Snagajob* electronic applicant pool used by Texas Roadhouse, D. 586-2 ¶¶ 14, 32;

and (3) a random sample of the unsuccessful paper applications produced by Texas Roadhouse,

<u>id.</u> ¶¶ 14, 43, 49.   In so doing, Crawford analyzed the comparisons across the three different

benchmarks to assess the likelihood that age-neutral hiring would have resulted in the number of

actual PAG hires given the pool.  <u>Id.</u> ¶¶ 56-60.  In his analysis, he presents his findings for each of

the individual FOH positions at issue as well as aggregated findings based upon all FOH positions

combined.  <u>Id.</u> ¶ 60.

Texas Roadhouse now moves to strike Crawford's opinions and proffered testimony.[4]  D.

584.  Texas Roadhouse initially argues that this opinion should be struck because Crawford's use

of census data as a proxy is not reliable under Fed. R. Evid. 702 given the breadth and variety of

---

[4] The EEOC moves to strike excessive pages from Texas Roadhouse's <u>Daubert</u> and summary judgment memoranda on the basis that Texas Roadhouse used 24 point font spacing instead of double-spacing as required by Local Rule 7.1(b)(4). D. 610 at 1-3.  Given that the Court is denying in part Texas Roadhouse's motion to exclude Crawford's testimony on substantive grounds and likewise denying Texas Roadhouse's motion for summary judgment, it denies this motion as moot.

service jobs reflected in census data that exceeds that of the four FOH categories.  D. 585 at 9-16.

Texas Roadhouse first maintains that the census data is unreliable because it contains an overbroad

range of food service workers at varying types of establishments that is not equivalent to FOH

positions at Texas Roadhouse.  D. 585 at 12-14.  Here, the census data upon which Crawford relies

is not general census data but instead age distribution data from the EEO Tabulation of census data

for particular occupations in particular geographic areas.  D. 586-2 ¶ 28.  Namely, Crawford relied

upon age distribution data for the job categories of (1) waiters and waitresses; (2) other food

preparation and serving related workers; (3) hosts and hostesses; and (4) bartender categories

within the EEO Tabulation information which he further broke down by geographic region

corresponding to each Texas Roadhouse location.  Id. ¶¶ 28-31.  Crawford compared data on actual

PAG hires at Texas Roadhouse against this census data that includes those coded as waiters and

waitresses, other food preparation and serving related workers, hosts and hostesses, and bartenders.

Id.  These categories include a variety of jobs outside of the FOH positions and from restaurant

positions including cafeteria workers, maître d's, and lunchroom aides as well as establishments

dissimilar to Texas Roadhouse like luxury restaurants and hospital cafeterias.  D. 586-9; D. 586-1

at 49-54.

This contention, however, does not warrant exclusion of Crawford's opinion.  Even when

statistical analysis has involved general population census data to show discriminatory intent, it

has not been precluded on Fed. R. Evid. 702 grounds.  See E.E.O.C. v. FAPS, Inc., No. 10-cv-

3095-JAP DEA, 2014 WL 4798802, at *5-*6 (D.N.J. Sept. 26, 2014) (admitting expert who relied

upon local labor market data to examine race discrimination in hiring over Daubert challenge to

the reliability of his conclusions); see also Pina v. City of E. Providence, 492 F. Supp. 1240, 1245-

46 (D.R.I. 1980) (concluding that plaintiffs established a *prima facie* case after presenting

statistical evidence that compared "the percentage of ranked minorities and the percentage of minorities in the general population" because "the skill involved . . . is one that the general population may possess").  Here, the subset of census data was more particularized than general population census information, i.e. figures of persons worked in similar food service positions and were closer, if not perfectly aligned, with FOH positions.  Although not perfect, reliance upon this census data is a reliable proxy where, as both parties acknowledge, the actual Texas Roadhouse application data for years 2007 to 2013 is not complete.  D. 586-2 ¶¶ 33, 44; D. 617 ¶¶ 188, 190, 193; D. 644 ¶¶ 188, 190, 193; see FAPS, Inc., 2014 WL 4798802, at *5-*6 (admitting the opinion of statistical expert who relied upon local labor market census data because that expert did not find the applicant flow data to be reliable or complete).  Finally, failing to use a perfect set of variables that incorporates all relevant factors or excludes all potentially irrelevant variables is not a means for rejecting an expert's analysis.  See Flebotte v. Dow Jones & Co., No. 97-cv-30117-FHF, 2000 WL 35539238, at *4 (D. Mass. Dec. 6, 2000); McMillan v. Massachusetts Soc. for Prevention of Cruelty to Animals, 140 F.3d 288, 302 (1st Cir. 1998).  This is because statistical "analyses are admissible even in disparate treatment cases unless they are so incomplete as to be inadmissible as irrelevant."  McMillan, 140 F.3d at 303 (internal quotation marks and citations omitted).  That is not the case here.  Any concerns raised by overbroad census data go to weight, not admissibility. Currier v. United Techs. Corp., 393 F.3d 246, 250-252 (1st Cir. 2004).

This reasoning applies with equal force to Texas Roadhouse's argument that Crawford's opinion should be excluded because the census data does not reliably estimate the actual PAG applicant pool for any given year.  D. 585 at 10.  Here, Texas Roadhouse emphasizes that for the year 2014, the calculations of PAG applicants based upon the complete *Snagajob* data differs from the PAG proportions resulting from the census data.  D. 585 at 10-11; see D. 586-1 at 56-59.  It is

undisputed that for 2014, the one year for which there is complete applicant pool data, D. 589 ¶ 101; D. 616 ¶ 101, the estimated applicant figures of 17.7% or 18.5% based upon the census data is substantially higher than the 3.7% representing the applicant pool, a figure based upon the actual *Snagajob* data, D. 586-1 at 58-59; D. 586-6 at 120-121.  That is, the census data calculation may overstate the actual shortfall percentage.  D. 585 at 11; D. 586-1 at 58-59.  Even when considered with Texas Roadhouse's other critiques, this argument also does not warrant exclusion of Crawford's opinion.  First, the 2014 data may not be indicative of the applicant pools for the rest of the liability period.  See E.E.O.C. v. Am. Nat. Bank, 652 F.2d 1176, 1195-97 (4th Cir. 1981) (explaining that "[a]pplicant flow data limited to one out of seven relevant years cannot be held to rebut a *prima facie* case based upon gross disparities").  Second, complete applicant pool data is not available for all of 2007 to 2014 and the use of a proxy, even an imperfect proxy, is not grounds for exclusion.  McMillan, 140 F.3d at 302; Flebotte, 2000 WL 35539238, at *4.  Texas Roadhouse again is not without recourse in challenging Crawford's results based upon census data:  it can raise them on cross-examination, in its final argument to the jury and through the testimony of its own statistical expert.

That it is unclear whether the census data Crawford relied upon includes people new to the job market, D. 585 at 14-15, also goes to the weight, not the admissibility, of his opinion.  Here, Texas Roadhouse and the EEOC dispute whether Crawford's use of census data omits a set of younger applicants that could alter his results.  D. 585 at 14-15; D. 613 at 21; D. 595-2 ¶¶ 66, 73-74 (Saad addressing this issue); D. 586-4 ¶¶ 10(p), 71 (Crawford responding to Saad's critique); Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988) (concluding that the drawbacks in the expert's statistics on forced terminations that may have included data of those

who were terminated voluntarily was fodder for cross-examination but not for exclusion from the jury).

Texas Roadhouse contends that Crawford's inability to link initially twenty-eight stores with a unique core-based statistical area renders the entirety of the census data comparison as incomplete. D. 585 at 16. In his analysis, Crawford culled the applicable census data by (1) matching the zip codes of each relevant Texas Roadhouse store with a core-based statistical area that was defined the Census Bureau; (2) using the street address for stores cut across multiple core-based statistical areas to assign the store to one core-based statistical area; (3) applying county-based data for each store where core-based statistical data was unavailable; and (4) ultimately using this collected data as benchmark comparisons for the percentage of PAG hiring by Texas Roadhouse for the FOH positions. D. 586-2 ¶¶ 29-30. This provided comparison data for roughly 370 of the 396 stores at issue. Id. ¶ 30; D. 586-4 ¶ 72 (admitting that one minor problem with the available CBSA level data was that 28 stores did not have unique CBSA level data available).

Using alternative proxy data when the primary evidence is not complete—such as the potentially missing paper applications or the piecemeal use of the *Snagajob* electronic application program—is not grounds for inadmissibility. See Brown v. Nucor Corp., 785 F.3d 895, 903-904 (4th Cir. 2015) (collecting cases). Indeed, "an incremental reduction in probative value—which is a natural consequence of the use of proxy data—does not itself render a statistical study unreliable in establishing a question of discrimination" because to hold otherwise would render "plaintiffs unable to bring a statistics-based employment discrimination claim after a company has intentionally or inadvertently destroyed actual applicant data." Id. at 906. This is particularly so here where Crawford applied a specified methodology—using street addresses to identify a CBSA for stores that otherwise did not fall squarely within one—to attempt to round out his analysis and

find a proxy for the imprecision of comparing Texas Roadhouse stores to the census data.  D. 586-2 ¶¶ 29-30.

Texas Roadhouse also contends that Crawford's opinion should be struck because there is no reason for relying upon 2014 census data because the actual applicant flow data for that year is complete.  D. 585 at 15.  Even if the paper and electronic data for 2014 were complete and representative, Crawford's report has separate sections for his results based upon census data comparisons and based upon *Snagajob* data comparisons such that his report drew distinctions between any disparate results.  This means that if his analysis is not "watertight" and "omitted . . . important variables[] or was deficient in other respects" Texas Roadhouse can "exploit and discredit the analysis during cross examination."  McMillan, 140 F.3d at 302-03; see Currier, 393 F.3d at 252 (1st Cir. 2004).

Such opinion evidence also does not run afoul of Fed. R. Evid. 403.  Here, Texas Roadhouse asserts that the sum of the potential weaknesses in Crawford's census data will result in undue prejudice against Texas Roadhouse.  D. 585 at 16.  The Court disagrees.  While Texas Roadhouse has highlighted possible flaws in Crawford's analysis, none rise to the level of causing unfair prejudice or creating inflammatory effect with the jury, particularly where the probative value—statistical support for the EEOC's allegations of discriminatory animus on the part of Texas Roadhouse—is clear.

### 2.   *Statistics as Measure of Store-Level Discrimination*

Contrary to Texas Roadhouse's argument, D. 585 at 17-20, the statistics that Crawford has compiled and analyzed for nationwide Texas Roadhouse statistics are probative.  The EEOC alleges that Texas Roadhouse engaged in a pattern and practice of age discrimination that reigned down from its headquarters.  Given the nature of the claims, aggregating data for a nationwide

view is not improper or unduly prejudicial.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339 (1977); Stagi v. Nat'l R.R. Passenger Corp., 391 Fed. App'x 133, 145, 148 (3d Cir. 2010) (collecting cases); see Reynolds v. Barrett, 685 F.3d 193, 203 (2d Cir. 2012). Unlike Wal-Mart Stores v. Dukes, 564 U.S. 338, 356-57 (2011), where the Court had to address whether the proposed class members, who were employed at different stores under different managers, had shown commonality of their claims for the purposes of class certification under Fed. R. Civ. P. 23, the very nature of the claim compels a global and unified view of the company's nationwide pattern and practice.

Moreover, it is imprecise to say that Crawford's analysis did not address store to store data. Crawford did not simply average the results across the restaurants nationwide.  Indeed, as he describes in his report, Crawford "calculate[d] PAG% for each store-year, compute[d] the standardized difference between each store-year PAG% and the corresponding store-year benchmark, and statistically test[ed] whether a set of standardized differences was consistent with age-neutral hiring" by Texas Roadhouse.  D. 586-4 ¶ 15.  Furthermore, Defendant's rebuttal expert, Saad, acknowledged this fact, in part, when he said Crawford "uses several benchmarks for the expected rate of hiring, and compares, store by store and by job the actual to the expected numbers of hires based upon those benchmarks, and then presents aggregated findings . . . ."  D. 595-2 ¶ 4. The underlying store-year data comparisons are provided in Crawford's charts on a store-by-store and year-by-year comparison, D. 622-18; D. 622-19; should Texas Roadhouse take issue with whether those more granular calculations discredit the EEOC's theory of disparate treatment, it may do so on cross-examination.  Such evidence is at least probative of EEOC's claim and would also be helpful to the jury as it is asked to determine if the EEOC proved a pattern or practice.

The admission of this evidence is not unduly prejudicial given its probative value and that any "perceived flaws in [Crawford's] reasoning or calculations may be challenged through the normal adversary process." Haemonetics Corp. v. Baxter Healthcare Corp., 593 F. Supp. 2d 303, 306 (D. Mass. 2009). For this reason, the Court also declines to exclude Crawford's census data under Fed. R. Evid. 403.

That Crawford's opinions may not prove all of the EEOC's case is not a basis for excluding it. Adams v. Ameritech Servs. Inc., 231 F.3d 414, 427-28 (7th Cir. 2000) ("ruling out chance was an important step in the plaintiffs' proof, even if it was not a single leap from the starting line to the finish line"); see Palmer v. Schultz, 815 F.2d 84, 91 (D.C. Cir. 1987); FAPS, Inc., 2014 WL 4798802, at *14. Consideration of Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 994 (1988) (noting that "the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force") does not compel another outcome since the EEOC does not rely solely upon Crawford's opinion or his underlying statistical analysis alone for its claim.

### 3. The Effect of the 2010 Determination Letter and the 2011 Litigation

Texas Roadhouse's challenges to certain of Crawford's opinions as speculative, D. 585 at 21-22, however, stand on different ground. Crawford opines that for several sets of data that "the results . . . are consistent with the hypothesis that [Texas Roadhouse] increased its effort to hire older workers after the EEOC's Letter of Determination in 2010. The results . . . are also consistent with the hypothesis that [Texas Roadhouse] increased its effort to hire older workers after the EEOC's filing of this case, which was in 2011."[5] D. 586-2 ¶ 62; see also, e.g., id. ¶¶ 62, 83, 96.

---

[5] There are also instances throughout Crawford's report in which he states that the results for particular data sets are not consistent with the hypothesis that Texas Roadhouse increased the hiring of PAG workers after the 2010 letter or the 2011 litigation. See, e.g., D. 586-2 ¶ 64.

Under Fed. R. Evid. 702, expert testimony must be more than unsupported speculation or abstract beliefs. Haemonetics Corp., 593 F. Supp. 2d at 305 (quoting Daubert, 509 U.S. at 590). Indeed, a court may exclude an expert's opinion when it is based upon conjecture or speculation deriving from an insufficient evidentiary source. United States v. Organon USA Inc., No. 07-cv-12153-RWZ, 2015 WL 10002943, at *3–4 (D. Mass. Aug. 17, 2015).

If the evidence at trial shows that, as a factual matter, increases in 40+ hiring improved after the EEOC's 2010 letter and/or the initiation of this lawsuit in 2011, the EEOC could certainly argue to the jury that there is some correlation between the two. For Crawford, however, to opine as a matter of his expertise that there is a causal link between the two, there must be a reliable factual basis for the same. It is unclear that he has provided such a basis. For example, Crawford did not know who at Texas Roadhouse was aware of the 2010 letter or whether there was evidence that the Managing Partners—those employees generally in charge of hiring—knew of the 2010 letter. D. 586-1 at 14. Moreover, Crawford admitted that he made no professional conclusion as to whether the hypothesis that Texas Roadhouse increased its efforts to hire FOH workers in the protected age group after the 2010 letter of determination was true. Id. at 15. That is, Crawford explained in his deposition that he "ha[s] not proven and do[es]n't claim to have proven that the changes before and after the letter were caused by the letter." Id. In addition, Crawford explained that his "statistical observation is that there was a difference in the rates before and after the filing of the complaint," not that the filing of the complaint necessarily caused this increase. Id. at 13-14. For these reasons, the Court strikes these proffered opinions.

### 4. The "Chilling Effect" Opinion

Lastly, Texas Roadhouse moves to exclude Crawford's opinion, offered in rebuttal to Saad's report, that his results are "consistent with post-opening chilling of applications from

people who were 40 or older." D. 586-5 ¶ 61; D. 585 at 23. First, Texas Roadhouse argues this disclosure was untimely under Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii). D. 585 at 23-24. Pursuant to Fed. R. Civ. P. 26(a)(2)(D)(ii), rebuttal disclosures made by experts must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party" and must be disclosed within 30 days after the other party's disclosure. Fed. R. Civ. P. 26(a)(2)(D)(ii); see In re High-Tech Employee Antitrust Litig., No. 11-cv-02509-LHK, 2014 WL 1351040, at *3 (N.D. Cal. Apr. 4, 2014). Pursuant to Rule 37, a party that fails to adhere to the Rule 26(a) requirements "is not allowed to use that [untimely] information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, Texas Roadhouse argues that Crawford's analysis of the "chilling effect" was untimely because it was not disclosed as an opinion in his primary expert report and did not contradict or rebut anything raised by its own expert, Saad. D. 585 at 23-24. Indisputably, Crawford's opening expert reports include no analysis or opinion on "chilling effect." See D. 586-2. The Court, however, does not agree that the introduction of this opinion was not appropriately disclosed in Crawford's rebuttal to Saad's report. Saad, in relevant part, criticized Crawford for using census data as a benchmark where the paper application benchmark was sufficiently representative of the percentage of PAG applicants. D. 595-2 ¶ 52. Saad does so by analyzing the paper applications by store-month instead of store-year and includes a variable into his calculations that takes into account the fact that the periods leading up to store openings—as opposed to post-opening periods—tend to produce a substantially larger number of applicants. Id. ¶ 54. To rebut this argument, Crawford noted that the paper applications were incomplete and unrepresentative of the older applicants and points out several flaws in Saad's calculations. D. 586-5 ¶¶ 54-60. In doing so, he further opined that the statistical results of pre-opening and post-opening PAG

applications were "consistent with post-opening chilling of applications." Id. ¶ 61. This contention is responsive to Saad's opinion that the paper application benchmark was a more complete and accurate measure of the number of 40+ applicants. The "chilling effect" opinion that Crawford offers in rebuttal is responsive to this critique. Accordingly, its disclosure was not untimely under Fed. R. Civ. P. 26 and the Court will not preclude its admission on that basis.

Texas Roadhouse additionally seeks to exclude this opinion on the grounds that Crawford's testimony as to the "chilling" effect will not assist the trier of fact because it is speculative. D. 585 at 21-23. Similar to his proffered testimony on the 2010 determination letter and the 2011 litigation, Crawford provides no opinion or basis as to the causal effect of post-opening "chilling." In his deposition, Crawford explains that he has "no empirical evidence that demonstrates a causal relationship" and makes no professional opinion as to the causal relationship. D. 586-1 at 16-17. Instead, he posits only that the numbers are consistent with the hypothesis of "chilling" as the cause and recognizes that a decline in applications from those 40 and older could have resulted from other external economic factors. Id. at 16-17, 20. For these reasons, the Court strikes Crawford's proffered opinion as to the "chilling" effect.

### B.     EEOC's Motion to Strike Portions of Expert Report and Testimony of Saad

#### 1.     Use of PUMS Data

Instead of using EEO tabulation census data as Crawford does, Texas Roadhouse's expert, Saad, relies upon American Community Survey Public Use Microdata Sample ("PUMS") data as his external labor market benchmark. D. 595-2 ¶ 68. Specifically, Saad used zip codes to determine the Public Use Microdata Sample Area ("PUMA") for each store location, calculated availability rates for each restaurant based upon the PUMAs and compared that against the

representation of PAG individuals in FOH positions in the same Texas Roadhouse location.  Id. ¶¶ 68-69.

The EEOC now moves to strike Saad's use of the PUMS data and all resulting opinions on the basis that the PUMS data is unreliable.  D. 594 at 17-19.  The Court disagrees.  In his reply report, Crawford pointed out the flaws in Saad's original PUMS analysis and calculated the corrected outcomes that derive from accounting for non-unique PUMAs, D. 586-4 ¶¶ 65-67, and Saad admitted this error, D. 623-8 at 2-5.  To the extent that there were errors before or perhaps remaining drawbacks to Saad's analysis, use of an imperfect proxy, as it was for Crawford's analysis, is not grounds for exclusion.  Flebotte, 2000 WL 35539238, at *4; McMillan, 140 F.3d at 302.  Any perceived shortcomings associated with using the PUMS data goes to the weight, not the admissibility, of the evidence.  Freeman v. Package Mach. Co., 865 F.2d 1331, 1338 (1st Cir. 1988).  In addition, the parties' differing opinions as to which party the corrected PUMS data supports, D. 594 at 16; D. 621 at 8-10, can again be addressed in the course  of direct and cross-examinations of both Saad and Crawford and, ultimately, will be resolved by the jury.  See Milward, 639 F.3d at 15.  The Court denies the EEOC's motion on this ground.

2.     *Statistically Significant Thresholds*

EEOC also objects to Saad's opinion on statistically significant thresholds for variation in store-level hiring shortfalls because it amounts to testimony about the legal standard, i.e., whether EEOC's conduct amounts to a pattern or practice of age discrimination. D. 594 at 19-21.  While it is true that Fed. R. Evid. 704 bars "opinions which would merely tell the jury what result to reach" and "opinions phrased in terms of inadequately explored legal criteria,"  Chow v. Zimny, No. 10-cv-10572-GAO, 2014 WL 4964408, at *1 (D. Mass. Sept. 30, 2014) (internal quotation marks and citation omitted) and Fed. R. Evid. 702 provides that an expert "may not 'assist' the jury by expounding upon the law . . . because to do so would intrude upon the province of the trial judge," Ji v. Bose Corp., 538 F. Supp. 2d 354, 357–58 (D. Mass. 2008) (citing Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997)), an expert may still offer an opinion that bears upon the factual determination that the jury will have to make about whether the EEOC has shown that Texas Roadhouse engaged in a pattern or practice of discrimination.  Saad's opinion is that "from a statistical perspective" he does not believe the numbers support a pattern or practice of age discrimination. D. 595-2 ¶ 8; see also id. ¶¶ 5, 18, 24-26, 34, 46, 120, 142.  In the context of proper (and, perhaps, contemporaneous) jury instructions to the jurors that they get to decide what weight, if any, they give to any testimony, including opinions offered by the parties' competing experts and that the issue of whether the EEOC has met its burden of proof is for the jury to decide, Saad's proffered opinion falls within the bounds of Fed R. Evid. 702 and 704.

The Court also will not strike Saad's opinion regarding the variation in store-by-store data on the grounds, as the EEOC contends, D. 594 at 20, that it is unreliable because Saad admitted he had no basis to opine on how much variation in PAG hiring is too much to prevent a finding of pattern-or-practice discrimination.  In his expert report, Saad opined that "[i]f one examines Dr.

Crawford's backup materials, one finds wide variation in the nature of the hiring patterns across the hundreds of [Texas Roadhouse] stores" and that if Crawford had "examined his own store level statistical findings, he would have seen wide variations in hiring outcomes between stores" which "are inconsistent with the statistical notion of a common 'pattern or practice.'" D. 595-2 ¶ 8. That there were variations in store to store shortfalls and Saad testified that he did not know how much store to store variation was too much to preclude a legal finding of pattern or practice discrimination, D. 595-3 at 36, does not undermine the reliability of his opinion where he explained that the variations present in this data "are inconsistent from a statistical perspective with the hypothesis that the standard operating procedure across [Texas Roadhouse] store locations is to treat applicants aged 40 and above (40+) adversely . . . ." D. 595-2 ¶ 7.

Finally, the EEOC maintains that Saad's testimony that the shortfalls identified by Crawford are insufficient statistical thresholds for establishing pattern or practice violations is unreliable because it is based upon speculation and Saad's subjective belief. D. 594 at 21; see, e.g., D. 595-2 ¶¶ 19, 22, 25-26. This is not a sufficient basis for excluding this portion of Saad's testimony. As an example, in his expert report, Saad writes "[o]ver all stores, jobs and years analyzed by Dr. Crawford a statistically significant shortfall at two standard deviations is found only 26% of the time. A statistically insignificant shortfall is found 74% of the time." D. 595-2 ¶ 19. In his deposition, when asked when he would exclude the word "only," Saad testified that was not an expert driven issue. D. 595-3 at 39. Whether Saad, as an economist, has explained the significance of the shortfall to his ultimate conclusion about nationwide pattern or practice and has done so upon the basis of statistical analysis and identifiable data, the jury may choose to accept or reject that conclusion after hearing his testimony upon both direct and cross examination.

3.       *Duration Dependence Theory and the Cox Proportional Hazards Model*

Finally, the EEOC moves to strike Saad's analysis stemming from "duration dependence." D. 594 at 6-17.  Saad opined that Crawford's age discrimination analysis was flawed because he assumed all applicants were similarly situated—i.e., same productivity, same motivation, etc.—and that FOH applicants to Texas Roadhouse under 40 and over 40 are equal substitutes.  D. 595-2 ¶¶ 84-89.  Saad posits that for Crawford's statistical analysis to be accurate, it must incorporate duration dependence, a theory that accounts for changes in average applicant pools given the changes that workers undergo as they progress through their careers.  Id. ¶¶ 86-96.  In Saad's estimation, Crawford did not account for the human capital that some older workers acquire over time and thus are no longer interested in, or available for, entry-level positions; on the other hand, a pool of younger workers will include both those with high potential who may later develop skills to rise in rank in the job market and lower performing young workers, all of whom are applying for entry-level positions.  Id. ¶ 87.  Thus, Saad opines that those in the PAG applicant pool applying for FOH positions at Texas Roadhouse may not be equal substitutes for those in the younger applicant pool in terms of potential and that this must be accounted for in the statistical analysis. Id. ¶¶ 86-96.  To apply this theory, Saad examined data from the National Longitudinal Study of Youth ("NLS") for both those in the study since 1979 and those in the study since 1997, id. ¶¶ 100, 100 n. 71, 101-03, and incorporated the unemployment spell data derived from those studies into a Cox proportional hazards statistical model.  Id. ¶¶ 103-04.  Saad then took the hazard ratio—representing the likelihood that an unemployed PAG individual is to become employed at a new job at any given time as an individual under 40—and used it to modify Crawford's analysis to account for the concept of duration dependence.  Id. ¶¶ 104-07, 114, 118.

The EEOC challenges duration dependence and its application via the Cox proportional hazards model as "junk science."  D. 594 at 7; <u>see</u> D. 586-4 ¶ 10(t)-(v).  The EEOC argues that Saad's use of the duration dependence theory is inadmissible because it has never before been applied in the hiring context and Saad fails to cite peer-reviewed publications to support his application here.  <u>Id.</u> at 9.  The duration dependence theory, however, is not new.  <u>See, e.g.</u>, <u>Barnes v. The Hershey Co.</u>, No. 12-cv-01334-CRB, 2016 WL 192310, at *9-10 (N.D. Cal. Jan. 15, 2016) (considering the duration dependence statistical theory at summary judgment in an age-based employee termination case); <u>see also</u> <u>Paxton v. Lanvin-Charles of the Ritz, Inc.</u>, No. 77-cv-28-LBS, 1978 WL 13903, at *4 (S.D.N.Y. July 24, 1978), <u>aff. sub nom.</u> <u>Paxton v. Lanvin-Charles of the Ritz, Inc.</u>, 594 F.2d 852 (2d Cir. 1978) (explaining that there is a "natural tendency of the newly hired employee to be young" because older workers move out of the workforce as younger ones constantly move in).  Although application of this theory to the hiring context may be new, D. 594 at 10, D. 586-4 ¶ 10(t), neither duration dependence as a theory nor the Cox proportional hazard model as a method is novel.  <u>See</u> <u>Barnes</u>, 2016 WL 192310, at *9-10 (analyzing duration dependence theory in age-based discriminatory termination case); D. 623-9; D. 623-10.  Even if applying duration dependence via the proportional hazard model were novel here and applied for the purpose of this litigation, this remains a single factor in the Fed. R. Evid. 702 analysis where Saad has otherwise met that rule's criteria.  <u>See</u> <u>Granfield v. CSX Transp., Inc.</u>, 597 F.3d 474, 486 (1st Cir. 2010) (explaining that when assessing an expert's admissibility, one factor is whether the testimony was created for the purpose of the litigation).

While the Frye standard of general acceptability is no longer the touchstone of admissibility of expert opinion under Fed. R. Evid. 702 post-<u>Daubert</u>, whether a methodology has been peer reviewed remains one factor for the Court to consider when addressing challenges to the

admissibility of expert testimony.  See Milward, 639 F.3d at 14, 22.  To support exclusion, the EEOC relies upon Wyche v. Marine Midland Bank, No. 94-cv-4022-DC, 1997 WL 109564, at *1 (S.D.N.Y. Mar. 11, 1997) to argue that the Cox proportional hazard model is not generally accepted in the scientific community.  That case, however, does not warrant exclusion of the opinion here.  First, the Wyche court focused on whether "jurors may find the model difficult to understand" and thus that the expert opinion should be excluded on the grounds that it would not assist the trier of fact.  Id. at *1.  No such concern exists here and any complexities of applying the model to age discrimination cases can be explained during examination and is otherwise adequately explained in Saad's expert report.  To the extent that the Wyche court also excluded the proportional hazards model on the basis that the proponent "ha[d] not demonstrated that the [model] has generally been accepted in the scientific community," id. at *1, the same cannot be said here.  As explained, the record indicates that the general use of the Cox proportional hazards model is not novel and has been the subject of publication and peer comment.  See, e.g., D. 623-9 (investigating time-dependent effects in a proportional hazards regression in a 1990 journal article and explaining generally that the model "has proved an exceedingly useful method of analyzing survival or failure data"); D. 623-10 (providing a 1972 journal article on Cox's regression models and peer discussion of the same).  Moreover, Texas Roadhouse has demonstrated that at least some commentators posit that the proportional hazards model is appropriate to apply in age discrimination cases.  See Michael O. Finkelstein & Bruce Levin, Proportional Hazard Models for Age Discrimination Cases, 34 Jurimetrics J. 153, 157 (1994) (explaining that variations of the proportional hazards models has been used in other notable cases and "are also appropriate in the context of age discrimination").  This demonstrates at least some acceptance of the use of this model in age discrimination cases and some level of reliability even if, as Wyche explains, there

may not be overall general acceptance in the community. Wyche, 1997 WL 109564, at *1. For these reasons, Wyche does not compel exclusion of Saad's application of duration dependence via the proportional hazards model in this case.

The EEOC next asserts that even if Saad's methodology was sound, he did not apply it in a reliable manner because he used NLS study data to determine what the hazard ratio calculation should be and that data is improperly applied here. D. 594 at 12. Specifically, the EEOC contends that Saad's reliance on the NLS data to compute the hazard ratio calculation is flawed because the NLS longitudinal data is based upon study participants who were between the ages of 21 and 33 and 41 and 55 for the 2006-2013 time period and thus did not serve as a proper calculation for all applicants under 40 and all applicants over 40 as it missed those under 21, between 33 and 41, and those over 55. Id. Again, this alone—the use of an imperfect proxy to estimate the expected productivity of under 40 and over 40 workers—does not make Saad's analysis inadmissible but instead goes to the weight of his findings. Flebotte, 2000 WL 35539238, at *4; McMillan, 140 F.3d at 302; Freeman, 865 F.2d at 1338. The EEOC also argues that this manner of calculating the hazard ratio is ill-fitting here because Saad calculates the hazard ratio based upon the lengths of unemployment experienced by older workers in the NLS study without assessing whether Texas Roadhouse applicants are employed or unemployed when they apply for a FOH position. D. 594 at 13. This is not unlike the EEOC's own expert's calculations based upon census data which considered the age of individuals already employed in FOH corollary positions and not those applying for such positions.

The EEOC's remaining contentions—that Saad treats the lower odds of an applicant in the PAG being hired as an inevitable consequence or the fact that he concentrates on the single variable of low productivity, id. at 13-14—do not render his analyses as inadmissible but instead are

"cloaked as objections . . . under Rule 702, [but] are actually objections about the weight of the evidence." Granfield v. CSX Transp., Inc., 597 F.3d 474, 487 (1st Cir. 2010).  This is also true of the EEOC's contentions that Saad is inconsistent in arguing that those who are over 40 when hired earn higher wages, stay with Texas Roadhouse longer and are more likely to be promoted than their younger counterparts and then simultaneously applying the duration dependence theory on the basis that those in the PAG who seek entry-level jobs are less likely to be productive and successful workers.  D. 594 at 16.  Any such limitations of his analysis are concerns to be raised on cross-examination and are a matter for the jury to consider and weigh.  Milward, 639 F.3d at 22 (explaining that "[w]hen the factual underpinning of an expert's opinion is weak, [that] is a matter affecting the weight and credibility" of that expert's opinion) (quoting United States v. Vargas, 471 F.3d 255, 264 (1st Cir. 2006)).

For the foregoing reasons, the Court denies the EEOC's motion to strike portions of Saad's proffered expert opinion.

**C.      The EEOC's Motion to Strike Report and Testimony of Dunleavy**

Texas Roadhouse retained Dunleavy to answer two separate but related questions:  whether the Texas Roadhouse interviewing and hiring materials reflected the characteristics of behavioral interview questions found in industrial and organizational psychology literature and whether Texas Roadhouse's "legendary traits" reflected the worker characteristics of jobs akin to the Texas Roadhouse FOH positions.  D. 602-1 at 6; D. 602-2 at 9.  The EEOC now moves to strike Dunleavy's expert opinion on the grounds that (1) his analysis of a limited universe of hiring materials at Texas Roadhouse are not relevant to this case; (2) his report and testimony are unreliable because Dunleavy did not conduct a job analysis and his analysis is otherwise not based

upon scientific principles and methods; and (3) his opinion will not assist the trier of fact in understanding the evidence or determining any disputed issue.  D. 600.

Here, the EEOC first fails to demonstrate how Dunleavy's report and testimony is not relevant to the material issues.  The EEOC correctly points out that Dunleavy did not express an opinion as to whether age was a factor in Texas Roadhouse's hiring, D. 602-2 at 8, and that Dunleavy focused only on one set of hiring materials produced by Texas Roadhouse that were made available for discretionary use in the hiring of FOH jobs, D. 602-1 at 3-4; D. 602-2 at 6-7, 10.  Moreover, the EEOC properly notes that there is no basis to conclude that the interview materials Dunleavy reviewed were actually used in store-level hiring decisions because Managing Partners used these interview questions at their discretion and could ask other questions by choice. D. 602-2 at 18-21; 60-61.

The EEOC, however, bases its claims against Texas Roadhouse in part on the fact that "Texas Roadhouse exercises centralized control over a detailed training regime" in which "managers are trained on how and whom to hire" and where "hiring for [Texas Roadhouse's] image means hiring young."  D. 615 at 9.  That is, centralized control is part of what it wants the jury to believe led to Texas Roadhouse's nationwide pattern and practice of age discrimination. Therefore, the hiring materials that Texas Roadhouse distributed, either in whole or in part, bears upon the nationwide message it was sending to its store's managers.  That Dunleavy does not offer an opinion as to the ultimate issue of age discrimination does not preclude admission of his opinion where, presumably, such evidence is presented in conjunction with percipient witness testimony about the breadth and depth of the distribution of the same to managers and stores.  Likewise, that Dunleavy could not say how widespread use of the interview questions was at the store-level may

be ample fodder for cross examination or to be put in the context of witness testimony offered by either party.  Neither is a basis for exclusion under Fed. R. Evid. 702.

Next, the EEOC contends that Dunleavy's opinions and proffered testimony are unreliable because they are not grounded in sufficient facts and data since Dunleavy did not conduct a local job analysis in this case.  D. 601 at 12-14.  The EEOC correctly points out that Dunleavy did not conduct a job analysis in this case and that Dunleavy admits that his O*Net analysis is not a substitute for conducting a local job analysis.  D. 602-2 at 24, 31; see D. 602-10 at 9 (explaining, in a book chapter written by Dunleavy, that "work analysis data are critical for both proximal and distal personnel selection work"); D. 602-11 at 2 (arguing, in a blog post by Dunleavy, that conducting a job analysis is important to determine effectively whether a selection procedure is appropriate for a particular job).  Simply because Dunleavy did not adhere to certain methodologies employed in the past does not mean that no other method can be reliably employed and provide some insight; this is because "[e]xperts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion."  Ernst v. City of Chicago, 39 F. Supp. 3d 1005, 1014 (N.D. Ill. 2014) (quoting Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1020 (7th Cir. 2000)) (internal quotation marks omitted).  This is particularly the case here where Dunleavy testified that O*Net data is useful as a reasonable comparator, D. 602-2 at 33, flagged that leveraging external job analyses to consider whether the Legendary Traits reflect worker requirements needed for the FOH positions was possible despite the lack of a local job analysis, D. 602-1 at 17-18, and notes that there is value from looking at information in O*Net as a useful resource for comparison to the People's Department interview materials, D. 602-1 at 21-22, and the EEOC points to no evidence or case law to show that the lack of a local job analysis is fatal.  Instead of exclusion altogether, the EEOC

can attempt to undercut Dunleavy's testimony at trial by highlighting his changed methodology and otherwise undermine the method he chose to apply in this instance.  See Ernst, 39 F. Supp. 3d at 1014 (allowing the defendants to cast doubt onto an expert industrial psychologist's new methods on cross-examination); E.E.O.C. v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 462–63 (S.D.N.Y. 2004), aff'd in part sub nom. (S.D.N.Y. July 8, 2004) (noting that the while the expert's earlier writings and testimony in other litigation differ from her opinion in this litigation, this should go to the weight of her opinions).

The EEOC next argues that Dunleavy's opinion will not be helpful to the trier of fact since the jury could competently review the same information that Dunleavy analyzed and draw its own conclusions.  D. 601 at 15, 19; see Pfeiffer v. Lewis Cnty., 308 F. Supp. 2d 88, 96 (N.D.N.Y. 2004).  It is true that comparing O*Net job titles such as waiter and waitress to Texas Roadhouse's food server position is rather intuitive, much like the comparison of job descriptions in Pfeiffer.  See Pfeiffer, 308 F. Supp. at 96.  This, however, was only the beginning, not the end, of Dunleavy's analysis.   From this starting point, Dunleavy then culled O*Net worker requirements for comparable positions, took those requirements and reduced them to eighteen important requirements across the four FOH positions and compared the legendary traits to those eighteen O*Net characteristics by doing a cross-comparison between the "Goldberg adjectives," the O*Net characteristics and the Texas Roadhouse legendary traits.  D. 602-1 at 24-25.  This was not a case of simply looking at similar positions outside of Texas Roadhouse, but instead a multi-layered analysis that took into account research literature on developing personality models, processes of rating adjective descriptors and understanding how personality research can be used to predict human behavior.  D. 602-2 at 50-51.

Second, the EEOC asserts that no special expertise is required for making a comparison between the Goldberg adjectives and those listed in the Texas Roadhouse Legendary Traits. D. 601 at 19. The Court is not persuaded. First, Dunleavy's conclusions derive in part from his expertise in the use of personality descriptors as a basis for personality trait clusters and the use of adjective-rating instruments to measure personality. D. 602-1 at 24-25. Moreover, Dunleavy applied Goldberg's industrial and organizational psychology literature alongside his professional judgment and the professional judgment of his team of industrial psychologists to compare the Big 5 personality traits with the Texas Roadhouse Legendary Traits and then further to do a cross-comparison between the Big 5 personality traits, the Texas Roadhouse Legendary Traits and the O*Net listed characteristics for similar FOH positions at other establishments. Id. at 24-27. As explained in his deposition, this professional judgment included evaluating "the research literature on developing personality models and the process used to rate adjective descriptors as part of the approach to developing a way to get one's standing on a personality characteristic" which required "an understanding of personality research and the use of personality to predict human behavior." D. 602-2 at 49-50. The Court cannot conclude that this area is one known to the average layperson. See Gonzalez v. Conoco, Inc., No. H-98-3109, 1999 WL 1043756, at *3 (S.D. Tex. Oct. 15, 1999) (concluding that an industrial psychologist's analysis of a company's reduction in force policy and implementation of that policy as to different employees was the subject of specialized knowledge that would assist the jury); Ferretti v. Pfizer Inc., No. 11-CV-04486, 2013 WL 140088, at *19 (N.D. Cal. Jan. 10, 2013) (rejecting the argument that an industrial psychologist's expert opinion would not assist the jury because applying generally accepted human resources practices to an employee is not a matter within the knowledge of the ordinary juror or the court). As Texas Roadhouse emphasizes, "most lay people will not even have heard of the Big 5 personality

characteristics, Goldberg adjectives, or O*NET, much less have the necessary background or expertise to know how to assimilate these sources to evaluate whether 'Legendary traits' link to particular personality characteristics." D. 624 at 23-24.

The EEOC finally stresses that Dunleavy's opinions are unreliable for the additional reason that his analysis is subjective and Dunleavy makes too great an analytical leap to reach his conclusions. D. 601 at 14-20. Namely, the EEOC contends that Dunleavy's opinion is unreliable because instead of comparing the Texas Roadhouse Legendary Traits directly against the O*Net characteristics for similar FOH positions elsewhere, he indirectly links them to the O*Net traits by comparing each to the Big Five personality characteristics. Id. at 20; see D. 602-1 at 25-27; D. 602-2 at 39, 72-73. The EEOC, however, does not explain adequately why a multi-layered comparison completed by linking each set of unrelated traits to the Big Five personality characteristics is "precarious." D. 601 at 16, 20.

The EEOC relies in part on Roniger for the proposition that there is too great an analytical divide here for the proffered opinion to be reliable. Roniger v. McCall, No. 97-cv-8009-RWS, 2000 U.S. Dist. LEXIS 11999, at *9-10 (S.D.N.Y. Aug. 16, 2000). Roniger, however, is inapposite. First, the Roniger court reasoned that the expert did not explain his theory or method used to arrive at his opinion so it could not be evaluated for reliability. Id. at *9. Here, Dunleavy explained his method in both his expert report and his deposition testimony: he compared the legendary traits hiring materials against the Big 5 personality traits, separately compared the Big 5 personality traits against the O*Net worker requirements and then created a three-way chart that consolidated this information. D. 602-1 at 17-27. Second, Roniger held that the expert's mitigation testimony was unreliable because the opinion was not tailored to the job in question, Roniger, 2000 U.S. Dist. LEXIS 11999 at *10, whereas Dunleavy searched O*Net specifically to

find positions comparable to the FOH positions at Texas Roadhouse to draw his conclusions about whether the legendary traits could gage job-related traits of a potential applicant, D. 602-1 at 19-21.  Thus, the analytical gaps identified in <u>Roniger</u> are inapplicable here.

For these reasons, the Court denies the motion to strike Dunleavy's report and proffered testimony.

## VI.    Motion for Summary Judgment

Texas Roadhouse also moves for summary judgment. D. 587.  It argues that, as a matter of law based upon the undisputed material facts, the combination of statistical and anecdotal evidence proffered by the EEOC does not establish that it engaged in a pattern or practice of age discrimination.[6]  D. 588 at 8-9.

Pattern-or-practice cases, including this case, proceed in two phases:  a liability phase and a remedial phase.  <u>Mavis Disc. Tire, Inc.</u>, 129 F. Supp. 3d at 103.  To prevail on a pattern or practice disparate treatment claim in the liability phase, the EEOC must demonstrate that intentional unlawful discrimination was Texas Roadhouse's standard operating procedure or regular practice or policy.  <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 336 (1977); <u>Apsley v. Boeing Co.</u>, 691 F.3d 1184, 1194 (10th Cir. 2012) (citing <u>Thiessen v. Gen. Elec. Cap. Corp.</u>, 267 F.3d 1095, 1106 (10th Cir. 2001)).  At the liability stage, the plaintiff's burden "is to establish a *prima facie* case that such a policy existed." <u>Teamsters</u>, 431 U.S. at 330.  Random or

---

[6]  Texas Roadhouse argues that there is no statutory or case law establishing that the ADEA provides a cause of action for pattern or practice age discrimination.  D. 588 at 6 n.2.  There is, however, case law that reflects a cause of action for pattern or practice age discrimination cases. <u>See, e.g.</u>, <u>Apsley v. Boeing Co.</u>, 691 F.3d 1184, 1194 (10th Cir. 2012); <u>King v. Gen. Elec. Co.</u>, 960 F.2d 617, 624 (7th Cir. 1992); <u>E.E.O.C. v. W. Elec. Co.</u>, 713 F.2d 1011, 1016 (4th Cir. 1983); <u>E.E.O.C. v. Darden Rests., Inc.</u>, 143 F. Supp. 3d 1274, 1280 (S.D. Fla. 2015); <u>Gerlib v. R.R. Donnelley & Sons Co.</u>, No. 95-cv-7401, 2001 WL 1313794, at *12 (N.D. Ill. Oct. 26, 2001); <u>Sperling v. Hoffmann-La Roche, Inc.</u>, 924 F. Supp. 1346, 1355-56 (D.N.J. 1996).

isolated incidents of discrimination are insufficient to make out such a claim.  Id.  To meet this

burden, the EEOC must demonstrate via statistical evidence, anecdotal evidence, or a combination

of the two that the employer's policy or practice was to make employment decisions "predicated

on illegal criterion."  Segar v. Smith, 738 F.2d 1249, 1298–99 (D.C. Cir. 1984).  That is, the

plaintiff must show that the defendant treats some individuals less favorably than others *because*

*of* their protected classification.  Teamsters, 431 U.S. at 335, n. 15.  Generally, to do so in age

discrimination cases, a plaintiff relies upon circumstantial evidence (as the EEOC largely does

here), not direct evidence, of discrimination.  That is, the totality of circumstantial evidence

including statistical evidence showing disparate treatment, comments by decisionmakers which

denigrate those over forty, incidents of differential treatment and the use of younger employees

can establish the plaintiff's case.  See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991)

(internal citations omitted).  While "proof of discriminatory motive is critical . . . it can in some

situations be inferred from the mere fact of differences in treatment."  Teamsters, 431 U.S. at 335,

n. 15.

Once the EEOC has established a *prima facie* case, the burden shifts to Texas Roadhouse

to demonstrate that age-protected applicants were not denied FOH positions due to their age or

otherwise establish that the EEOC's proof is either inaccurate or insignificant.  Apsley, 691 F.3d

at 1194 (quoting Teamsters, 431 U.S. at 360) (internal citation omitted); Mavis Disc. Tire, Inc.,

129 F. Supp. 3d at 104.  It can do so by attacking the statistical evidence relied upon or otherwise

producing non-statistical evidence to show that it lacked a discriminatory intent.  Mavis Disc. Tire,

Inc., 129 F. Supp. 3d at 104 (quoting United States v. City of New York, 717 F.3d 72, 85 (2d Cir.

2013).  "Any nondiscriminatory justification offered by the company will be subject to further

evidence by the Government" that the purportedly neutral decision-making was in fact pretext for

unlawful discrimination.  FAPS, Inc., 2014 WL 4798802, at *13 (quoting Teamsters, 431 U.S. at 362 n.15).  If Texas Roadhouse fails to rebut the inference, the fact finder may determine that a violation has occurred.  Apsley, 691 F.3d at 1194.

### A.    Statistical Evidence

Texas Roadhouse argues that the EEOC's statistical evidence provides no support for a pattern or practice of age discrimination.  D. 588 at 13.   Here, the Court has declined to strike the bulk of Crawford's expert testimony regarding statistical data that the EEOC contends support its claim.  Accordingly, the Court relies upon this evidence (and Saad's proffered opinion, which the Court also declined to strike) to determine whether Texas Roadhouse has shown that, based upon a record of undisputed material facts, it is entitled to summary judgment.

"'[S]tatistical analyses have served and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue" and are "competent in proving employment discrimination." Teamsters, 431 U.S. at 339 (quoting Mayor of Philadelphia v. Educ. Equal. League, 415 U.S. 605, 620 (1974)).  Indeed, "[t]here is no presumption that statistical evidence has no useful role to play in disparate treatment employment discrimination cases," Adams, 231 F.3d at 424, and statistics are generally considered central to pattern-or-practice cases. Mavis Disc. Tires, Inc., 129 F. Supp. 3d at 103.  "[G]ross statistical disparities . . . alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."  Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-08 (1977); Mavis Disc. Tire, Inc., 129 F. Supp. 3d at103.  This is because "absent explanation, it is ordinarily expected that nondiscriminatory hiring practices will in time result in a work force more or less representative  . . . of the population in the community from which employees are hired." Hazelwood Sch. Dist., 433 U.S. at 307 (quoting Teamsters, 431 U.S. at 340, n. 20).  Normally, standard deviations greater than two or three

standard deviations provide a reasonable inference that hiring decisions were not neutral.  Id. at 309 n.14; Adams, 231 F.3d at 424.  An important caveat is that statistics are not irrefutable and the context and circumstances determine the evidentiary weight that the statistics provide.  Teamsters, 431 U.S. at 340; FAPS, Inc., 2014 WL 4798802, at *14.  "A battle of statisticians is to be expected in a pattern-or-practice case."  Mavis, 129 F. Supp. 3d at 114.

In this case, Texas Roadhouse and the EEOC present dueling statistical analysis as to whether the percentage of PAG hiring indicates that Texas Roadhouse engaged in illegal age discrimination.  For the EEOC, Crawford undertook to examine potential statistically significant shortfalls in PAG hiring at Texas Roadhouse by comparing the actual PAG hiring rates against three different benchmarks (census data, the *Snagajob* data and a random sample of the unsuccessful paper applications that Texas Roadhouse produced).  D. 586-2 ¶¶ 14-17, 20, 29, 32, 43, 49, 56.  In so doing, Crawford concluded that there were many instances of statistically significant shortfalls in PAG hiring for FOH positions that would be unlikely if the hiring process were age neutral.  For example, Crawford concluded that when comparing the census data's %PAG server positions against the actual %PAG hiring at Texas Roadhouse, 99.9% of the store-years from the census data had a larger %PAG than the %PAG of Texas Roadhouse hires and that if there had been age-neutral hiring, the likelihood of this result would be more than seven standard deviations.[7]  Id. ¶ 61(a); D. 586-4 ¶ 42; D. 622-20 at 11.  Moreover, he found that for 93.1% of the

---

[7]  In Crawford's expert rebuttal report dated June 14, 2016, Crawford indicates that he erred in calculating the standard errors of the EEO estimates in that he assumed the margins of error were equal to 1.9 times the standard error rates instead of assuming the margin of errors were 1.645.  D. 586-4 ¶ 42.  In so acknowledging, Crawford corrected his results but still found that almost all of his original results still stood.  Id.  Still, there were a few changes to his calculations based upon this correction.  Id.  In its review, the Court examined both his original amended report and his corrected calculations and cites to either the amended report or the rebuttal report calculations, or both, where appropriate.

store-years, the differences were larger than two standard deviations, which if hiring were age neutral would result in less than 1 in 781,000,000,000 times.  D. 586-4 ¶ 42, D. 622-20 at 11; <u>see also</u> D. 586-2 ¶ 61(b) (explaining his original finding of 94.1%).  Crawford's findings for the host/hostess and the bus/server assistant posts were similarly compelling.  <u>See, e.g.</u>, D. 586-2 ¶¶ 63(a)-(c), 65(a)-(c), 68(a)-(c); D. 586-4 ¶ 42; D. 622-20 at 12-14.

In addition, when Crawford examined the store-years with at least thirty FOH hires and thirty unsuccessful paper applications, he found that for 94.3% of store-years, the %PAG paper applicants for any FOH position was larger than the %PAG hires and that if hiring were age neutral, the probability of this result obtaining would be less than 1 in 781,000,000,000.  <u>Id.</u> ¶ 95(a); D. 586-4 ¶¶ 18, 42; D. 622-20 at 2, 14.  Beyond this, he found that for 26.0% of those store-years, the differences in hiring were larger than two standard deviations, an outcome that Crawford posits would result once out of more than 781,000,000,000 times if age-neutral hiring were in effect.  D. 586-2 ¶ 95(b); D. 586-4 ¶ 19, D. 622-20 at 2, 14.  When considering the electronic applications in which the store-year had at least thirty hires for all FOH positions and thirty or more *Snagajob* applications, he found that 83.5% of store-years had larger *Snagajob* %PAG applications than the %PAG hires and that 15.8% of store-years had a difference that was larger than two standard deviations; if age neutral hiring were in place, this result would be the equivalent of more than seven standard deviations.  D. 586-2 ¶ 82(a)-(b).  He found other statistically significant shortfalls in PAG hiring in other parts of his analysis using the electronic data and the unsuccessful paper application sample.  <u>See, e.g.</u>, <u>id.</u> ¶¶ 71(a)-(g), 77(a)-(b), 82(a)-(g), 85(a)-(g).  This evidence, at the very least, raises a genuine issue of material fact as to whether Texas Roadhouse had a standard operating procedure of age discrimination and raises an inference that this policy intentionally discriminated against those 40 and older.  <u>See Hazelwood Sch. Dist.</u>, 433 U.S. at 307-08

(explaining that "gross statistical disparities" can alone constitute prima facie proof of a practice of discrimination); United States v. Fairfax Cnty., Va., 629 F.2d 932, 939 (4th Cir. 1980) (explaining that proof of a statistical imbalance "is often a telltale sign of purposeful discrimination" and that "statistics can establish a prima facie case, even without a showing of specific instances of overt discrimination").

Again, relying on Dukes, Texas Roadhouse argues that it is entitled to summary judgment since the EEOC's reliance upon Crawford's use of aggregated data fails, as a matter of law, to show a pattern or practice of discrimination. Dukes does not compel this conclusion. In Dukes, plaintiffs brought a proposed class action against Wal-Mart alleging that Wal-Mart's refusal to restrict local managers' autonomy and discretion over pay and promotion and its allowance of the same disproportionately favored men and thus constituted disparate treatment by Wal-Mart. Dukes, 564 U.S. at 343-45. This is distinct from the EEOC's allegations, which contend that Texas Roadhouse had a top-down policy of hiring under 40 FOH workers instituted by its corporate structure and emphasized by its training programs. Additionally in Dukes, the Supreme Court, in concluding that Rule 23 certification was not warranted because the class of female plaintiffs subject to hiring/promotion positions decided by local supervisors had not shown commonality of their claims, concluded that the statistical analysis was insufficient to support commonality. Dukes, 564 U.S. at 356-57, 359-60. There, plaintiffs' statistical evidence was two-fold. One expert used regression analysis to compare the number of women promoted into management positions with the percentage of women in the available pool of hourly workers and concluded that the disparities could only be explained by gender and the second compared work-force data from Wal-Mart competitors and opined that Wal-Mart promotes a lower percentage of women than those competitors do. Id. at 356. In analyzing these statistics, the Court found that the nationwide

commonality necessary to satisfy Rule 23 was not met because regional and national level disparities did not establish store-by-store disparities, a critical component of the plaintiffs' commonality theory. Id. at 357. No such problem exists here with the use of Crawford's statistical analysis as the EEOC does not use it to show store-by-store disparities nor need rely upon those localized disparities but instead utilizes Crawford's analysis to demonstrate nationwide disparities that may reveal a top-down policy of encouraging discriminatory hiring. The Supreme Court also concluded that, even if the statistical evidence demonstrated that every Wal-Mart store had gender disparity in pay and promotion, plaintiffs still failed to satisfy Rule 23 commonality because merely showing that the policy of discretion has produced an overall disparity does not suffice to show disparate treatment and the entirety of the evidence revealed that class members held a number of different jobs at different level of the corporate hierarchy and that these jobs were held for differing lengths of time and subject to a number of varying regional policies. Id. The same is not true here where this litigation is confined to one set of positions at Texas Roadhouse, the statistics bear only upon those specified positions and the discrepancies in hiring therein and the non-statistical evidence raises a genuine issue of fact as to whether there was a company-wide message of discriminatory hiring. Thus, these kinds of statistics are more relevant here as a manner of proving that the top-down policy was causing disparate treatment in the hiring of PAG workers.

Texas Roadhouse also contends that Crawford's analysis should not be afforded weight because his statistical results show no common pattern of discrimination among the four FOH positions because the hiring trends fluctuate from job to job, year to year and restaurant to restaurant. D. 588 at 17. There is case law that supports the use of aggregated data to show discriminatory patterns and that highlights that requiring plaintiffs to break down the statistics to smaller and smaller components may make it difficult, if not impossible, to show statistical

significance of discrimination.  See Stagi, 391 Fed. App'x at 148 (explaining that increasing the absolute numbers in the data will help exclude chance as a cause of the disparities discovered); Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 654-56 (5th Cir. 1983) (explaining that, since case was premised on theory of system-wide pattern or practice of disparate treatment, aggregating data was a reasonable approach and parsing data out by geographic area or year was not required); Wheeler v. City of Columbus, Miss., 686 F.2d 1144, 1151 (5th Cir. 1982) (elaborating that focus on certain departments within city not discriminating did not absolve entire city because lower court needed to consider evidence as a whole across the city).

Texas Roadhouse also argues that Crawford's analysis is not indicative of a cohesive pattern of discriminatory hiring decisions because some restaurants have no statistically significant shortfall in a given year, the national maps broken down by restaurant and year show the absence of a national pattern of discrimination and store level data shows that relative rates at which restaurants hire PAG applicants varies dramatically.  D. 588 at 14-17.   The same reasoning discussed above applies with full force here; there may be some rationales behind aggregating data other than to produce a result that is favorable for the EEOC.  Moreover, some of Texas Roadhouse's arguments go to the question of how much weight Crawford's analysis merits, an issue for the jury to decide.  See FAPS, Inc., 2014 WL 4798802, at *18.

This is not to say that there is no probative value to the fluctuations in hiring rates across the years or across the specific locations of Texas Roadhouse.  This evidence helps to support Texas Roadhouse's position that no top-down policy existed.  It does not, however, preclude Crawford's data from having force and creating a genuine issue of material fact.  Moreover, Texas Roadhouse has produced other statistical evidence to rebut Crawford's findings.  Saad explained possible frailties in Crawford's calculations that include the store-by-store variations, D. 595-2 ¶¶

36-42, 120-21, and possible drawbacks to his use of external census data, id. ¶¶ 9-13, 48-49, 58-60.   For instance, Saad took Crawford's store by store analysis, computed the statistical significance of each location's shortfall in PAG hiring per liability year as compared to the census data benchmarks and mapped out whether there was a statistical significance on a store by store basis using green dots to indicate no statistical significance and white dots to identify those stores with statistically significant shortfalls.  D. 598-6 at 1, 17-21; see also id. at 7-16.  In so doing, Saad opined that on a store by store basis, more than half of the stores analyzed showed no statistically significant shortfall and that certain stores fluctuate between statistically significant shortfalls one year to no such shortfall in the next year.  Id. at 2.  Saad also formulated an alternative statistical analysis that incorporates duration dependence and ultimately concluded that there was no statistical shortfall in PAG hiring.  D. 595-2 ¶¶ 84-96, 107-08.  A jury may find Saad's analysis more persuasive than Crawford's testimony but that is a question for trial and not for summary judgment.  Here, the EEOC has established a statistical analysis, when coupled with the anecdotal evidence discussed below, raises an issue of fact as to whether Texas Roadhouse had a system-wide policy of discriminatory hiring and whether that policy was executed nationwide.

### B.  Anecdotal Evidence

The EEOC, however, does not rely upon statistical evidence alone and instead offers context for those statistics in the form of anecdotal evidence from both headquarters and store-level managers and unsuccessful applicants and evidence of its corporate-wide hiring objectives.

In pattern and practice cases, a plaintiff need not rely upon statistical evidence alone.  Palmer v. Shultz, 815 F.2d 84, 96 (D.C. Cir. 1987).  Instead, "plaintiffs may introduce any additional evidence which is probative on this issue" and "the issue for the trier of fact in determining whether the plaintiffs have established a prima facie case must be whether the totality

of plaintiffs' evidence demonstrates that, more likely than not, the disparity resulted from an unlawful discriminatory animus." Id. at 96-97 (alteration in original).  Indeed, where "the statistical disparity is insufficient alone to establish a prima facie case, the plaintiff may get over his or her initial hurdle by combining statistics with historical, individual, or circumstantial evidence." Apsley, 691 F.3d at 1202 (quoting Pitre v. W. Elec. Co., 843 F.2d 1262, 1267 (10th Cir. 1988)); Gerlib v. R.R. Donnelley & Sons Co., No. 95-cv-7401, 2001 WL 1313794, at *12 (N.D. Ill. Oct. 26, 2001).  This anecdotal evidence provides texture to the statistics and can bring "the cold numbers convincingly to life." Teamsters, 431 U.S. at 339; see FAPS, Inc., 2014 WL 4798802, at *14.

### 1.  Testimonial Evidence

Texas Roadhouse provides declarations of current employees who were hired when they were over the age of 40, declared they had not experienced discrimination on the basis of age and had not witnessed someone else be discriminated on this basis.  See, e.g., D. 597-1 at 2-3, 5-6, 7-9, 26-28, 35-36, 44-47; D. 597-2 at 4-5, 8-9, 65-66, 73-74; D. 597-5 at 2-3, 37-42.  While the EEOC emphasizes potential weaknesses in these declarations, D. 616 ¶¶ 140-41, the declarations do support Texas Roadhouse's contention that it did not discriminate on the basis of age.[8]  PAG employee declarations aside, Texas Roadhouse also points to Market Partner declarations and depositions in which they discuss their messages and materials to their subordinates to avoid age discrimination.  See D. 591-21 ¶¶ 4-9, 14-16; D. 591-32 ¶¶ 21, 23.  Beyond this, the record includes declarations from 372 Managing Partners that they have always understood that the Texas

---

[8]  The EEOC argues that these "happy camper" affidavits should be given little to no weight.  D. 615 at 24.  While the Court is aware of the potentially coercive context in which such affidavits might be given, Brown v. Nucor Corp., 785 F.3d 895, 913–14 (4th Cir. 2015), this does not equate to the Court, or a jury, according no weight to these affidavits.

Roadhouse policy is not to discriminate based upon age when making hiring decisions and that they have adhered to this policy.  D. 589 ¶ 71; D. 616 ¶ 71.  This favors Texas Roadhouse.

The record also includes testimonial evidence, however, that creates a genuine issue of material fact as to Texas Roadhouse's liability.  First, the record includes evidence from former Texas Roadhouse applicants that raise the specter of an age-based discrimination policy being executed at local store locations.  For instance, when Renae Stueland interviewed for a position at the Fayetteville, NC location, her interviewer told her that the store "would like to hire you, but we are only hiring young girls."  D. 617 ¶ 176; D. 644 ¶ 176.  Likewise, when Karen Fratianni applied for a position at the Syracuse, NY location at age 42, a female manager told her, "[m]y manager usually hires younger women, but I'm going to show him your application."  D. 617 ¶ 176; D. 644 ¶ 176.  Fratianni stated that this second manager, Doug, who interviewed her seemed cold and distant and she noticed that the FOH employees at the store location appeared to be in their twenties.  D. 617 ¶ 176; D. 644 ¶ 176.  When Desirea Brisbon applied for a position to the Mathews, NC store she was told, "you're not really the type of person we were looking for.  We were looking for somebody younger."  D. 618-36 at 15-16; D. 617 ¶ 176; D. 644 ¶ 176.  Delores Silva, an applicant at the Methuen, MA location, was hired before finishing the written application because she was told she fit the Texas Roadhouse image.  D. 618-69 at 7-8; D. 617 ¶ 176; D. 644 ¶ 176.  Then, after disclosing her age, the manager told her that if he had known her age at the time, he would not have hired her.  D. 618-69 at 13; D. 617 ¶ 176; D. 644 ¶ 176.   When Thomas Hicks applied to be a food server to the Fort Smith, AR location, the male manager repeatedly asked Hicks if he could keep up with the pace of the younger employees.  D. 617 ¶ 176; D. 644 ¶ 176.  When Hicks interviewed with the female manager of the same store location, she also asked him whether he would be able to keep up with the younger employees and be able to dance.  D.

617 ¶ 176; D. 644 ¶ 176.  Similarly, when Tiffany Wisman applied for a FOH position at the Brookville, FL location at age 44, the manager questioned whether the young, high-spirited and upbeat environment would be too much for her to handle and whether she would have issues working for younger management.  D. 617 ¶ 176; D. 644 ¶ 176.  While Wisman—who had had almost twenty years of experience—never heard back from management, another applicant that Wisman met who appeared to be in her twenties and had no bartending experience was hired as a bartender.  D. 617 ¶ 176; D. 644 ¶ 176.

Kyla Lentz's testimony is also telling:  she states that she was 59 years old when she applied and the manager asked Lentz during her interview if she would have a problem taking orders from younger bosses.  D. 617 ¶ 176; D. 644 ¶ 176.  When she followed up on her application a few days later, she was told that there were no positions available at that time.  D. 617 ¶ 176; D. 644 ¶ 176.  Tammy Leonard's testimony buttresses this point.  Leonard was 50 years old when she applied to the Christianburg, VA location.  D. 617 ¶ 176; D. 644 ¶ 176.  During her interview, she was told that most of the people who worked at the restaurant were young and college-aged and the interviewer asked Leonard if she thought she would fit in and be able to work with them.  D. 617 ¶ 176; D. 644 ¶ 176.  Mary Carol Pritt faced a similar line of questioning from a manager when she applied to the Canton, OH location at age 56.  D. 617 ¶ 176; D. 644 ¶ 176.  In Waukeska, WI, Janette Schneck applied to the Texas Roadhouse at age 47, the manager asked her if she could keep up with the staff at this location who were between the ages of 18 and 25 years old and the manager eventually told her that they had found someone more suitable for the position.   D. 617 ¶ 176; D. 644 ¶ 176.  Other similar application anecdotes exist in the record.  See D. 617 ¶ 176; D. 644 ¶ 176.

Testimony by some former employees of Texas Roadhouse corroborate the applicant

testimonies.  Kathryn Osborne, a former employee of Asheville, NC training center, testified that

she believed the Legendary Look to be attractive, mostly female, younger and fit, D. 617 ¶ 170,

176; D. 644 ¶ 170, 176, and that she derived this opinion from both looking around the stores and

from statements made in front of her by Market Partner Greg Beckel and other male managers

from other stores.  D. 618-62 at 11-12; D. 617 ¶ 1; D. 644 ¶ 1.

Allyson McCauley Fore testified that, with respect to hiring, "we were told to have more

females that were, you know, within the age range that we were looking for" by Market Partner

Greg Beckel.  D. 618-46 at 11-12.  She further explained "it was understood by anyone who was

doing interviews – well, anyone that could come into the restaurant, it was understood what ages

were ideal for each position.  You know, hostesses were in the 16 to 20ish range . . . and then the

servers, . . . older people didn't really fit the bill for that because they couldn't keep up, most cases.

And so the ideal age range for that was always, you know, the 18 to 24 range."  Id. at 18-19.[9]  In

the Mesa, AZ location, former service manager Sherry Olges explained that her manager told her

that he wanted to hire "young, good-looking, sharp . . . young adults" for their hires and explained

that there were times that she recommended hiring applicants older than college age who had

experience and personality yet her Managing Partner rejected them.  D. 618-61 at 4-14; D. 617 ¶¶

175-176; D. 644 ¶¶ 175-176.   Finally, in the Methuen, MA location, a former employee stated

that she witnessed a 42 year old individual hand in an application for a position and the application

was "thrown directly in the trash, not even looked over."  D. 618-69 at 21-22, 26.   This evidence,

while anecdotal, adds context to the statistical analysis showing a disparity in the hiring of 40+

---

[9]  Ms. Fore also testified that even though the company had target age ranges for front-of-house
employees, her Managing Partner Chuck Conklin "was really, really good about if somebody was
qualified, you know, he wasn't against breaking that rule" because "[h]e was really flexible."  D.
618-46 at 4, 17.

FOH applicants and demonstrates a possible discriminatory intent in FOH hiring executed at individual locations. That is, this evidence raises a genuine issue of material fact as to whether a top-down policy of discrimination existed and whether it was executed at the store level.

Texas Roadhouse first argues that this testimonial evidence is quantitatively insufficient because at best, the anecdotes show only that discrimination may have occurred 35 times out of hundreds of thousands of times. D. 588 at 22-23. For support, Texas Roadhouse relies upon E.E.O.C. v. McDonnell Douglas Corp., 191 F.3d 948, 952 (8th Cir. 1999). This case is inapposite. There, the Eighth Circuit concluded the statistical evidence of age discrimination in the reduction in force plan to be insignificant, the anecdotal evidence to be probative that the company's plan was motivated not by age, but by permissible factors, such as salary, seniority, or retirement eligibility and that the remaining anecdotes demonstrated isolated discriminatory acts. Id. at 952-53. Here, when viewed in the light most favorable to the EEOC, the statistical evidence is probative of a nationwide shortfall in PAG hiring and the anecdotal evidence supports a company-wide pattern of disfavoring hiring older FOH employees. Texas Roadhouse also cites to Apsley for support but, again, that case is dissimilar from the instant one. In Apsley, the Tenth Circuit "acknowledge[d] that the comments [from lower management] suggest some discrimination may have occurred" but decided no genuine issue of material fact existed because those comments did not complement a statistical showing of age discrimination in the company restructuring plan. Apsley, 691 F.3d at 1203-04. Again, here, Crawford's analysis provides a statistical backdrop for which the anecdotal discriminatory comments and experiences "br[ing] the cold numbers convincingly to life." Teamsters, 431 U.S. at 339.

Texas Roadhouse also contends that the anecdotes are qualitatively insufficient because the testimonial evidence does not support a pattern or practice of discrimination as the testimony

provides no common thread between the different restaurant locations.  D. 588 at 23.  This evidence, however, when taken in conjunction with the non-testimonial evidence of hiring objectives discussed below and Crawford's statistical evidence, does raise the possible inference of a common thread between the store locations in that the record includes possibly discriminatory communications between executives at Texas Roadhouse, written materials and training programs that contain possible discriminatory messaging in the hiring practices expected at Texas Roadhouse and statistically significant shortfalls in expected PAG hiring.  Sperling v. Hoffmann-La Roche, Inc., 924 F. Supp. 1346 (D.N.J. 1996) does not undermine this conclusion.  The Sperling court concluded there was no pattern or practice claim because the policy at issue involved a one-time reduction-in-force plan that had no indication of future use by the company and also provided complete discretion to managers to make termination decisions without any inferences or allegations by the plaintiffs that the company's standard operating procedure was one of intentional discrimination.  Id. at 1363-64.  Neither is true here:  the allegations and the EEOC's proffered evidence record are not centered on a "one shot" plan and the EEOC relies upon a theory that Texas Roadhouse executives trained and encouraged a pattern of age-based discrimination, not merely allowed hiring discretion to its managing partners.

Finally, Texas Roadhouse argues that anecdotes show that the inference of a standard operating procedure of discrimination is not reasonable.  D. 588 at 24.  At least 2,780 PAG workers were hired for FOH positions during the liability period.  D. 589 ¶ 104; D. 616 ¶ 104.  Texas Roadhouse highlights this fact alongside the numerous employee declarations of near-PAG or PAG FOH employees filed on behalf of Texas Roadhouse attesting that they did not experience or witness discrimination in hiring and Managing Partner testimony declaring that they were not told to reject applicants based upon age.  D. 588 at 24.  While this evidence carries some weight in

favor of Texas Roadhouse and may demonstrate the lack of execution of a discriminatory policy at the store level, it does not foreclose the Court's conclusion that a genuine issue of material fact remains here.

### 2.  Other Anecdotal Evidence

The factual record also contains anecdotal evidence that supports statistical and testimonial evidence that Texas Roadhouse may have created an age discriminatory hiring policy that was implemented at the store level.   Putting aside the "sticky notes" comments by store-level employees unidentified by the EEOC,[10] there are numerous communications between Texas Roadhouse employees, managers and high-level executives that raise an inference of purposeful age discrimination.  For example, when Mark Simpson was searching for photos to show age and race diversity in the FOH positions, Doug Thompson responded to his email by stating "Have you noticed the snow on Petty's dome?  Take a pic of that and say we don't hire us some Mature folk . . . ."  D. 620-17.  Simpson's response was simply "[f]unny."[11]  Id.

EEOC points to other examples as well.   In an e-mail that Ortiz forwarded to several individuals, Joel Nuzzolillo described to Ortiz that "a host is generally a young person."  D. 619-40 at 3-4.  In a different e-mail from Brian North to Matt Cornett, which was then forwarded to Ortiz, North attached a picture of five young employees as an example of what "legendary" looks

---

[10]  Texas Roadhouse argues that these notes are inadmissible hearsay.  D. 588 at 21.  It is not clear that these notes would be excluded at trial on this ground since they are not being offered for the truth of the matter asserted therein but instead as evidence of Texas Roadhouse's intent or motive.  Cf. Kassel v. Gannett Co., 875 F.2d 935, 945 (1st Cir. 1989).  Given the lack of evidence about the author of these notes, however, there are at least Fed. R. Evid. 403 concerns and so, in an abundance of caution, the Court has not relied upon them here in resolving this motion for summary judgment.

[11]  The Court disagrees with Texas Roadhouse's contention that such evidence would be inadmissible at trial D. 620-17; D. 618-25 at 45-46.

like.  D. 619-33 at 3-4.[12]  Michael Halpern also explained that a picture of a young-looking set of line-dancing employees represented the "image" of Texas Roadhouse.  D. 619-8 at 3; D. 618-11 at 35-36.  Furthermore, upon reading an article about the pending litigation, former employee Traci Payne confronted the Director of Care and Concern Dee Shaughnessy who said, "Did we do it?  Of course we did it.  All you have to do is walk in the front door of our restaurants and see what people look like" and later stated that Texas Roadhouse liked to hire pretty, young girls because it was the look and type Texas Roadhouse wanted to convey.[13]  D. 617 ¶¶ 1, 168; D. 644 ¶¶ 1, 168; D. 625-29 ¶¶ 4-5.  Shaughnessy testified that she does not deny Payne's contention that Shaughnessy did not deny allegations of age discrimination, although she also testified that she has no memory of what she said to Payne during the conversation.  D. 617 ¶ 169; D. 644 ¶ 169.  The foregoing illustrates that a genuine issue of material fact exists as to whether Texas Roadhouse had a policy of age discriminatory FOH hiring and whether that policy was carried out in its various restaurant locations.

### C.  Evidence of Corporate-wide Hiring Objectives

In addition to anecdotal evidence from both the headquarters and local stores, the EEOC offers evidence of headquarter guidance about hiring that, as it alleges, reflects age bias.  These communications and written materials highlighted by the EEOC also show that a question of fact

---

[12]  The Court disagrees with Texas Roadhouse's assessment that this would be inadmissible at trial. D. 619-33; D. 603-10 at 124-125.

[13]  Texas Roadhouse disputes that Shaughnessy's statements constitute a binding admission and argues that these statements are otherwise inadmissible.  Hr'g Tr. at 15-17.  They appear, at a minimum, the admissions of a party opponent under Fed. R. Evid. 801(d)(2).  See McLaughlin v. Nat'l Grid USA, No. 07-cv-40118-FDS, 2010 WL 1379814, at *13, *13 n. 22 (D. Mass. Mar. 31, 2010) (declining to strike statements from an affidavit that detailed a supervisor's previous discriminatory statements because these comments constituted party-opponent statements attributable to the company).

remains in this case as to whether Texas Roadhouse purposefully implemented a hiring policy that reflected age-based animus.  For instance, one e-mail stated that the attached sheet was used to validate a new manager-in-training's understanding of the Texas Roadhouse image.  D. 619-34 at 3-4.  That sheet contained eleven pictures of employees, most of whom appeared young; two individuals, one a gray-mustached man is labeled as "a Grandpa" and one woman is labeled as "a Grandma."[14]  Id.  Moreover, the cover sheet for at least some paper applications to work at Texas Roadhouse contains a picture of five individuals aged 23 to 29 as an example of Texas Roadhouse employees.  D. 591-10 ¶ 17; D. 591-33 at 3; D. 617 ¶ 106; D. 644 ¶ 106.  The Texas Roadhouse Examiner—a compilation of best practices from Managing Partners that is edited by the People Department and distributed to all managers as a reference tool—also, at some point, contained an article discussing the hiring and development of hosts titled "TRH Clones 'Perfect Host'" which featured multiple, repeating images of the same young-looking, attractive blonde woman.  D. 617 ¶¶ 88, 90; D. 644 ¶¶ 88, 90; D. 618-3 at 23-26; D. 619-1 at 4.

Furthermore, a Texas Roadhouse Legendary Learning program PowerPoint presentation on hiring included an image of young-looking individuals and stated this is "what Legendary looks like."  D. 618-14 at 39; 619-9 at 5, 7; D. 617 ¶ 95; D. 644 ¶ 95.  In addition, a "Hiring Legendary People" PowerPoint presentation created by Texas Roadhouse began with a lettuce analogy in which managers were taught that just as the restaurant has a policy to return brown or moldy lettuce in exchange for green, crisp and fresh produce, the restaurant should implement that same type of

---

[14]  The EEOC states that this picture shows images of employees and describes one as grandpa and one as grandma and that Ortiz stated that he could not tell whether he said anything to Steve Miller about the use of those terms, D. 617 ¶ 143, while Texas Roadhouse points to Miller's testimony that he used this sheet solely as a means of teaching anti-discrimination policy obligations, D. 644 ¶ 143.  This dispute is for the jury.

policy to its hiring practices.[15]  D. 618-9 at 7-9; D. 618-14 at 29-32; D. 619-9 at 3-4.  The totality

of this circumstantial evidence, in conjunction with the statistical and testimonial evidence, raises

a question of fact as to whether Texas Roadhouse did indeed have a policy of age discrimination.

Texas Roadhouse argues first that this circumstantial evidence is speculative and

unreasonable and relies upon stray remarks.  D. 588 at 19-20.  Texas Roadhouse's argument,

however, appears to be focused on examining each piece of evidence in a vacuum.  Id.  This is not

the EEOC's burden.   Instead, the Court evaluates whether the claim can survive summary

judgment by examining the totality of the circumstances to determine whether there is a question

of fact as to whether Texas Roadhouse had a top-down or company-wide discriminatory policy in

its FOH hiring.  See Segar v. Smith, 738 F.2d 1249, 1298–99 (D.C. Cir. 1984).  Moreover, "there

must come a point  . . . when there are enough remarks, all along the same lines, that they can no

longer be considered 'stray' and analyzed in isolation, when they plainly offer a window into the

way the decisionmaker or decisionmakers think."  Diaz v. Jiten Hotel Mgmt., Inc., 762 F. Supp.

2d 319, 336–37 (D. Mass. 2011).  To the extent that inferences must be drawn to support the

EEOC's case and the Court must view the record on summary judgment "in the light most

favorable to the nonmovant," Noonan, 556 F.3d at 25, this string of communication further

supports the EEOC's theory of the case.

Texas Roadhouse additionally contends that many of the remarks and evidence relied upon

by the EEOC are not evidence of discrimination of PAG applicants because they merely praise the

youthful.  D. 588 at 20.  For support, Texas Roadhouse relies upon Mesnick, 950 F.2d at 826.  That

---

[15]  Again, Texas Roadhouse and the EEOC disagree on the import of this analogy.   Texas
Roadhouse indicates that the green lettuce analogy was a method for teaching managers to identify
qualities they believe make successful employees.  D. 644 ¶ 97.  The EEOC relies upon this
evidence for its theory that Texas Roadhouse's hiring for image equates to hiring young.  D. 615
at 11.  Again, this is an issue to be weighed and resolved by the jury.

case is inapposite for two reasons. First, the outcome in that case was premised upon the fact that the plaintiff only presented two pieces of evidence of discriminatory remarks unlike the EEOC's extensive record here. Id. at 826. Second, in stating that "[w]ords of praise for youth . . . do not, by themselves, indicate a bias against more mature workers," the court elaborated that "there may be situations in which to laud the young is impliedly to deprecate the old," id., which, when examining the evidence in the light most favorable to the EEOC, is at least arguably the case here.

This is not to suggest that Texas Roadhouse has not identified anecdotal evidence to rebut the EEOC's theory of age discrimination. For instance, Texas Roadhouse highlights some of the weaknesses of the anecdotal evidence that the EEOC relies upon. One example of this is that the EEOC draws an inference of discriminatory messaging from a picture embedded within a hiring presentation in which the employees all appear young, yet this photo may not have been included for that purpose as it was a picture of Training Champion finalists who were examples of hard working employees. D. 605-3 at 148-49; D. 605-15 at 113-14. Similarly, when Market Partner Michael Halpern explained why he thought the photo of the line-dancing team exemplified the Texas Roadhouse image, he testified that their big smiles and energy looked like it could be part of the company's image. D. 605-7 at 177-78. In addition, other anecdotal evidence in the record supports Texas Roadhouse, such as an e-mail message sent from Nicole Green to Managing Partner Dave Hess in which she told him that she did not want him to provide her with candidates' ages because the age of the individual does not matter if they can do the job. D. 618-8 at 11-12.

Moreover, the EEOC agrees that Texas Roadhouse provides some training to managers concerning the laws prohibiting age discrimination, D. 589 ¶ 35; D. 616 ¶ 35. For instance, the evidence suggests that at least the Legendary Learning course included a three to five hour session on teaching equal employment opportunity policies and another session on interviewing which

touched upon equal employment opportunity issues a second time.  D. 591-32 ¶¶ 18-21; D. 604-1 at 102-03, 113-14; D. 604-3 at 26-27, 213; D. 605-3 at 35-36.  The session includes an overview of the EEOC, the laws administered by the EEOC and prohibited discrimination including training not to discriminate on the basis of age or any other protected classification.  D. 591-32 ¶¶ 18-21; D. 604-1 at 102-03, 113-14; D. 605-3 at 35-36.  Also, Texas Roadhouse has published written non-discrimination policies in various documents made available to employees, D. 589 ¶¶ 13, 23-24; D. 616 ¶¶ 13, 23-24; D. 591-32 at 154-55, provided employees with documents that flag that interview questions that ferret out an applicant's age are illegal, D. 589 ¶ 50; D. 616 ¶ 50, and gave employees anti-discrimination training, D. 589 ¶¶ 35, 45; D. 616 ¶¶ 35, 45.  In addition, Texas Roadhouse's  template applications and some of its job postings include a statement that Texas Roadhouse is an equal employment opportunity employer, D. 589 ¶ 31, 33-34; D. 616 ¶ 31, 33-34, and its paper applications did not include a field for an applicant to provide his or her date of birth, D. 589 ¶ 32; D. 616 ¶ 32.

This evidence against the EEOC's proffered evidence, however, confirms that there is an issue of fact and thus summary judgment should not be granted.  See FAPS, Inc., 2014 WL 4798802, at *22.  Considering the aforementioned statistical evidence, anecdotal evidence from headquarters and local stores and headquarter guidance on hiring objectives, even acknowledging that the weight of this evidence is hotly contested by Texas Roadhouse, the EEOC has raised a genuine issue of material fact as to its pattern or practice claim.

## VII.    Conclusion

For the foregoing reasons, the Court DENIES as moot EEOC's motion to strike excessive pages, D. 610, DENIES EEOC's motion to strike expert report and proposed testimony of Dr. Eric Dunleavy, D. 600, DENIES EEOC's motion to strike portions of the expert report and proffered

testimony of Dr. Ali Saad, D. 593, ALLOWS in part and DENIES in part Texas Roadhouse's

motion to strike the reports and testimony of Dr. David L. Crawford, D. 584, and DENIES Texas

Roadhouse's motion for summary judgment, D. 587.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge